# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

SYNQOR, INC.

                       Plaintiff,

     v.

ARTESYN TECHNOLOGIES, INC.,
ASTEC AMERICA, INC.,
BEL FUSE INC.,
CHEROKEE INTERNATIONAL CORP.,
DELTA ELECTRONICS, INC.,
DELTA PRODUCTS CORP.,
LINEAGE POWER CORP.,
MURATA ELECTRONICS NORTH AMERICA,
INC.,
MURATA MANUFACTURING CO., LTD.,
MURATA POWER SOLUTIONS INC.
POWER-ONE, INC.

                 Defendants.

Civil Action No. 2:07-CV-497-TJW-CE

**JURY TRIAL DEMANDED**

## SYNQOR, INC.'s MOTION TO STRIKE
## BEL FUSE'S INEQUITABLE CONDUCT DEFENSE

> **NOTE TO COURT RE: COMPANION MOTIONS**:  This motion is one of three companion motions filed at the same time seeking to strike/dismiss the inequitable conduct allegations of Bel Fuse, Lineage/Cherokee and the Fish defendants.  The motions interrelate to each other to avoid repetition.  This motion addresses Bel Fuse.  SynQor respectfully requests that the Court review this motion first, then the Lineage/Cherokee motion, and finally the Fish defendants motion.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

STATEMENT OF FACTS AS TO BEL FUSE ALLEGATIONS ................................. 5

ARGUMENT ................................................................................................................. 9

I.     LEGAL STANDARD FOR PLEADING INEQUITABLE CONDUCT ................................. 9

II.    LEGAL STANDARDS FOR STRIKING DEFENSES AND DISMISSING COUNTERCLAIMS ............ 10

III.   BEL FUSE'S AMENDED ANSWER FAILS TO ALLEGE SUFFICIENT FACTS TO SUPPORT FINDING THAT THE STATEMENTS ABOUT MWEENE WERE FALSE *OR* THAT DR. SCHLECHT KNEW ABOUT THE INFORMATION/ARTICLE THAT ALLEGEDLY RENDER THE STATEMENTS FALSE ................................................................................ 11

     A.    Facts Alleged Do Not Support Finding that the Statements About Mweene Were False ............................................................................................ 11

          1.    "Well Known in the Art" ........................................................... 12

          2.    Gutmann Article ........................................................................ 13

     B.    Facts Alleged Do Not Support Finding That Dr. Schlecht Knew About the Information/Article That Allegedly Render the Statements False ........................ 14

          1.    Gutmann Article ........................................................................ 14

          2.    "Well Known in the Art" ........................................................... 15

CONCLUSION ........................................................................................................... 15

# TABLE OF AUTHORITIES

## CASES

*Burlington Indus., Inc. v. Dayco Corp.*
  849 F.2d 1418 (Fed. Cir. 1988) ........................................................................... 9

*Chiron Corp. v. Abbott Labs.*
  156 F.R.D. 219 (N.D. Cal. 1994) ......................................................................... 9

*Exergen Corp. v. Wal-Mart Stores, Inc.*
  575 F.3d 1312 (Fed. Cir. 2009) ............................................... 1, 9, 10, 14, 15

*FMC Corp. v. Mani-towoc Co.*
  835 F.2d 1411 (Fed. Cir. 1987) ......................................................................... 14

*Kane Enters. v. MacGregor (USA) Inc.*
  322 F.3d 371 (5th Cir. 2003) ............................................................................... 6

*Katrina Canal Breaches Litig.*
  495 F.3d 191 (5th Cir. 2007) ............................................................................... 6

*Lannett Co. v. KV Pharmas.*
  2008 WL 4974579 (D.Del. Nov. 21, 2008) ....................................................... 10

*Novo Nordisk Pharma., Inc. v. Bio-Tech. Gen. Corp.*
  424 F.3d 1347 (Fed. Cir. 2005) ......................................................................... 12

*Techsys Chassis, Inc. v. Sullair Corp.*
  No. 4:08-cv-203, 2009 WL 1766105 (E.D. Tex. June 23, 2009) ....................... 6

*T-Netix, Inc. v. Global Tel*Link Corp.*
  2003 WL 25782759 (E.D. Tex. Aug. 15, 2003) ................................................ 12

*Unique Indus., Inc. v. Alberta Ltd.*
  --- F. Supp.2d ---, 2009 WL 2185555 (D.D.C. 2009) ....................................... 10

*Westerngeco v. Ion Geophysical Corp.*
  2009 WL 3497123 (S.D. Tex. Oct. 28, 2009) ................................................... 10

