## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

SYNQOR, INC.

                Plaintiff,

    v.

ARTESYN TECHNOLOGIES, INC.,
ASTEC AMERICA, INC.,
BEL FUSE INC.,
CHEROKEE INTERNATIONAL CORP.,
DELTA ELECTRONICS, INC.,
DELTA PRODUCTS CORP.,
LINEAGE POWER CORP.,
MURATA ELECTRONICS NORTH AMERICA,
INC.,
MURATA MANUFACTURING CO., LTD.,
MURATA POWER SOLUTIONS INC.
POWER-ONE, INC.

                Defendants.

Civil Action No. 2:07-CV-497-TJW-CE

**JURY TRIAL DEMANDED**

### SYNQOR, INC.'s MOTION TO STRIKE LINEAGE/CHEROKEE'S INEQUITABLE CONDUCT DEFENSES, AND MOTION TO DISMISS LINEAGE/CHEROKEE'S INEQUITABLE CONDUCT COUNTERCLAIMS

**NOTE TO COURT RE: COMPANION MOTIONS**:  This motion is one of three companion motions filed at the same time seeking to strike/dismiss the inequitable conduct allegations of Bel Fuse, Lineage/Cherokee and the Fish defendants.  The motions interrelate to each other to avoid repetition.  This motion addresses Lineage/Cherokee.  SynQor respectfully requests that the Court review the Bel Fuse motion first, then this motion, and finally the Fish defendants motion.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 1

STATEMENT OF FACTS AS TO LINEAGE/CHEROKEE ALLEGATIONS ......................... 2

    I.       THEORY 1(A): STATEMENTS REGARDING MWEENE REFERENCES ........................... 2

    II.      THEORY 1(B): NON-DISCLOSURE OF THE GUTMANN ARTICLE ............................... 4

    III.    THEORY 1(C): NON-DISCLOSURE OF THE BOSCHERT AND SMALL
               DEPOSITIONS .............................................................................................. 5

    IV.    THEORY 2: STATEMENTS REGARDING "NEW MATTER" ......................................... 6

    V.      THEORY 3(A): FAILURE TO REMIND EXAMINER THAT TRANSFORMER
               USUALLY DOES NOT SATURATE ..................................................................... 7

    VI.    OTHER THEORIES ....................................................................................... 7

ARGUMENT ...................................................................................................................... 7

    I.       APPLICABLE LEGAL STANDARDS ................................................................... 7

    II.      LINEAGE/CHEROKEE'S AMENDED ANSWER FAILS TO ALLEGE SUFFICIENT
               FACTS TO SUPPORT ANY OF THEIR THEORIES REGARDING THE STATEMENTS
               DISTINGUISHING THE MWEENE REFERENCES ................................................. 8

          A.    Lineage/Cherokee's Amended Answer Fails to Allege Sufficient
                  Facts to Support Finding that the Statements About Mweene Were
                  False *or* That Dr. Schlecht Knew About the Information/Article
                  That Allegedly Render the Statements False ............................................. 8

                  1.    Lineage/Cherokee's Allegations Regarding the State of the
                         Art in 2005 (or 1999) Are Irrelevant .............................................. 8

                  2.    Lineage/Cherokee's Allegation Regarding What Is Possible
                           Misses the Mark ......................................................................... 10

                  3.    Lineage/Cherokee's Remaining Allegations Are
                           Insufficient to Support Its Inequitable Conduct Theory .............. 10

          B.    Lineage/Cherokee's Theory 1(B), That Dr. Schlecht Did Not
                    Disclose the Gutmann Article, Fails For Lack of Proof That Dr.
                    Schlecht Was Aware of the Gutmann Article ......................................... 11

          C.    Lineage/Cherokee's Theory 1(C), That Dr. Schlecht Did Not
                      Disclose the Boschert/Small Depositions, Fails Because, At Best,
                    the Depositions Were Cumulative ........................................................... 12

    III.    LINEAGE/CHEROKEE'S THEORY 2, THAT DR. SCHLECHT/MR. SMITH'S NEW
               MATTER STATEMENT WAS FALSE, IS FATALLY FLAWED ................................... 13

IV.     LINEAGE/CHEROKEE'S THEORY 3(A), THAT DR. SCHLECHT FAILED TO
        REMIND THE EXAMINER OF TRANSFORMER SATURATION, FAILS BECAUSE,
        AT BEST, THE INFORMATION WAS CUMULATIVE.................................................... 14

CONCLUSION.......................................................................................................................... 15

# TABLE OF AUTHORITIES

## CASES

*Akzo N.V. v. U.S. ITC*
    808 F.2d 1471 (Fed. Cir. 1986) ........................................................................ 14

*Beckman Instru., Inc. v. LKB Produkter AB*
    5 USPQ2d 1462 (D.Md. 1987) .......................................................................... 14

*Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*
    474 F. Supp. 2d 1148 (E.D. Cal. 2007) ............................................................ 15

*Ethyl Molded Prods. Co. v. Betts Package, Inc.*
    9 USPQ2d 1001 (E.D. Ky 1988) ...................................................................... 14