## RULES

Fed. R. Civ. P. 12 ................................................................................................. 10

Fed. R. Civ. P. 9 ................................................................................................... 9

## INTRODUCTION

Proving the old adage that no good deed goes unpunished, some (but not all) of the defendants amended their answers, at the November 2 deadline, to allege inequitable conduct against SynQor based principally on the theory that Dr. Martin F. Schlecht, the inventor of the patents-in-suit,[1] misled the Patent Office when, instead of simply citing all of his and his students' prior work to the patent office *en masse*, he took the time to point the examiner to specific portions of the work, briefly summarized potentially relevant content, listed specific pages containing that content, and then presented his arguments for why his inventions were patentable over that prior work.  To make their allegations, the defendants ignore what Dr. Schlecht actually said to the Patent Office, instead setting up a straw man they attack as false (because what Dr. Schlecht actually said is true).  Their allegations are insufficient to meet the Rule 9 standard for pleading inequitable conduct with particularity under the Federal Circuit's recently emphasized standard in *Exergen Corp. v. Wal-Mart Stores, Inc.*  SynQor thus respectfully requests that the allegations in the affirmative answers be stricken and the defendants' DJ counterclaims seeking declarations of unenforceability be dismissed.

Certain of the defendants alleging inequitable conduct (the same ones that the Court just ordered to provide end product information: Lineage and the Fish defendants) also added a hodge-podge of additional theories and allegations against Dr. Schlecht that Bel Fuse, the other defendant alleging inequitable conduct, did not even see fit to make.  Those theories and allegations are also meritless, fail to meet the *Exergen* standard and, SynQor respectfully suggests, should be stricken and dismissed as well.

---

[1] Dr. Schlecht is the lone inventor on four of the five patents-in-suit, and one of two co-inventors on the fifth patent-in-suit.  Dr. Schlecht is also the founder and CEO of plaintiff SynQor, a company with millions of dollars in annual sales of various power converter products.

Because the defendants alleging inequitable conduct submitted three different sets of amended answers, each set raising a different selection of allegations, SynQor is filing three different motions to strike/dismiss, inclusive of this one.  This motion specifically addresses the Bel Fuse amended answer, after first including a brief summary of (1) all the amended answers, (2) how they differ, and (3) which of the defendants filed (or did not file) amended answers containing each set of allegations.

## BACKGROUND

1.      The eleven defendants in this case are represented by four law firms.

2.      Artesyn Tech., Inc. ("Artesyn") and Astec America, Inc. ("Astec") are represented by one law firm, Bel Fuse, Inc. ("Bel Fuse") is represented by another firm, Lineage Power Corp. ("Lineage") and Cherokee Int'l Corp. (Cherokee") (both collectively "Lineage/Cherokee") are represented by a third firm, and the remaining defendants, Delta Electronics, Inc. and Delta Products Corp., Murata Mfg. Co. Ltd., Murata Electronics North America, Inc. and Murata Power Solutions, Inc., and Power-One, Inc. ("Power-One") are represented by a fourth firm, Fish & Richardson P.C. (collectively "the Fish defendants").

3.      On October 20 and 21, defendants took the depositions of Dr. Schlecht (as SynQor's 30(b)(6) designee for the defendants' notice seeking testimony allegedly relevant to inequitable conduct) and James Smith, the prosecuting attorney of the patents-in-suit.

4.      November 2 was the deadline to amend pleadings.  (Dkt No. 128 at 3.)

5.      Artesyn and Astec have not amended their answers to allege inequitable conduct.

6.      On November 2, Bel Fuse, Lineage/Cherokee and the Fish defendants all amended their answers to allege inequitable conduct.

7.      Bel Fuse's amended answer asserts <u>one</u> inequitable conduct theory.  (Dkt No. 321 at ¶¶ 187-97.)

8.      Lineage/Cherokee's amended answer and counterclaims assert <u>five</u> inequitable conduct theories, inclusive of the one asserted by Bel Fuse.  (Dkt No. 322 at ¶¶ 179-252.)

9.      The Fish defendants' amended answers and counterclaims assert <u>eight</u> inequitable conduct theories, inclusive of the five asserted by Lineage/Cherokee.  (Dkt No. 327 at ¶¶27-202.)