*Exergen Corp. v. Wal-Mart Stores, Inc.*
    575 F.3d 1312 (Fed. Cir. 2009) ..................................................................... 1, 2

*In re Omerprazole Patent Litigation*
    258 F. Supp.2d 221 (S.D. N.Y. 2001) ............................................................. 15

*Liposome Co. v. Vestar, Inc.*
    36 USPQ2d 1295 (D.Del. 1994) ....................................................................... 13

*Northern Telecom, Inc. v. Datapoint Corp.*
    908 F.2d 931 (Fed. Cir. 1990) .......................................................................... 14

*Novo Nordisk Pharma., Inc. v. Bio-Tech. Gen. Corp.*
    424 F.3d 1347 (Fed. Cir. 2005) .......................................................................... 9

*Rothman v. Target Corp.*
    556 F.3d 1310 (Fed. Cir. 2009) ........................................................................ 12

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*
    537 F.3d 1357 (Fed. Cir. 2008) ........................................................................ 12

*T-Netix, Inc. v. Global Tel*Link Corp.*
    2003 WL 25782759, at *2 (E.D. Tex. Aug. 15, 2003) ...................................... 9

## RULES

Fed. R. Civ. P. 12 .................................................................................................... 8

Fed. R. Civ. P. 9 ...................................................................................................... 8

## INTRODUCTION

Lineage/Cherokee assert the same inequitable conduct theory as Bel Fuse: that Dr. Schlecht's statements distinguishing the Mweene references were false, relying on the same two underlying factual assertions as support for finding that the statements were false and that Dr. Schlecht knew they were false.  However, Lineage/Cherokee also allege a collection of nine other underlying facts as support for that theory, and allege four completely different theories that do not appear in Bel Fuse's amended answer.  Lineage/Cherokee's additional allegations/theories add little more than length to Bel Fuse's amended answer.  The allegations are insufficient to meet the Rule 9 heightened standard for pleading inequitable conduct delineated in *Exergen Corp. v. Wal-Mart Stores, Inc.,* and SynQor respectfully requests that they, like the Bel Fuse allegations, be stricken and the counterclaims based thereon be dismissed.

As previously noted in SynQor's companion motion to strike as to Bel Fuse, because the defendants that did allege inequitable conduct submitted three sets of amended answers, each set raising a different selection of allegations, SynQor is filing three different motions to strike/dismiss, inclusive of this one.  This motion specifically addresses the Lineage/Cherokee amended answer.  It builds on SynQor's motion to strike/dismiss Bel Fuse's amended answer, and so SynQor respectfully requests that the Court review that motion first.

## BACKGROUND

1.      Lineage/Cherokee's amended answer and counterclaims assert <u>five</u> inequitable conduct theories, inclusive of the one asserted by Bel Fuse.  (Dkt No. 322 at ¶¶ 179-252.)

2.      Lineage/Cherokee assert all three of the group 1 theories summarized in the Background section of SynQor's motion to strike/dismiss as to Bel Fuse, the single group 2 theory and one of the two group 3 theories.  *See* Dkt No. 334 at 3-4.  Apparently, Lineage/ Cherokee hope asserting many theories will serve to disguise the deficiencies of each.

## STATEMENT OF FACTS
## AS TO LINEAGE/CHEROKEE ALLEGATIONS

**I.     THEORY 1(A): STATEMENTS REGARDING MWEENE REFERENCES**

3.     Lineage/Cherokee make the same allegations regarding Dr. Schlecht's statements distinguishing the Mweene references that Bel Fuse made in its amended answer.  *Compare* Dkt No. 322 at ¶¶ 179-212 (Lineage/Cherokee), *with* Dkt No. 321 at ¶¶ 187-97 (Bel Fuse).

4.     As with the Bel Fuse allegations, the characteristics of the depicted "point-of-load converters" in the Mweene references, or, more precisely, what one of ordinary skill in the art would understand the characteristics to be, is the key point of contention.

5.     As with Bel Fuse, Lineage/Cherokee omit certain key aspects of the disclosures of the Mweene references from their allegations.[1]  In addition to specifically being identified as of 1992 (the date of the Mweene references) as "point-of-load" converters that receive 50 volts at their input and provide 5 volts, 15 volts or -15 volts at their outputs, the Mweene references disclose that the "point-of-load" converters about which Dr. Schlecht made his statements (1) are part of a 1,500 watt system utilizing an AC/DC front-end to supply power to the "point-of-load" converters, (2) are located on individual boards in high-end telecommunications/computing equipment that is susceptible to noise, and (3) provide power to electronic circuitry on those boards.  (Exh. 1 at 18-20, 142 (Mweene thesis); Exh. 2 at 723 (Mweene article).)