10.     The eight inequitable conduct theories can be divided into four groups.

11.     <u>Group 1</u>:  The first group includes three inequitable conduct theories, all centered around statements Dr. Schlecht made regarding two references authored by Loveday Haachitaba Mweene that Dr. Schlecht submitted to the Patent Office.  Mr. Mweene was a student of Dr. Schlecht when Dr. Schlecht was a professor at MIT.  The three theories are:

> a) Dr. Schlecht's statements distinguishing his inventions from the Mweene references were false.  (Dkt No. 321 at ¶¶ 187-97; Dkt No. 322 at ¶¶ 179-212; Dkt No. 327 at ¶¶ 27-107.)

> b) Dr. Schlecht should have disclosed an article by Ronald J. Gutmann that allegedly contradicts Dr. Schlecht's statements distinguishing the Mweene references.  (Dkt No. 322 at ¶¶ 213-17; Dkt No. 327 at ¶¶ 108-15.)

> c) Dr. Schlecht should have disclosed two deposition transcripts that allegedly contradict his statements distinguishing the Mweene references.  (Dkt No. 322 at ¶¶ 218-28; Dkt No. 327 at ¶¶ 116-34.)

12.     The group 1(a) theory is the <u>only</u> theory Bel Fuse asserts.  Both Lineage/Cherokee and the Fish defendants assert that theory, and add the 1(b) and 1(c) theories.  *Compare supra* Dkt No. 321 (Bel Fuse), 322 (Lineage/Cherokee), and 327 (Power-One).

13.     <u>Group 2</u>:  The second group includes only one inequitable conduct theory; namely that Dr. Schlecht misled the patent office when he added a few words and a figure to the specification of one of the patents-in-suit during its prosecution and, after telling the examiner exactly what he added, asserted that those additions did not constitute "new matter" within the

3

meaning of 35 U.S.C. Section 112.  (Dkt No. 322 at ¶¶ 229-38; Dkt No. 327 at ¶¶ 186-202.)

14.    Both Lineage/Cherokee and the Fish defendants assert the group 2 theory.

*Compare supra* citations for Dkt No. 322 (Lineage/Cherokee) and 327 (Power-One).

15.    Group 3:  The third group includes two inequitable conduct theories, both

centered around a limitation found only in the newly-issued patents-in-suit requiring that the

claimed transformer "not be driven into saturation."  The two theories are:

> a) Although it is commonly known in the art that most transformers in DC-DC
> converters do not saturate, Dr. Schlecht should have reminded the examiner of
> that fact.  (Dkt No. 322 at ¶¶ 239-52; Dkt No. 327 at ¶¶ 164-80.)

> b) Dr. Schlecht should have disclosed one of his textbooks that says that "in most
> applications saturation is avoided."  (Dkt No. 327 at ¶¶ 181-85.)

16.    Both Lineage/Cherokee and the Fish defendants assert the 3(a) theory, but only

the Fish defendants assert the 3(b) theory.  *Compare supra* citations for Dkt No. 322

(Lineage/Cherokee) and 327 (Power-One).

17.    Group 4:  The fourth group includes two inequitable conduct theories, both

centered around statements Dr. Schlecht made regarding three references by Leo Casey that were

submitted to the Patent Office.  Leo Casey was another student of Dr. Schlecht when Dr.

Schlecht was a professor at MIT.  The two theories are:

> a) Dr. Schlecht's statements summarizing the potentially relevant portions of the
> Casey references and pointing to those portions were false.  (Dkt No. 327 at ¶¶
> 135-57.)

> b) Dr. Schlecht should have disclosed an article he wrote that allegedly
> contradicts his statements regarding the Casey references.  (Dkt No. 327 at ¶¶
> 158-63.)

18.    Only the Fish defendants assert the two group 4 theories.

19.    The remainder of this motion focuses on Bel Fuse's version of the group 1(a)

theory, the only theory Bel Fuse purports to assert in its amended answer, and explains why the

defenses based thereon should be stricken.  SynQor is filing concurrently herewith two additional motions to strike/dismiss, one directed at the Lineage/Cherokee set of purported theories and the other directed at the Fish defendants' set of purported theories.

### STATEMENT OF FACTS AS TO BEL FUSE ALLEGATIONS

20.      As alleged by Bel Fuse, during prosecution of the first patent-in-suit to issue, U.S. Patent No. 7,072,190 ("the '190 Patent"), Dr. Schlecht worked with his attorney, James Smith, to bring two references by Mr. Mweene to the attention of the patent examiner.  (Dkt No. 321 at ¶ 188;  *id.* at ¶ 192 ("After describing the new claims, Schlecht directed the Examiner's attention to the Mweene Article and the Mweene Thesis.").)  Those two references are: L. Haachitaba Mweene, et al., *A High Efficiency 1.5 kW, 390-50 V Half-Bridge Converter Operated at 100% Duty-Ratio*, IEEE, 1992, pp. 723-30 ("Mweene Article"); and Loveday Haachitaba Mweene, *The Design of Front-End DC-DC Converters of Distributed Power Supply Systems with Improved Efficiency and Stability*, Thesis, Massachusetts Institute of Technology, Sept. 1992, pp. 1-184 ("Mweene Thesis") (collectively, the "Mweene References").  (*Id.* at ¶ 188.)  According to Bel Fuse, in bringing these references to the attention of the examiner, Dr. Schlecht mischaracterized what they disclose.  (*Id.* at ¶¶ 193-94.)