6.     Lineage/Cherokee, again, like Bel Fuse, only partially quote the substance of the amendment containing Dr. Schlecht's statements distinguishing the Mweene references in their

---

[1] Lineage/Cherokee cite to and incorporate portions of various references, the prosecution history of the patents-in-suit and deposition transcripts in their amended answers.  The Court should consider the full references, prosecutions histories and depositions at issue, including the Mweene references, the statements about the Mweene references and Dr. Schlecht's deposition testimony, because they are referred to in the amended answers and are central to the defendants' inequitable conduct defenses.  *See* cases cited Dkt No. 334 at 6 n.2.

allegations.  (Dkt No. 322 at ¶¶ 192-93.)  The full text reads:

> The examiner's attention is directed to the previously cited Mweene et al. paper "A High Efficiency 1.5kW, 390-50 V Half-Bridge Converter Operated at 100% Duty-Ratio" and the Mweene thesis.  As shown in Figure 1 of the Mweene paper, an isolation stage provided step down from 390V to 50V without regulation.  The 50V was then stepped down in plural point of load converters to various output voltages.  The point of load converters were not the subject of Mr. Mweene's work.  However, given the high voltage level at their inputs, each would necessarily have included isolation.  By contrast, the present invention is primarily directed to a converter system that receives an input on the order of the 50 volt level of Mweene.  Rather than directly converting from the 50 volts to the required voltage in an isolation and regulating stage as in Mweene, the present invention first down converters though [sic] an isolating stage without regulation to a voltage that does not require isolation and then converters that voltage to the required voltage without further isolation.

(Exh. 3 at 8).[2]

7.     In addition to the same two factual allegations Bel Fuse makes to support drawing an inference that a portion of this passage was false <u>and</u> Dr. Schlecht knew the statement was false, Lineage/Cherokee make nine additional factual allegations.  (Dkt No. 322 at ¶¶ 198-210.)

8.     Five of Lineage/Cherokee's additional factual allegations deal with the state of the art well after the 1992 publication dates of the Mweene references.  Lineage/Cherokee allege:

> - that, in 2005, certain UL standards did not require isolation for 50 volt input converters  (Dkt No. 322 at ¶¶ 198-200)
>
> - that, in 2005, SynQor sold certain non-isolated converters (no allegation is made regarding the input voltage)  (*Id.* at ¶ 201)
>
> - that, in 2005, STMicroelectronics sold certain non-isolated switching regulators that could accept 50 volt inputs (*Id.* at ¶ 201)
>
> - that, in 2005, it was commonly understood that point-of-load converters would typically be non-isolated (no input voltage allegation is made) (*Id.* at ¶ 204)
>
> - that, in 1999, Dr. Schlecht asked a potential customer whether the customer needed an isolated or non-isolated power supply when that customer asked for a converter with a 75 volt input and 5 volt output (*Id.* at ¶ 203)

---

[2] *See supra* note 1 and cases cited therein.

9.      The remaining four of Lineage/Cherokee's additional factual allegations are:

- that, before the Mweene references were published, Boschert, Inc. sold what it called a 3T regulator with a 50 volt input that was non-isolated (no allegation is made that Dr. Schlecht knew of the 3T in 2005, i.e., before the defendants disclosed it in their invalidity contentions in this case)  (*Id.* at ¶202)

- that, since the Mweene references were published, it has been possible to build non-isolated point-of-load converters with a 50 volt input (*Id.* at ¶ 204)

- that Dr. Schlecht and Mr. Smith did not verify the accuracy of the statements about the Mweene references by checking any textbooks (no allegation is made that any textbooks actually contradict the statements) (*Id.* at ¶ 209)

- that Dr. Schlecht did not check with Mr. Mweene (Dr. Schlecht's former student)  to verify that the point-of-load converters discussed in the Mweene references were, in fact, isolated (*Id.* 322 at ¶ 209)

10.     While Lineage/Cherokee cite to Dr. Schlecht's deposition in their amended answers, (Dkt No. 322 at ¶¶ 198, 207, 209-10), they neglect to mention that they asked Dr. Schlecht why he believed his statements distinguishing the Mweene references were true, and that Dr. Schlecht explained in detail why the statements were (and are), in fact, true.  For example, Dr. Schlecht explained that the converters were "called point-of-load converters, which was a term at that time and also later in '97, 1997, indicat[ing] isolated converters."[3]  (Exh. 6 at 10:23-14:3.)  He further explained why the technical requirements of the Mweene system, such as ground noise issues, the size and  purpose of the Mweene system and that the Mweene system was a 1,500 watts system, dictate that the point-of-load converters would necessarily be isolated . (Exh. 6 at 38:16-40:1; 131:14-134:5; 149:18-153:5.)

## II.     THEORY 1(B):  NON-DISCLOSURE OF THE GUTMANN ARTICLE

11.     In addition to alleging that the Gutmann article proves that Dr. Schlecht's statements distinguishing the Mweene references were false, Lineage/Cherokee also allege Dr. Schlecht should have disclosed the Gutmann article to the Patent Office.  (Dkt No. 322 at ¶ 213.)

---

[3] *See supra* note 1 and cases cited therein.

12.     This is an inequitable conduct theory that Bel Fuse did <u>not</u> assert.  And, of course, it is not asserted by Artesyn or Astec, who do not allege inequitable conduct at all.