21.      The focus of Bel Fuse's  allegations is on Figure 1 of the Mweene article, reproduced below, which allegedly "depicts an isolation stage whose output is connected in parallel to plural point-of-load converters:"



5

(*Id.* at ¶ 189; *see also id.* at ¶ 190 (similar disclosure in Mweene thesis).)

22.    The characteristics of the depicted "point-of-load converters," or, more precisely, what one of ordinary skill in the art would understand the characteristics to be, is the key point of contention for purposes of this motion.

23.    Bel Fuse, however, omits certain key aspects of the disclosures of the Mweene references from its allegations.[2]  In addition to specifically being identified as of 1992 (the date of the Mweene references) as "point of load" converters that receive 50 volts at their input and provide 5 volts, 15 volts or -15 volts at their outputs, the Mweene references disclose that the "point-of-load" converters about which Dr. Schlecht made his statements (1) are part of a 1,500 watt system utilizing an AC/DC front-end to supply power to the "point-of-load" converters, (2) are located on individual boards in high-end telecommunications/computing equipment that is susceptible to noise, and (3) provide power to electronic circuitry on those boards.  (Exh. 1 at 18-20, 142 (Mweene thesis); Exh. 2 at 723 (Mweene article).)

24.    As Bel Fuse alleges, James Smith submitted an IDS disclosing the Mweene references on March 29, 2004.  (Dkt No. 321 at ¶ 188.)

---

[2] Bel Fuse cites to and incorporates portions of various references and portions of the prosecution history of the patents-in-suit in its amended answers.  The Court should consider the full references and prosecution histories at issue, including the Mweene references and the statements about the Mweene references, because they are referred to in the amended answers and are central to the defendants' inequitable conduct claims and defenses.  *See Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) ("But because the defendants attached the contracts to their motions to dismiss, the contracts were referred to in the complaints, and the contracts are central to the plaintiffs' claims, we may consider the terms of the contracts in assessing the motions to dismiss") (citation omitted); *see also Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003) (stating that "the court may review the documents attached to the motion to dismiss, e.g., the contracts in issue here, where the complaint refers to the documents and they are central to the plaintiff's claim") (citation omitted); *Techsys Chassis, Inc. v. Sullair Corp.*, No. 4:08-cv-203, 2009 WL 1766105, at *3 (E.D. Tex. June 23, 2009) (stating that "[a] district court may consider documents attached to a motion to dismiss if the documents are referred to in the plaintiff's complaint and are central to the plaintiff's claims").

25.     Bel Fuse only partially quotes the substance of a later amendment containing Dr. Schlecht's statements distinguishing the Mweene references in its allegations.  (Dkt No. 321 at ¶¶ 192-3.)  The full text reads:[3]

> The examiner's attention is directed to the previously cited Mweene et al. paper "A High Efficiency 1.5kW, 390-50 V Half-Bridge Converter Operated at 100% Duty-Ratio" and the Mweene thesis.  As shown in Figure 1 of the Mweene paper, an isolation stage provided step down from 390V to 50V without regulation.  The 50V was then stepped down in plural point of load converters to various output voltages.  The point of load converters were not the subject of Mr. Mweene's work.  However, given the high voltage level at their inputs, each would necessarily have included isolation.  By contrast, the present invention is primarily directed to a converter system that receives an input on the order of the 50 volt level of Mweene.  Rather than directly converting from the 50 volts to the required voltage in an isolation and regulating stage as in Mweene, the present invention first down converters though [sic] an isolating stage without regulation to a voltage that does not require isolation and then converters that voltage to the required voltage without further isolation.

(Exh. 3 at 8.)

26.     Bel Fuse alleges that Dr. Schlecht was wrong in asserting above that the point-of-load converters in Mweene "would necessarily have included isolation" and that Dr. Schlecht knew that his statement was false.  In support of its contention, Bel Fuse makes two and only two factual allegations.[4]

27.     Bel Fuse first alleges:

> "As was well known in the art, a point-of-load converter with an input in the range of 50V does not have to include isolation."[5] (Dkt No. 321 at ¶ 194.)