13.     Lineage/Cherokee make no additional specific factual assertions to support this theory.  They simply rely on the allegations they (and Bel Fuse) made regarding whether the Gutmann article contradicts Dr. Schlecht's statements distinguishing the Mweene references and whether Dr. Schlecht knew of the alleged materiality of the Gutmann article.  Hence, Lineage/ Cherokee's only basis for alleging that Dr. Schlecht knew of the Gutmann article <u>and</u> its alleged materiality is that the Gutmann article is cited in the '634 patent, <u>a patent that issued in 1988</u>, upon which Dr. Schlecht is a named co-inventor.  (*Id.* at ¶¶ 213-17; *see also id.* at ¶¶ 195-96.)

## III.     THEORY 1(C):  NON-DISCLOSURE OF THE BOSCHERT AND SMALL DEPOSITIONS

14.     In addition to alleging that Dr. Schlecht's statements distinguishing the Mweene references were false, Lineage/Cherokee also allege that Dr. Schlecht should have disclosed two depositions to the Patent Office that were recently taken in this case after the issue fee for the two newly-issued patents-in-suit had been paid, but before official issuance.  (*Id.* at ¶¶ 218-28.)

15.     This is another inequitable conduct theory that Bel Fuse did <u>not</u> assert.  And, of course, it is not asserted by Artesyn or Astec, who do not allege inequitable conduct at all.

16.     As Lineage/Cherokee allege, on June 2, 2009, the defendants took the depositions of Mr. Boschert and Mr. Small, two people associated with Boschert, Inc. in the late 1980's and/or early 1990's.  (*Id.* at ¶¶ 222-23.)

17.     Lineage/Cherokee allege Mr. Boschert called the 3T regulator a "point-of-load regulator," and Mr. Boschert and Mr. Small said the 3T was not isolated.  (*Id.* at ¶¶ 222-23.)

18.     However, Mr. Boschert did <u>not</u>, as Lineage/Cherokee allege,[4] testify that the 3T

---

[4] *See supra* note 1 and cases cited therein.

regulators were referred to as "point-of-load regulators."  He testified that he <u>did not remember</u> if the term "POL" was used when the 3Ts were developed.  (Exh. 7 at 18:22-19-3.)

19.     Lineage/Cherokee allege that, after the issue fees for the two new patents-in-suit were paid, but before they issued, Dr. Schlecht and Mr. Smith reviewed and did not disclose the transcripts for the Boschert and Small depositions to the Patent Office.  (Dkt No. 322 at ¶ 225.)

20.     Yet, Lineage/Cherokee also concede in their allegations, (*id.* at ¶¶ 220-21), that Dr. Schlecht and Mr. Smith previously disclosed to the Patent Office during prosecution of the two newly-issued patents-in-suit: (a) catalogs discussing the 3T regulators that contained their specifications (which defendants included in their invalidity contentions for the three original patents-in-suit); and, (b) defendants' invalidity contentions for the three original patents-in-suit.

21.     The defendants' invalidity contentions for the Boschert products, including the 3T regulator, that Dr. Schlecht disclosed to the Patent Office and appear on the face of the two newly-issued patents-in-suit, specifically identify the 3T regulators as non-isolated:

> The means for providing plural regulated outputs without further isolation, from the isolated output includes at least the 3T regulators in Boschert Catalog B at 8-9.

(Exh. 8 at 24 (invalidity contentions for 3T: includes images of Boschert catalogs re: 3T).)

## IV.     THEORY 2:  STATEMENTS REGARDING "NEW MATTER"

22.     Lineage/Cherokee allege that Dr. Schlecht and/or Mr. Smith made a misrepresentation to the Patent Office when he/they submitted an amendment to the specification of the application that issued as the '034 patent-in-suit adding nine words and a figure to that specification, pointed the examiner to those added words and the added figure, and stated: "Because this phrase merely presents a term for the previously presented description, no new matter has been added.  New Fig. 11 is referenced at pages 6 and 23.  Support for Fig. 11 can be found at page 23, lines 22 through page 24, line 14."  (Dkt No. 322 at ¶¶ 230-32.)

23.     This is yet another inequitable conduct theory that Bel Fuse did <u>not</u> assert.  And, of course, it is not asserted by Artesyn or Astec, who do not allege inequitable conduct at all.

## V.   THEORY 3(A):  FAILURE TO REMIND EXAMINER THAT TRANSFORMER USUALLY DOES NOT SATURATE

24.     Lineage/Cherokee allege that Dr. Schlecht failed to disclose to the Patent Office that the power transformers in most converters are not driven into saturation.  (*Id.* at ¶¶ 239-52.)

25.     Again, this is yet another theory that Bel Fuse (and Artesyn/Astec) did <u>not</u> assert.

26.     Lineage/Cherokee allege that Dr. Schlecht added a limitation to the claims of the two newly-issued patents-in-suit that is not in the claims of the three original patents-in-suit, a limitation that the claimed transformer "is not driven into saturation."  (*Id.* at ¶¶ 243-44.)

27.     Lineage/Cherokee further allege that "a person of ordinary skill reviewing the prior art would have assumed that transformers were 'not driven into saturation' unless there was an explicit teaching otherwise."  (*Id.* at ¶ 248.)