28.     Second, Bel Fuse alleges that "Ronald J. Gutmann, *Application of RF Circuit Design Principles to Distribute Power Converters*, IEEE Transactions on Industrial

---

[3] *See supra* note 2 and cases cited therein.

[4] In fact, the statement is not false, and nothing herein should be taken as SynQor agreeing with any of the allegations in Bel Fuse's or the other defendants' amended answers.

[5] This is more properly considered a conclusory allegation without specific factual allegations supporting it, such as citations to references allegedly demonstrating what was well-known.  But, for sake of argument, SynQor will assume it is not fatally flawed as an unsupported conclusory allegation.

ELECTRONICS AND CONTROL INSTRUMENTATION, Vol. IECI -27, No. 3, August 1980 ("Gutmann

Article"), unequivocally states that isolation is not required in a 48-V to 5-V distributed power

converter:"

> III. DESIGN FOR 25-W, 48-V TO 5-V DISTRIBUTED
> POWER CONVERTER
>
> In this investigation into high frequency dc-to-dc converters,
> a 25-W, 48-V to 5-V design objective was specified. The
> approach was taken as follows:
>
> 1) emphasize overall conversion efficiency as the key
> design goal, selecting RF circuit approaches most likely
> to achieve high efficiency;
> 2) use available RF designs, as much as possible, to realize
> the components of a dc-to-dc converter (sine wave in-
> verter, single frequency transformer, rectifier with sine
> wave input);
> 3) load and line regulation and control circuit method-
> ologies should be considered, but without expending
> effort in design implementations;
> 4) dc isolation would not be required, but the design
> should be amenable to including this feature if necessary;
> 5) input and output filtering requirements would not ex-
> plicitly be considered, but the ripple amplitudes would
> be delineated.

(*Id.* at ¶ 194 (red circles in Bel Fuse amended answer).)

29.     And Bel Fuse further alleges as to the Gutmann article:

> On information and belief, Schlecht was well aware of this. For example,
> Schlecht is a named inventor of U.S. Patent No. 4,788,634 ("'634 patent"), which
> issued on November 29, 1988, over eight years before the provisional patent
> application to which the '190 patent claims priority. The '634 patent provides
> that "point-of-load converters should have a power handling density of at least 50
> watts/in3 in order to make [] a distributive power system viable," and asserts that
> in order to achieve such power handling density, the switching frequency of the
> point-of-load converter must be in the 5-10 MHz range. ('634 patent, at col. 1,
> lines 15-32.) The '634 patent then states that "[t]he switching of a power circuit
> in the 10 MHz range is disclosed by … [the Gutmann Article] …." As discussed
> above, the Gutmann article clearly discloses that a point-of-load converter with a
> relatively high input voltage does not need to be isolated.

(*Id.* at ¶ 195.)

30.     Bel Fuse makes no further factual allegations supporting an inference that Dr. Schlecht either knew that it "was well known in the art" that "a point-of-load converter with an input in the range of 50V does not have to include isolation" or knew of the Gutmann article. Nor does Bel Fuse make any further factual allegation to support its conclusory assertion that Dr. Schlecht considered such to be material to the patentability of his inventions and/or to contradict his statements to the Patent Office regarding the Mweene references.

## ARGUMENT

### I.     LEGAL STANDARD FOR PLEADING INEQUITABLE CONDUCT

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Inequitable conduct requires proving that (1) an individual associated with the filing and prosecution of a patent application made an affirmative misrepresentation of a material fact, failed to disclose material information, or submitted false material information; and (2) the individual did so with a specific intent to deceive the PTO. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 fn.3 (Fed. Cir. 2009) (citations omitted). "'[I]nequitable conduct, while a broader concept than fraud, must be pled with particularity' under Rule 9(b)." *Id.* at 1326 (citation omitted). "Whether inequitable conduct has been pleaded with particularity under Rule 9(b) is a question governed by Federal Circuit law." *Id.* at 1318 (citation omitted).

The Rule 9(b) standard serves to deter unfounded allegations of fraud and the like that call the opposing party's truth and veracity into question. *See, e.g., Chiron Corp. v. Abbott Labs.*, 156 F.R.D. 219, 220 (N.D. Cal. 1994). As the Federal Circuit has explained: "[T]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague." *Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988).