28.     Despite alleging one of skill would know this, Lineage/Cherokee allege that Dr. Schlecht should have reminded the examiner of the above alleged facts – that the power transformers in most converters are not driven into saturation.  (*Id.* at ¶ 251.)

## VI.   OTHER THEORIES

29.     The remaining inequitable conduct theories summarized in SynQor's motion to strike/dismiss as to Bel Fuse – theory 3(b) and theories 4(a) and 4(b) – are not asserted by Lineage/Cherokee.  *See* Dkt No. 334 at 3-4.  Those theories are only asserted by the Fish defendants, and are addressed in SynQor's motion to strike/dismiss as to the Fish defendants.

## ARGUMENT

## I.   APPLICABLE LEGAL STANDARDS

The applicable legal standards, under Rule 9(b) and Rule 12(b)(6) / 12(f), are set forth in

SynQor's companion motion to strike/dismiss as to Bel Fuse.  *See* Dkt. No. 334 at 9-10.

II.     **LINEAGE/CHEROKEE'S AMENDED ANSWER FAILS TO ALLEGE SUFFICIENT FACTS TO SUPPORT ANY OF THEIR THEORIES REGARDING THE STATEMENTS DISTINGUISHING THE MWEENE REFERENCES**

   A.     **Lineage/Cherokee's Amended Answer Fails to Allege Sufficient Facts to Support Finding that the Statements About Mweene Were False *or* That Dr. Schlecht Knew About the Information/Article That Allegedly Render the Statements False**

In a continuing effort to create a "straw man" against which to argue, Lineage/Cherokee

(like Bel Fuse and the Fish defendants) portray Dr. Schlecht's remarks during the prosecution of

the '190 patent-in-suit as stating that isolation is required in <u>all</u> DC/DC converters accepting an

input of roughly 50 volts and generating an output of roughly 5 volts, <u>regardless</u> of converter

type and <u>regardless</u> of the power system in which it is to be employed (i.e., the specific system of

Mweene).  (Dkt No. 322 at ¶ 194.)  But the June 13 Amendment did <u>not</u> state that all DC/DC

converters with a 50 volt input are isolated, or even that all point-of-load converters with a 50

volt input are isolated.  Rather, the June 13 Amendment merely stated that the point-of-load

converters in Mweene's specific disclosed system necessarily included isolation.  As with the

allegations shared between the Bel Fuse and Lineage/Cherokee amended answers, *see* Dkt No.

334 at 11-15 (opposition hereby incorporated by reference), none of the nine additional factual

allegations in Lineage/Cherokee's amended answers, even if accepted as true for purposes of this

motion, support finding that Dr. Schlecht's statements were false, much less knowingly false.

        1.     **Lineage/Cherokee's Allegations Regarding the State of the Art in 2005 (or 1999) Are Irrelevant**

Lineage/Cherokee make four additional factual assertions about the state of the art in

2005, and one about the state of the art in 1999.  *See supra* ¶ 8.  Those factual allegations have

no bearing on how one of skill would interpret what the 1992 Mweene references disclose.

For purposes of determining what the Mweene references disclose, the proper frame of

reference is when they where published.  *See Novo Nordisk Pharma., Inc. v. Bio-Tech. Gen. Corp.*, 424 F.3d 1347, 1356 (Fed. Cir. 2005) (concluding disclosure of prior art reference is enabling because it disclosed "techniques that would have been understood by one of ordinary skill in the art at the time of its publication").  The state of the art and the meaning at that time of the terms used in that art are what matter.  *See T-Netix, Inc. v. Global Tel*Link Corp.*, 2003 WL 25782759, at *2 (E.D. Tex. Aug. 15, 2003) ("a technical term used in a patent is interpreted as having the meaning a person of ordinary skill in the field of the invention would give such term in the relevant art at the time the application maturing into the subject patent was filed").

Whether, in 2005, 13 years after the Mweene references were published in the fast-moving electrical art, certain standards do not require isolation, (Dkt No. 322 at ¶¶ 198-200), or any company sold non-isolated converters, (*id.* at ¶ 201), is irrelevant to the meaning of the term point-of-load converter in the 1992 Mweene references.  The same is true of whether, in 2005, point-of-load converters were typically non-isolated, (*id.* at ¶ 204), or whether, in 1999, Dr. Schlecht asked a customer whether it wanted isolated or non-isolated power supplies for its specific needs (which were nothing like the system disclosed in Mweene), (*id.* at ¶ 203).  The inquiry is whether the point-of-load converters in the 1992 disclosure of the Mweene references are necessarily isolated.[5]  As Dr. Schlecht explained at his deposition, point-of-load converters in general, and certainly the point-of-load converters in the Mweene work, were isolated in 1992. (Exh. 6 at 11:12-12:2.)  Defendants allege no contrary facts.

---

[5] Defendants ignore that, with the change in the industry from distributed power systems with multiple isolated converters on each board to the intermediate bus architectures of the claimed inventions with only one isolated converter on each board and the rest of the converters being non-isolated, the term "point-of-load" converter evolved from referring to isolated converters in the 1990s (including 1992 and 1997) to referring to non-isolated converters today.  (Exh. 6 18:12-24:12.)  Hence, it is far from inconsequential that their allegations fail to focus on how the term "point-of-load" was understood at the time of the Mweene publications in 1992, rather than at some later date.