For these reasons, Rule 9(b) requires that "the pleading must identify the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Exergen*, 575 F.3d at 1328. In addition, as the Federal Circuit emphasized in its recent *Exergen* decision:

> although 'knowledge' and 'intent' may be averred generally, a pleading of inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO."

*Id*. at 1328-29 (citations omitted). As explained below, that standard has not been satisfied here.

## II.    LEGAL STANDARDS FOR STRIKING DEFENSES AND DISMISSING COUNTERCLAIMS

Whether a pleading satisfies Rule 9(b)'s particularity standard is decided in the context of the applicable Rule 12 standards. Rule 12(f) provides that "upon motion made by a party before responding to a pleading ... the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). "A motion to strike under Rule 12(f) eliminates insufficient defenses and saves the time and expense of litigating issues that ultimately would not affect the outcome of the case." *Lannett Co. v. KV Pharmas.*, 2008 WL 4974579, at *2 (D.Del. Nov. 21, 2008) (granting motion to strike inequitable conduct allegations). "The decision to grant or deny a motion to strike is vested in the trial judge's sound discretion." *Unique Indus., Inc. v. Alberta Ltd.*, --- F. Supp.2d ---, 2009 WL 2185555, at *2 (D.D.C. 2009) (granting motion to strike inequitable conduct allegations). "In deciding [a] Rule 12(f) motion, all of [the non-movant's] well-pleaded allegations must be accepted as true." *Lannett*, 2008 WL 4974579, at *2. The same standards apply to a Rule 12(b)(6) motion to dismiss an inequitable conduct DJ counterclaim. *See, e.g.*, *Westerngeco v. Ion Geophysical Corp.*, 2009 WL 3497123, at *2 (S.D. Tex. Oct. 28, 2009).

III.    **BEL FUSE'S AMENDED ANSWER FAILS TO ALLEGE SUFFICIENT FACTS TO SUPPORT FINDING THAT THE STATEMENTS ABOUT MWEENE WERE FALSE *OR* THAT DR. SCHLECHT KNEW ABOUT THE INFORMATION/ARTICLE THAT ALLEGEDLY RENDER THE STATEMENTS FALSE**

The facts Bel Fuse allege, even if accepted as true for purposes of deciding this motion, fail to show that Dr. Schlecht's actual statements regarding the Mweene references were false, much less that they were believed by Dr. Schlecht to be false.  In fact, Bel Fuse fails even to allege facts sufficient to show that Dr. Schlecht was aware of the information and/or article upon which Bel Fuse relies.

A.    <u>Facts Alleged Do Not Support Finding that the Statements About Mweene Were False</u>

Bel Fuse's amended answer (and the Lineage/Cherokee and Fish defendants' amended answers) wrench a single sentence fragment from its context within the prosecution history of the '190 patent in an attempt to weave an expansive inequitable conduct theory.  The full paragraph of the remarks regarding the Mweene references from the June 13, 2005 Amendment that the defendants attribute to Dr. Schlecht is quoted above.  *See supra* Statement of Facts at ¶ 25.  The remarks regarding the Mweene references specifically and unequivocally relate to the system described in the Mweene references and the converters described therein as "point-of-load converters."  The June 13 Amendment simply did not, as Bel Fuse and the other defendants that pled inequitable conduct allege, tell the Patent Office that all 50 volt input converters of any type in existence at the time of the Mweene references were isolated.  Rather, the June 13 Amendment merely stated that the point-of-load converters in Mweene's specific disclosed system necessarily included isolation.

Notwithstanding this, Bel Fuse (and Lineage/Cherokee and the Fish defendants) recasts the remarks from the June 13 Amendment as stating that isolation is required in <u>all</u> DC/DC converters accepting an input of roughly 50 volts and generating an output of roughly 5 volts,

regardless of converter type and regardless of the power system in which it is to be employed (i.e., the specific system of Mweene).  (Dkt No. 321 at ¶ 194 ("As was well known in the art, a point-of-load converter with an input in the range of 50V does not have to include isolation.").)  In this way, Bel Fuse twists the remarks from the June 13 Amendment to set up a "straw man" argument which it alleges is inaccurate. [6]

### 1.     "Well Known in the Art"

Bel Fuse's conclusory allegation that it "was well known in the art" that "a point-of-load converter with an input in the range of 50V does not have to include isolation" simply misses the mark.  (Dkt No. 321 at ¶ 194.)  Even if true, it does not contradict the June 13 Amendment.  That Amendment, far from stating that all point of load converters with a 50 volt input include isolation, merely states that the specific point of load converters disclosed in the context of the Mweene system necessarily include isolation.  (Exh. 3 at 8.)