### 2. Lineage/Cherokee's Allegation Regarding What Is Possible Misses the Mark

Lineage/Cherokee's allegation that, since the Mweene references were published in 1992, it has been possible to build non-isolated point-of-load converters with a 50 volt input says nothing about whether the point-of-load converters used in the context of the Mweene system necessarily include isolation. The disclosure of the Mweene references govern that question. The converters in Mweene about which Dr. Schlecht made his statements (1) are called "point-of-load" converters; (2) have 50 volt inputs and 5, 15 or -15 volt outputs as part of a 1,500 watt system, (3) are located on individual boards in high-end telecom/computing equipment that is susceptible to noise, and (4) provide power to electronic circuitry. (Exh. 1 at 18-20, 142; Exh. 2 at 723.) As Dr. Schlecht explained in detail at his deposition, in that context, the point-of-load converters in Mweene are necessarily isolated.[6] (Exh. 6 at 10:23-14:3.)

### 3. Lineage/Cherokee's Remaining Allegations Are Insufficient to Support Its Inequitable Conduct Theory

Lineage/Cherokee's final collection of factual allegations – regarding the Boschert 3T, Dr. Schlecht checking textbooks, and Dr. Schlecht calling Mweene – add nothing of substance.

Lineage/Cherokee do not even allege, because they cannot do so in good faith, that Dr. Schlecht knew of the Boschert 3T regulators in 2005 when he made the statements distinguishing the Mweene references. As Dr. Schlecht testified at his deposition, he did not learn of the 3T regulators until the defendants included them in their invalidity contentions in this case for the three original patents-in-suit. (Exh. 6 at 141:7-13.) Hence, regardless of what the 3T regulators might represent, they could not provide Dr. Schlecht with information contrary to his 2005 statements to the Patent Office. Additionally, as Lineage/Cherokee well know, Dr. Schlecht explained at length why the Boschert 3T is fundamentally different from the point-of-load

---

[6] *See supra* note 1 and cases cited therein.

converters described in the Mweene references.  (Exh. 6 at 142:11-148:20.)

Lineage/Cherokee's allegations that Dr. Schlecht and/or Mr. Smith should have verified the accuracy of his/their statement by referencing unspecified textbooks and/or calling Mr. Mweene are equally meritless.  Dr. Schlecht is a former MIT professor, (Dkt No. 322 at ¶ 209), who has written a textbook on power electronics, (Dkt No. 327 at ¶ 183).  And, the Mweene work at issue was done by Mr. Mweene under Dr. Schlecht's supervision when Mr. Mweene was Dr. Schlecht's student.  (Dkt No. 322 at ¶ 209.)  As he explained at his deposition, Dr. Schlecht knows whether the point-of-load converters in the Mweene references were, in fact, isolated, and knows whether one of skill would understand that they are necessarily isolated.  (*E.g.*, Exh. 6 at 10:23-14:3; 23:11-24:12; 38:16-40:1; 131:14-134:5; 142:11-148:20; 149:18-153:5.)  He did not need to check a textbook, and certainly did not need to call his former student.  That he did neither fails to raise an inference he thought the statements about the references were false.

**B.**      **Lineage/Cherokee's Theory 1(B), That Dr. Schlecht Did Not Disclose the Gutmann Article, Fails For Lack of Proof That Dr. Schlecht Was Aware of the Gutmann Article**

As explained in SynQor's motion to strike/dismiss as to Bel Fuse, (Dkt No. 334 at 14-15), Lineage/Cherokee (and the other defendants) fail to allege facts sufficient to support their assertion that the Gutmann article and its disclosure related to a 48-V to 5-V distributed power converter were known to Dr. Schlecht.  Lineage/Cherokee allege that Dr. Schlecht knew about the Gutmann Article because it was cited in the '634 patent listing Dr. Schlecht as a co-inventor, but the '634  patent issued almost 17 years before the June 13, 2005 Amendment was submitted to the Patent Office.  (Dkt No. 322 at ¶ 195.)  The Federal Circuit in *Exergen* held that "[t]he mere fact that an applicant disclosed a reference during prosecution of one application, but did not disclose it during prosecution of a related application, is insufficient to meet the threshold level of deceptive intent required to support an allegation of inequitable conduct."  575 F.3d at

1331.  For the same reason, Lineage/Cherokee fail to allege facts sufficient to show that Dr.

Schlecht had the Gutmann article in mind when he submitted the statements about the Mweene

references to the Patent Office, 17 years after the article was mentioned in the '634 patent.

Additionally, Lineage/Cherokee fail to allege facts sufficient to show Gutmann is

material.  At most, Lineage/Cherokee contend it contradicts Dr. Schlecht's statement about the

Mweene point-of-load converters.  However, Lineage/Cherokee do not (and cannot) allege that

Gutmann even uses the term "point-of-load," in the context of Mweene's system or otherwise.