Moreover, Bel Fuse did not allege what "was well known in the art" in 1992, i.e., at the time of the publication of the Mweene references.  (Dkt No. 321 at ¶ 194.)  Rather, Bel Fuse only alleged what it claims "was well known in the art" at some unspecified time.  (Id.)  What matters is what "was well known in the art" at the time the Mweene references were published – because that was the time and context in which the statements were made.  See Novo Nordisk Pharma., Inc. v. Bio-Tech. Gen. Corp., 424 F.3d 1347, 1356 (Fed. Cir. 2005) (concluding disclosure of prior art reference is enabling because it disclosed "techniques that would have been understood by one of ordinary skill in the art at the time of its publication"); T-Netix, Inc. v. Global Tel*Link Corp., 2003 WL 25782759, at *2 (E.D. Tex. Aug. 15, 2003) ("a technical term used in a patent is

---

[6] Dr. Schlecht explained at length at his deposition why the point-of-load converters in the specific systems disclosed in the Mweene references would necessarily include isolation, but, because Bel Fuse does not cite to his deposition to support its allegations (unlike Lineage/Cherokee and the Fish defendants, who do), SynQor will only address Dr. Schlecht's deposition testimony in relation to the Lineage/Cherokee and Fish defendants' amended answers.

interpreted as having the meaning a person of ordinary skill in the field of the invention would give such term in the relevant art at the time the application maturing into the subject patent was filed").

### 2.    Gutmann Article

Bel Fuse fails to allege facts sufficient to support its assertion that the Gutmann article, and its disclosure of an "investigation[al]" "approach" to designing a theoretical 5 megaHertz, 25 watt distributed power converter with a 48 volt input and 5 volt output, contradicts Dr. Schlecht's statements regarding the Mweene references and the specific system and point-of-load converters disclosed therein.  As with what is allegedly "well known in the art," the allegations miss the mark.

To start with, the Gutmann Article never uses the words "point-of-load converters."[7] (Exh. 4 at 156-64.)  Bel Fuse's allegations seek to imply it did by conflating the Gutmann article with the '634 patent – a patent that was disclosed to the Patent Office.  (Dkt No. 321 at ¶ 195.)  But only the '634 patent refers to "point-of-load converters."  (Exh. 5 at 1:5-20.)  Moreover, the full statement in Gutmann upon which Bel Fuse focuses is one of five assumptions the author made when designing an investigational 5 megaHertz, 25 watt, 48 volt-to-5 volt converter and reads: "dc isolation would not be required, but the design should be amenable to including this feature if necessary."  (Exh. 4, at 157 (emphasis added).)  Whether Gutmann assumed during initial design that his investigational converter may not need isolation is irrelevant to what one of skill would understand the actual point-of-load converters in the specific Mweene systems to be.  Indeed, reinforcing that point, immediately after the portion quoted by Bel Fuse, Gutmann states "that much additional design work is needed to obtain an operational power converter."  (*Id.*)

---

[7] *See supra* note 2 and cases cited therein.

At most, Gutmann stands for the proposition that not all converters with up to a 48 volt input need to be isolated.  That, however, says nothing about whether the <u>point-of-load</u> converters used in the context of the Mweene system necessarily include isolation.  The converters in Mweene about which Dr. Schlecht made his statements (1) are called "point-of-load" converters, (2) have <u>50 volt</u> inputs and 5, 15 or -15 volts outputs as part of a 1,500 watt system, (3) are located on individual boards in high-end telecommunications/computing equipment that is susceptible to noise, and (4) provide power to electronic circuitry.  (Exh. 1 at 18-20, 142 (Mweene thesis); Exh. 2 at 723 (Mweene article).)  Gutmann says nothing about those specific point-of-load converters and whether they are necessarily isolated.

### B.    Facts Alleged Do Not Support Finding That Dr. Schlecht Knew About the Information/Article That Allegedly Render the Statements False

#### 1.    Gutmann Article

Bel Fuse also fails to allege facts sufficient to support its assertion that the Gutmann article and its disclosure related to the referenced 48-V to 5-V distributed power converter were known to Dr. Schlecht.  Bel Fuse alleges that Dr. Schlecht knew about the Gutmann article because it was cited in the '634 patent listing Dr. Schlecht as a co-inventor, but the '634 patent issued <u>almost 17 years</u> before the June 13, 2005 Amendment was submitted to the Patent Office. (Dkt No. 321 at ¶ 195.)