**C.**      **Lineage/Cherokee's Theory 1(C), That Dr. Schlecht Did Not Disclose the Boschert/Small Depositions, Fails Because, At Best, the Depositions Were Cumulative**

Lineage/Cherokee's allegation that Dr. Schlecht should have disclosed the recently taken

depositions of Mr. Boschert and Mr. Small to the Patent Office at the end of the prosecution of

the two newly-issued patents-in-suit fails because, at best for Lineage/Cherokee, the testimony

they point to in the depositions is cumulative of information submitted to the Patent Office.  As

the Federal Circuit has repeatedly held:  "An applicant has no duty to disclose a reference to the

PTO if it is cumulative of or less material than references already before the examiner."

*Rothman v. Target Corp.*, 556 F.3d 1310, 1326 (Fed. Cir. 2009); *see also Star Scientific, Inc. v.*

*R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1367 (Fed. Cir. 2008).

When asserting that the deposition transcripts should have been disclosed, Lineage/

Cherokee only allege Mr. Boschert called the Boschert 3T regulator a "point-of-load regulator,"

and Mr. Boschert and Mr. Small said the 3T was not isolated.  (Dkt No. 322 at ¶¶ 222-23.)

However, Mr. Boschert did <u>not</u>, as Lineage/Cherokee allege, testify that the 3T regulators were

referred to as "point-of-load regulators."[7]  Rather, Mr. Boschert testified that he <u>did not</u>

---

[7] *See supra* note 1 and cases cited therein.

remember if the term "POL" was even used when the 3T regulators were developed.  (Exh. 7 at

18:22-19-3.)  Thus, the only real testimony to which Lineage/Cherokee point is Mr. Boschert's

and Mr. Small's testimony that the 3T regulators were not isolated.

At best, however, such testimony is merely cumulative of information already submitted

to the Patent Office during the prosecution of the two newly-issued patents-in-suit.  As Lineage/

Cherokee concede, (Dkt No. 322 at ¶¶ 220-21), Dr. Schlecht and Mr. Smith had already

disclosed: (a) catalogs discussing the 3T regulators that contained their specifications, including

that they were not isolated; and, (b) the defendants' invalidity contentions for the three original

patents-in-suit that specifically identify the 3T regulators as non-isolated:

> The means for providing plural regulated outputs <u>without further isolation</u>, from the
> isolated output <u>includes at least the 3T regulators in Boschert Catalog B at 8-9</u>.

(Exh. 8 at 24 (invalidity contentions for 3T: includes images of Boschert catalogs re: 3T).)

Such testimony is also inconsequential.  Dr. Schlecht testified at length as to why the 3Ts

are fundamentally different from the Mweene point-of-load converters.  (Exh. 6 at 142-148:20.)

## III.   LINEAGE/CHEROKEE'S THEORY 2, THAT DR. SCHLECHT/MR. SMITH'S NEW MATTER STATEMENT WAS FALSE, IS FATALLY FLAWED

Legal arguments, as opposed to factual statements, cannot form the basis of an

inequitable conduct claim when the facts upon which the arguments are based are fully disclosed

to the Patent Office.  *Liposome Co. v. Vestar, Inc.*, 36 USPQ2d 1295, 1316 (D.Del. 1994)

("While lawyers have a duty of candor to disclose material facts to an examiner, that duty does

not stretch so far that it should inhibit a lawyer from making an argument to the examiner on

how he or she should view those facts."); *Ethyl Molded Prods. Co. v. Betts Package, Inc.*, 9

USPQ2d 1001, 1039 (E.D. Ky 1988); *Beckman Instru., Inc. v. LKB Produkter AB*, 5 USPQ2d

1462, 1464 (D.Md. 1987); *see also Akzo N.V. v. U.S. ITC*, 808 F.2d 1471, 1482 (Fed. Cir. 1986).

Nevertheless, Lineage/Cherokee allege that Dr. Schlecht and/or Mr. Smith made a

misrepresentation to the Patent Office when they submitted an amendment to the specification of the application that issued as the '034 patent-in-suit.  That amendment added nine words and a figure to the specification, pointed the examiner to those added words and the added figure, and stated: "Because this phrase merely presents a term for the previously presented description, no new matter has been added.  New Fig. 11 is referenced at pages 6 and 23.  Support for Fig. 11 can be found at page 23, lines 22 through page 24, line 14."  (Dkt No. 322 at ¶¶ 230-32.)

        Dr. Schlecht/Mr. Smith's statement that "no new matter has been added" is a legal argument based upon fully disclosed facts that were squarely before the examiner.  That statement cannot form the basis of an inequitable conduct charge.  Indeed, the Federal Circuit rejected a similar argument in *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931 (Fed. Cir. 1990).  There, the accused infringer asserted that the patentee committed inequitable conduct by amending the specification of the patent during prosecution and asserting to the examiner that the amendments were "typographical errors and other such discrepancies."  *Id.* at 937.  The district court agreed, but the Federal Circuit overturned that holding as clearly erroneous, stating:

> The nature of these amendments was clear on their face, and the examiner was required to review them to determine whether they complied with law and practice.  All the pertinent information was squarely before the examiner in a simple document. As stated in *Akzo N.V. v. United States Int'l Trade Comm'n*, 808 F.2d 1471, 1482 (Fed. Cir. 1986), "the examiner was free to reach his own conclusion...."  *Id.* at 938-39.