As the Federal Circuit noted in *Exergen,* "[a] reference may be many pages long, and its various teachings may be relevant to different applications for different reasons.  Thus, one cannot assume that an individual, who generally knew that a reference existed, also knew of the specific material information contained in that reference." *Exergen*, 575 F.3d at 1330 (citing *FMC Corp. v. Mani-towoc Co.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987)).  The Federal Circuit therefore went on to hold: "[t]he mere fact that an applicant disclosed a reference during

14

prosecution of one application, but did not disclose it during prosecution of a related application, is insufficient to meet the threshold level of deceptive intent required to support an allegation of inequitable conduct." *Exergen*, 575 F.3d at 1331.  So too here.  Not only does Bel Fuse neglect to allege that the Gutmann article discusses converters called "point-of-load converters" (because it does not), but Bel Fuse fails to allege facts sufficient to show that Dr. Schlecht had the Gutmann article in mind 17 years after the article was mentioned in the '634 patent.

### 2.    "Well Known in the Art"

While Bel Fuse conclusorily alleges, without identifying a single supporting reference, that it "was well known in the art" that "a point-of-load converter with an input in the range of 50V does not have to include isolation," (Dkt No. 321 at ¶ 194), Bel Fuse does <u>not</u> allege that Dr. Schlecht knew that allegedly "well-known" information.  It is what Dr. Schlecht and anyone else substantively involved in the prosecution of the patents-in-suit knew that matters for purposes of inequitable conduct allegations.  Bel Fuse's conclusory allegation, unsupported by specific facts as to what is generally "well-known," is insufficient to impute that knowledge to Dr. Schlecht. *Exergen*, 575 F.3d at 1327 (stating that "[a]lthough 'knowledge' and 'intent' may be averred generally, our precedent, like that of several regional circuits, requires that the pleadings allege *sufficient underlying facts* from which a court may reasonably infer that a party acted with the requisite state of mind" (emphasis added)).

### CONCLUSION

For the foregoing reasons, SynQor respectfully requests that the Court strike Bel Fuse's inequitable conduct defense, Defense No. 9 from Bel Fuse's First Amended Answer, Dkt No. 321.

Dated:    November 16, 2009

_/s/ Thomas D. Rein_

**Thomas D. Rein** (_admitted pro hac vice_)
Lead Attorney
trein@sidley.com
**Russell E. Cass** (_admitted pro hac vice_)
rcass@sidley.com
**Sidley Austin llp**
One South Dearborn
Chicago, IL   60603
Telephone:    312.853.7000
Facsimile:    312.853.7036


**Michael D. Hatcher**
Texas State Bar No. 24027067
mhatcher@sidley.com
**David T. DeZern**
Texas State Bar No. 24059677
ddezern@sidley.com
**Sidley Austin llp**
717 North Harwood, Suite 3400
Dallas, TX   75201
Telephone:    214.981.3300
Facsimile:    214.981.3400


**_Attorneys for Plaintiff SynQor, Inc._**

## <u>CERTIFICATE OF CONFERENCE</u>

I hereby certify that the parties met and conferred with respect to this motion as required by Local Rule CV-7(h) but were unable to reach agreement. Counsel for SynQor were Thomas Rein and Michael Hatcher.

Counsel for SynQor and counsel for Defendant Bel Fuse discussed this motion by teleconference at 2:00 P.M. Central Time on November 13, 2009. Bel Fuse was represented by Steven Williams. SynQor explained its position that the factual allegations of the amended answer failed to allege facts sufficient to meet the Rule 9 pleading standard articulated, for instance, in the Federal Circuit's *Exergen Corp. v. Wal-Mart Stores, Inc.* case. Bel Fuse explained that it disagreed.

Also present during the teleconference, Artesyn and Astec were represented by Jeff Andrews, Cherokee and Lineage were represented by Mark Flagel, Dale Chang and Diane Devasto, and Delta, Murata/MPS and Power-One were represented by Alan Smith, Steven Katz, Kevin Su and Glenn Thames.

Because SynQor seeks to strike the inequitable conduct allegations in Bel Fuse's amended answer and Bel Fuse refuses to withdraw those allegations, the discussions with Bel Fuse have conclusively ended in an impasse, leaving an open issue for the court to resolve. Therefore, this motion is opposed.

*/s/ Thomas D. Rein*
Thomas D. Rein

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who are deemed to have consented to electronic

service are being served with a copy of this document via the Court's CM/ECF system pursuant to

Local Rule CV-5(a)(3) on November 16, 2009.


<u>*/s/ Michael D. Hatcher*</u>
Michael D. Hatcher