**IV.    LINEAGE/CHEROKEE'S THEORY 3(A), THAT DR. SCHLECHT FAILED TO REMIND THE EXAMINER OF TRANSFORMER SATURATION, FAILS BECAUSE, AT BEST, THE INFORMATION WAS CUMULATIVE**

        Pointing to a new limitation in the claims of the two new patents-in-suit calling for a transformer that "is not driven into saturation," (Dkt No. 322 at ¶¶ 243-44), Lineage/Cherokee allege that "a person of ordinary skill reviewing the prior art would have assumed that transformers were 'not driven into saturation' unless there was an explicit teaching otherwise,"

14

(*id.* at ¶ 248), and that Dr. Schlecht should have reminded the examiner of that fact, (*id.* at ¶ 251).  However, there is no reason or need to bring allegedly commonly known facts to the attention of the examiner.  *See, e.g.*, *Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*, 474 F. Supp. 2d 1148, 1155 (E.D. Cal. 2007) ("A USPTO examiner is a person skilled in the art of the patent."); *In re Omerprazole Patent Litigation*, 258 F. Supp.2d 221, 228 n.6 (S.D. N.Y. 2001) ("A patent examiner is regarded as skilled in the art and is presumed to do her job properly.").

Even if there were such an obligation, there would be no need to do so here, because the information at issue is cumulative of information before the examiner, as Dr. Schlecht pointed out at his deposition.  (Exh. 6 at 214:12-221:7.)  Many, many references dealing with all aspects of transformer core saturation were submitted to the Patent Office during prosecution of the two newly-issued patents-in-suit, including various textbooks and design guides for DC-DC power converters that discuss core saturation and/or the lack thereof in the various power converter circuit topologies.  One such textbook, for example, specifically notes the following:

> "The design of the transformer T1 is 'conventional' in the sense that deep magnetic saturation is avoided."  (Exh. 9 at 7 (Gottlieb, *Power Supplies, Switching Regulators, Inverters, and Converters*).)

There are many more such disclosures in this and the other art cited to the Patent Office. *See, e.g.*, Exh. 10 at 230 (Pressman, *Switching and Linear Power Supply, Power Converter Design*).); Exh. 11 at 428-30 (Ferenzi, *Switched Mode Power Supplies*)**.**  Any additional disclosure Lineage/Cherokee allege was needed would have been cumulative.

## CONCLUSION

For the foregoing reasons, SynQor respectfully requests that the Court strike Lineage/ Cherokee's inequitable conduct Defense No. 1, and dismiss Lineage/Cherokee's inequitable conduct counterclaims in Count Nos. 1-5, from their First Amended Answer, Dkt No. 322**.**

Dated:    November 16, 2009

/s/ Thomas D. Rein

**Thomas D. Rein** (*admitted pro hac vice*)
Lead Attorney
trein@sidley.com
**Russell E. Cass** (*admitted pro hac vice*)
rcass@sidley.com
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL   60603
Telephone:     312.853.7000
Facsimile:      312.853.7036


**Michael D. Hatcher**
Texas State Bar No. 24027067
mhatcher@sidley.com
**David T. DeZern**
Texas State Bar No. 24059677
ddezern@sidley.com
**SIDLEY AUSTIN LLP**
717 North Harwood, Suite 3400
Dallas, TX   75201
Telephone:     214.981.3300
Facsimile:      214.981.3400


***ATTORNEYS FOR PLAINTIFF SYNQOR, INC.***

## <u>CERTIFICATE OF CONFERENCE</u>

I hereby certify that the parties met and conferred with respect to this motion as required by Local Rule CV-7(h) but were unable to reach agreement.  Counsel for SynQor were Thomas Rein and Michael Hatcher.

Counsel for SynQor and counsel for Defendants Lineage/Cherokee discussed this motion by teleconference at 2:00 P.M. Central Time on November 13, 2009.  Lineage/Cherokee were represented by Mark Flagel, Dale Chang and Diane Devasto.  SynQor explained its position that the factual allegations of the amended answer failed to allege facts sufficient to meet the Rule 9 pleading standard articulated, for instance, in the Federal Circuit's *Exergen Corp. v. Wal-Mart Stores, Inc.* case.  Lineage/Cherokee explained that they disagreed.

Also present during the teleconference, Artesyn and Astec were represented by Jeff Andrews, Bel Fuse was represented by Steven Williams, and Delta, Murata/MPS and Power-One were represented by Alan Smith, Steven Katz, Kevin Su and Glenn Thames.

Because SynQor seeks to strike the inequitable conduct allegations in Lineage/Cherokee's amended answer and Lineage/Cherokee refuse to withdraw those allegations, the discussions with Lineage/Cherokee have conclusively ended in an impasse, leaving an open issue for the court to resolve.  Therefore, this motion is opposed.


*/s/ Thomas D. Rein*
Thomas D. Rein

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system pursuant to Local Rule CV-5(a)(3) on November 16, 2009.

*/s/ Michael D. Hatcher*
Michael D. Hatcher