IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SYNQOR, INC, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CASE NO. 2:07-CV-497-TJW-CE |
| | § | |
| ARTESYN TECHNOLOGIES, INC., | § | |
| ASTEC AMERICA, INC., | § | |
| BEL FUSE, INC., | § | |
| CHEROKEE INTERNATIONAL COPR., | § | |
| DELTA ELECTRONICS, INC., | § | |
| LINEAGE POWER CORP., | § | |
| MURATA ELECTRONICS NORTH | § | |
| AMERICA, INC., | § | |
| MURATA MANUFACTURING CO., LTD., | § | |
| MURATA POWER SOLUTIONS INC., | § | |
| and POWER-ONE, INC. | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff SynQor, Inc. ("SynQor") motion for a permanent injunction. [Dkt. No. 913.] Defendants Artesyn Technologies, Inc., Astec America Inc., Bel Fuse, Inc., Cherokee International Corp., Delta Electronics, Inc., Delta Products Corp., Lineage Power Corporation, Murata Electronics North America, Inc., Murata Manufacturing Co., Ltd., Murata Power Solutions, Inc., and Power-One, Inc., (collectively "Defendants") oppose the motion for permanent injunction. The Court held a full evidentiary hearing on the issue of a permanent injunction that started on January 19, 2011 and ended on January 20, 2011. In their response, Defendants ask the Court to stay any immediate injunction pending appeal. [Dkt. No. 919.] SynQor opposes the requested stay. The Court has carefully considered the parties' submissions,

the record, and the applicable law. For the following reasons, SynQor's motion for a permanent injunction is GRANTED and Defendants request for stay pending appeal is DENIED.

I.  BACKGROUND

The parties to this case selected a jury on November 30, 2010. The trial commenced on December 13, 2010 and the jury reached a verdict on December 21, 2010. The jury found that defendant, Artesyn Technologies, Inc. directly infringed claim 1 of U.S. Patent No. 7,558,083 ("the '083 patent") and induced or contributed to infringement of claims 2, 8, 10 and 19 of U.S. Patent No. 7,072,190 ("the '190 patent), claims 21 and 30 of U.S. Patent No. 7,272,021 ("the '021 patent"), claim 1 of the '083 patent, claims 56 and 71 of U.S. Patent No. 7,564,702 ("the '702 patent"), and claim 9 of U.S. Patent No. 7,269,034 ("the '034 patent"); that defendant, Astec America, Inc., directly infringed claim 1 of the '083 patent and induced or contributed to infringement of claims 2, 8, 10 and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083 patent, and claims 56 and 71 of the '702 patent; that defendant, Bel Fuse, Inc., directly infringed claims 2, 8, and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083 patent, and claims 56 and 71 of the '702 patent and induced or contributed to infringement of claims 2, 8, 10 and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083 patent, and claims 56 and 71 of the '702 patent and the Court having previously determined Bel Fuse directly infringed claims 2, 8, 10 and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083 patent, and claims 56 and 71 of the '702 patent; that defendant, Cherokee International Corp., directly infringed claim 1 of the '083 patent and induced or contributed to infringement of claims 2, 8, 10 and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083 patent, and claims 56 and 71 of

the '702 patent; that defendant, Lineage Power Corp., directly infringed claim 1 of the '083 patent and induced or contributed to infringement of claims 2, 8, 10 and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083 patent, claims 56 and 71 of the '702 patent, and claim 9 of the '034 patent; that defendant, Delta Electronics, Inc., directly infringed claim 1 of the '083 patent and induced or contributed to infringement of claims 2, 8, 10 and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083 patent, claims 56 and 71 of the '702 patent, and claim 9 of the '034 patent; that defendant, Murata Power Solutions, Inc., directly infringed claim 1 of the '083 patent and induced or contributed to infringement of claims 2, 8, 10 and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083 patent, and claims 56 and 71 of the '702 patent; that defendants, Murata Electronics North America, Inc., and Murata Manufacturing Co., Ltd., directly infringed claim 1 of the '083 patent and induced or contributed to infringement of claims 2, 8, 10 and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083 patent, and claims 56 and 71 of the '702 patent; that defendant, Power-One, Inc., directly infringed claim 1 of the '083 patent and induced or contributed to infringement of claims 2, 8, 10 and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083 patent, claims 56 and 71 of the '702 patent, and claim 9 of the '034 patent. The jury failed to find invalidity of any of the patents-in-suit.

On December 29, 2010, the Court entered a partial judgment on the verdict ordering Defendants to pay the monetary damages awarded by the jury, which collectively totaled Ninety-Five Million, Two Hundred Twenty-Four Thousand, Eight Hundred Sixty-Three Dollars ($95,224,863). [Dkt. No. 907.] Defendants have moved for judgment as a matter of law on the issues of invalidity, non-infringement, and no damages. Plaintiff has moved for judgment as a

3

matter of law on infringement and validity of the patents-in-suit. These motions have not been fully briefed and remain pending before the Court. The parties, however, do not dispute that SynQor is entitled to a permanent injunction. Thus, the issues presented before the Court relate to the scope of the injunction, the terms of the injunction, and whether Defendants are entitled to a stay of the injunction pending appeal.

## II. LEGAL STANDARD

The Patent Act provides that courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. A permanent injunction is appropriate when a four-part test is satisfied:

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *Id.*

Whether an injunction should be stayed pending an appeal involves four considerations:

1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits;

2) whether the applicant will be irreparably injured absent a stay;

3) whether issuance of the stay will substantially injure the other parties interested in the proceeding;

4) where the public interest lies.

*Standard Haven Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 512 (Fed. Cir. 1990). A court does not give equal weight to each factor, but instead uses a flexible balancing approach. *Id.* at 512-13.

### III. DISCUSSION

#### A. Permanent Injunction

Bearing these factors in mind, the Court now turns to the facts of this case to assess the propriety of permanent injunctive relief. SynQor contends that all four of the *eBay* factors point in favor of granting an injunction. Defendants do not dispute that a permanent injunction is warranted, but instead dispute the scope and terms of the injunction. In support of their proposed injunction, Defendants do not present any arguments relating to the first three *eBay* factors, but instead present arguments relating only to the public interest factor.

##### 1. Irreparable Injury

SynQor has demonstrated irreparable injury. SynQor directly competes with Defendants in the market for unregulated and semi-regulated bus converters, and this fact weighs heavily in the Court's analysis. The best case for obtaining a permanent injunction often occurs when the plaintiff and defendant are competing in the same market. In that context, the harm in allowing the defendant to continue infringing is the greatest. This Court has recognized the high value of intellectual property when it is asserted against a direct competitor in the plaintiff's market. "Past harm to a patentee's market share, revenues, and brand recognition is relevant for determining whether the patentee 'has suffered an irreparable injury.'" *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010) (citations omitted). There has been a loss of

market share, lost profits, and potential revenue to Defendants in the past by Defendants' acts of infringement, and the Court finds that there will likely be such loss in the future. The evidence supports SynQor's contention that it was essentially driven out of the bus converter market due to the prevalence of low priced bus converters offered by Defendants.

There is also a concern of loss of brand name recognition and goodwill. "These are the type of injuries that are often incalculable and irreparable." *z4 Technologies, Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 440-41 (E.D. Tex. 2006) (finding no irreparable harm when the plaintiff "will not suffer lost profits, the loss of brand name recognition or the loss of market share because of [defendant's] continued sale of the infringing products"). One example of the loss of goodwill is demonstrated by Defendants' customer Cisco System, Inc., ("Cisco") recent attempt to qualify unregulated bus converters made by non-party competitors of SynQor, even though SynQor has three bus converters that have been fully qualified by Cisco. Thus, the Court agrees that the evidence shows that SynQor will continue to suffer harm to its customer relationships, good will, and the opportunity to expand its business without an injunction. Defendants did not offer any responsive arguments relating to this factor. Accordingly, the Court finds that SynQor will suffer irreparable injury absent an injunction.

**2. Inadequate Remedies at Law**

SynQor has also demonstrated the inadequacy of legal remedies. It is true that the jury awarded a damage verdict based upon acts of direct infringement and induced infringement. Those damages, however, are designed to compensate SynQor fairly and reasonably for its past injury. Although future damages in lieu of an injunction may compensate SynQor for an *approximate* loss, such approximation does not make future damages adequate in the sense that

they are a suitable proxy for injunctive relief. As discussed above, SynQor makes and sells products and has a presence in the relevant market. Further, SynQor has name recognition, goodwill, and market share in the relevant market. The loss associated with any of these effects is particularly difficult to quantify. *See i4i*, 598 F.3d at 862. Difficulty in estimating monetary damages is evidence that remedies at law are inadequate. *Id.*; *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 703-04 (Fed. Cir. 2008). The inability to calculate SynQor's future loss with reasonable precision makes legal remedies inadequate in this case. *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008) (noting that in view of a patentee's right to exclude, infringement may cause a patentee irreparable harm not remediable by a reasonable royalty). Defendants did not offer any responsive arguments relating to this factor. Accordingly, the threat of future infringement exists and an injunction against future acts of infringement is the proper remedy to prevent future infringement.

### 3. Balance of Hardships

The "balance of hardships" assesses the relative effect of granting or denying an injunction on the parties. *See i4i*, 598 F.3d at 862. Absent an injunction, SynQor will continue to suffer irreparable injury to its business, future opportunities, goodwill, potential revenue, and the very right to exclude that is the essence of the intellectual property at issue. Although an injunction will interfere with Defendants' ability to sell their competing products, the harm to SynQor is significant. The Court finds that Defendants' actions relating to unregulated and semi-regulated bus converters have impacted SynQor's market share and its ability to sell its products.

The Court further finds that Defendants will not suffer any appreciable harm from an injunction that could outweigh SynQor's harm from continued infringement. The Defendants are larger than SynQor, more diversified, and sell many different products. Furthermore, Defendants have indicated that they are currently pursuing non-infringing substitutes that may make SynQor's products obsolete. Given this representation, the Court agrees with SynQor that the next year will be especially critical as it is likely to mark the end of a period during which SynQor should have enjoyed the benefits of exclusivity.

As with the previous two factors, Defendants did not offer any responsive arguments relating to this factor. The only implication made by Defendants is that Defendants' customers will be more harmed by the injunction. The effect of the injunction on third parties, however, is irrelevant under this prong of the injunction test. *Acumed*, 551 F.3d at 1330 ("[T]he balance considered is only between a plaintiff and a defendant, and thus the effect on [third parties] … is irrelevant under this prong of the injunction test."). Accordingly, the Court has considered the balance of hardships and finds that the balance of hardships favors SynQor in this case.

### 4. Public Interest

The question presented by this factor is whether the public interest would be disserved by an injunction. The "touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." *i4i*, 598 F.3d at 863. The public has an interest in a strong patent system and it is generally in the public interest to uphold patent rights against an adjudicated infringer. *See id.* Permanent injunctions help serve that interest.

In this case, Defendants have submitted a number of declarations from their customers about the impact that an injunction would have on their business and the general public. In particular, Defendants have focused their arguments on the impact an injunction would have on a specific customer, Cisco. Defendants argue that products that incorporate these bus converters (hereafter "Impacted Cisco Products") are networking devices that are fundamental to the continuing operation of important operating networks. Specifically, Defendants argue that these Impacted Cisco Products are purchased and used by a wide cross-section of the public, including important governmental entities. For example, Defendants contend that the Cisco customers who recently have placed orders for the Impacted Cisco Products include multiple branches of the United States armed forces, United States District Courthouses, key government agencies (such as the United States Postal Service, the Federal Bureau of Investigation, the Federal Aviation Administration, and the Departments of Defense, Justice, and State), government contractors, major financial institutions, global telecommunication service providers, and several cable service operators. Notably, Defendants purport that the armed forces use the Impacted Cisco Products in active combat roles. For example, Defendants represent that U.S. Army Humvees and U.S. Navy ships are often equipped with Cisco Catalyst 6000 series switches (which incorporate some of the impacted bus converters) to enable military communications.

Defendants further contend that in civilian installations, these products enable telecommunications and cable service providers to provide telephone service, cable service and Internet access, and they allow financial institutions to handle electronic trades and electronic banking. In sum, Defendants argue that whether in military or other installations, the Defendants' bus converters are necessary to the Defendants' customers' products that provide

9

integral parts of networks upon which the public relies. Moreover, Defendants argue that a disruption of the supply of these products will negatively affect a wide cross-section of the public.

As an initial matter, the Court notes that the declarations used to support Defendants' arguments are conclusory and fail to provide any concrete evidence of a specific harm to the public. Indeed, it appears that the main concern of the Defendants' customers is that they will lose sales to competitors and damage their business reputation if placed in a "line down" situation. Dkt. No. 919-10 at 6, ¶ 8, at 7, ¶ 12; Dkt. No. 919-11 at 5, ¶ 13; Dkt. No. 919-12 at 3, ¶¶ 5, 6; Dkt. No. 919-13 at 3, ¶ 5; Dkt. No. 919-14 at 4, ¶ 9. A loss of sales to a competitor, however, is not a public harm that weighs in Defendants' favor. In fact, it actually contradicts Defendants' position that a wide variety of the public will be impacted because it indicates that a market currently exist that will be available to fill any gaps caused by the injunction. Moreover, these declarations also indicate that Defendants' customers value their own business reputation more than SynQor's business reputation, who is the owner of the patent that these customers were found to directly infringe.

The Court also finds that the declaration provided by Cray Inc.'s representative is contrary to the position taken by Defendants at trial as it relates to available non-infringing alternatives. Defendants' technical expert, Dr. Rhyne, testified that a Cray representative said that there was no reason not to use a fully regulated bus converter in a system and that they have done so. 12/20/10 Morning Transcript at 98:17-21. This contradicts the position now asserted that if Cray were required to redesign its cabinetry to use a non-isolated, fully regulated converter, "it would pose significant design issues as a fully-regulated converter has significantly

different mechanical and electrical engineering characteristics." Dkt. No. 919-10 at 5, ¶ 7. Similarly, Dr. Rhyne testified that during a Juniper deposition, the representative said it doesn't matter in many cases whether it's a regulated or unregulated converter for their end products. 12/20/10 Morning Transcript at 99:6-10. This is also contrary to Juniper's declaration stating that if the Court were to enter an immediate injunction then Juniper would be placed in a "line down" situation. Dkt. No. 919-14 at 4, ¶ 9.

Granted, Dr. Rhyne's trial testimony is not an in-depth analysis and does not state with particularity the specific products to which the corporate representative was referring. The Court is also cognizant that testimony about one specific product may not be applicable to other products and generalizations may not apply to every bus converter. The Court finds, however, that Dr. Rhyne testified to the jury that a fully regulated converter was an available, non-infringing substitute for the patented unregulated converter for at least these two customers. It is self-serving and inconsistent for Defendants' customers to now contend that an acceptable non-infringing substitute does not exist and that they need more time to develop one when Defendants' own technical expert told the jury something else. *Transamerica Life Ins. Co. v. Lincoln Nat'l Life Ins. Co.*, 625 F. Supp. 2d 702, 719 (N.D. Iowa 2009) ("Transamerica's arguments about hardship it might suffer are disingenuous, in light of Transamerica's contention that it has non-infringing alternatives that it could use in the future to administer its riders."), *rev'd on other ground*, 609 F.3d 1364 (Fed.Cir. 2010).

The only declaration that provides any specificity, as it relates to public harm, is the declaration discussing Cisco's Catalyst 6000 Series Switches which are used by the U.S. military in Army Humvees and U.S. Navy ships. Dkt. No. 919-7 at 2, ¶ 3. This is not an issue because of

28 U.S.C. § 1498, which makes the use or manufacture for the United States immune from suit for patent infringement in the district courts against the user or manufacturer, and necessarily any injunction issued therefrom. *W.L. Gore & Assoc., Inc. v. Garlock, Inc.,* 842 F.2d 1275, 1283 (Fed. Cir. 1988) ("The patentee takes his patent from the United States subject to the government's eminent domain rights to obtain what it needs from manufacturers and to use the same."). Thus, there is no harm to the military or any government agency because sales to the United States are not enjoined by the injunction. However, this does not relieve Defendants or Defendants' customer from their duty of being able to demonstrate what is actually sold to the United States and therefore outside the scope of the injunction.

Finally, during the injunction hearing Defendants noted that SynQor has not identified an equivalent part for one of the bus converters used by Defendants' customer, Fujitsu. Defendants argued that the bus converter used by Fujitsu has a square footprint where all of the identified SynQor bus converters have a rectangular footprint. Defendants cross-examined Dr. Schlecht on this point and he confirmed that none of the identified SynQor bus converters have a square footprint. Dr. Schlecht also stated that the reason he did not identify an equivalent bus converter for the Fujitsu product was because he did not have access to the specification for this bus converter. Dr. Schlecht further testified that SynQor has asked for the specification but it has not been produced. Moreover, Dr. Schlecht testified that the square footprint of the bus converter used by Fujitsu was within the rectangular footprint of the SynQor bus converters. Thus, he did not see this as a significant distinction. Curiously, Defendants did not produce any other specifications for the square bus converter other than the footprint data. Additional specification data would naturally be the next logical step to firmly establish that SynQor could

not provide an equivalent bus converter. The Court finds that the evidence is ambiguous at best and that it would unfair to allow Defendants to focus on potentially one insignificant distinction when it could have easily provided the full specification to establish that SynQor could not provide an adequate substitute. Accordingly, after considering the traditional equitable factors, the Court concludes that a permanent injunction is proper in this case.

Thus, the Court GRANTS SynQor's request for a permanent injunction.

### 5. Scope of SynQor's Proposed Injunction

Under Federal Rule of Civil Procedure 65(d), an injunction must state the reasons it issued, "state its terms specifically," and "describe in reasonable detail … the act or acts restrained or required." Fed. R. Civ. P. 65(d). "[T]he scope of the injunction remains that which is necessary to deter future infringement." *Nat'l Instruments Corp. v. Mathworks, Inc.*, 2003 WL 24049230, at *5 (E.D. Tex. June 23, 2003) (Ward, J.), *aff'd* 113 Fed. Appx. 895 (Fed. Cir. 2004).

In its proposed order, SynQor not only seeks to enjoin the manufacture, use, and sale of the unregulated and semi-regulated bus converters at issue in the United States, but also seeks to preclude Defendants from selling those products to customers located outside the U.S. that lack adequate safeguards to prevent end products containing Defendants' bus converters from being imported into the U.S. SynQor argues that this provision is necessary to properly protect its patent rights.

An injunction "cannot impose unnecessary restraints on lawful activity.*" Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002); *see also Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1365 (Fed. Cir. 1998) ("judicial restraint of lawful non-infringing activities must be avoided."). And this court will not issue an injunction barring all

13

extraterritorial sales of the accused products. *Spine Solutions v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1317 (Fed. Cir. 2010) (vacating an extraterritorial portion of an injunction that appeared to be premised solely on past infringement, not on the prevention of future infringement). SynQor is, however, entitled to an injunction directed toward Defendants' activities which cause domestic infringement as well as the activities of those persons or companies acting *in concert with* Defendants. Therefore, the court will issue an injunction that enjoins Defendants from making, using, selling, or importing into the United States any of the accused products as well as from otherwise infringing or inducing others to infringe the claims of the one or more of U.S. Patent Nos. 7,072,190, 7,272,021, 7,269,034, 7,558,083 and 7,564,702. *See Spindelfabrik Suessen-Schurr v. Schubert & Salzer Maschinenfabrik AG*, 903 F.2d 1568, 1577 (Fed. Cir. 1990). Given the jury's finding of induced infringement, SynQor is entitled to an injunction that requires Defendants to provide the following Notice and a copy of this Order included with any shipped Enjoined Bus Converters or Enjoined Products or with the bill of sale for the Enjoined Bus Converters or Enjoined Products, as well as the other matters included in the order issued today:

> **This product is affected by a Permanent Injunction entered by the United States District Court for the Eastern District of Texas, Marshall Division in Civil Action No. 2:07-cv-00497-TJW-CE (copy enclosed). As set forth in that Order, certain acts associated with this product are prohibited. This Product is Not for Sale in, Use in, or Importation into the United States.**

These terms preserve Defendants ability to sell its products for use outside the United States while placing potential purchasers and importers on notice that the importation or sale of such products within the United States is prohibited.

### 6. Terms of the Injunction

Defendants argue that any injunction should account for the reality that change cannot occur immediately and should allow certain of the Defendants' customers to transition to non-infringing designs. To this end, Defendants propose that the injunction should exempt the sales of certain bus converters to certain customers at least until the termination of a transition period for each specified customer. Defendants' proposed injunction excludes certain enjoined products sold to Cisco until September 30, 2011; to Juniper until September 30, 2011; to Enterasys until September 30, 2011; to Cray until September 30, 2011; to Radisys until July 31, 2011; and to Fujitsu until September 30, 2011. Dkt. No. 919-1 at 5-7. Defendants suggest that the importance of accounting for these realities was recently acknowledged by the Federal Circuit in *i4i*, 598 F.3d at 863–64, where it modified the effective date of a permanent injunction from 60 days to five months after the date of the order, in response to declaration evidence by the defendant showing 5 months were needed to "implement the injunction." Thus, Defendants contend that for the same reasons that an immediately effective injunction was inappropriate in the *i4i* action, an immediately effective injunction is inappropriate here.

During oral arguments, Defendants also referenced *Transamerica* for the proposition that even if the Court decides to deny a stay, it should allow certain of the Defendants' customers to transition to non-infringing designs. Specifically in *Transamerica*, the district court denied a stay but granted the defendant an "implementation period" and additional period to disseminate the permanent injunction order and implement non-infringing alternatives under an enhanced royalty rate. *Transamerica,* 625 F. Supp. 2d at 720-21. The Court finds that the facts in *Transamerica* and *i4i* are distinguishable from the present case. Mainly, the jury in the present

case found that SynQor was entitled to lost profits, which based on the damage model presented at trial, implies that the jury believed that there were not any non-infringing alternatives. In contrast, the damage model in *Transamerica* and *i4i* were based on a reasonable royalty. It would be unfair to require SynQor to accept Defendants' proposed 5% reasonable royalty while allowing them to develop products that render SynQor's exclusivity right meaningless.

The Court also finds that Defendants' principal customers are not innocent bystanders taken by surprise by the jury's verdict who need time to deal with its consequences. Since at least the summer of 2009, when the customers were subpoenaed, Defendants and their directly infringing customers have had approximately 18 months to qualify SynQor's bus converters as replacements for the infringing parts, but they opted not to do so. And as indicated by the requested transition period from Defendants' customers, 18 months was sufficient time to protect themselves. Defendants' and their customers' unreasonable delay in preparing for the day when they would have to respect SynQor's patent rights is no reason to delay the injunction's effect. *See B&H Mfg., Inc. v. Owens-Illinois Glass Container, Inc.,* 1991 WL 337357, at *3 (N.D. Ga. July 5, 1991) ("Based upon this court's observations of the conduct of the defendant, this court is far from convinced that the defendant has acted fairly or reasonably or responsibly in preparing for the effects of this order.").

Moreover, the evidence reflects that Cisco made the conscious effort to align itself with Defendants. Dkt. No. 924-4 at 3. In addition, Cisco continues to take orders for products containing infringing bus converters, and has not redirected a single bus converter sale to SynQor. Dkt. No. 919-7 at 3, ¶ 6. Cisco provides two primary reasons for taking this course of action, neither of which the Court finds tip the scales of equity in its favor. First, Cisco states

that of the thirty-two types of bus converters sold by Defendants to Cisco, SynQor is only technically qualified to provide three of the units used in the Impacted Cisco Products. Thus, Defendants argue that qualifying SynQor parts as alternatives or substitutes for the other twenty-nine parts will take significant time. In addition, Defendants contend that SynQor would not be able to qualify its parts for use in Cisco's products any earlier then it will take to qualify the admittedly non-infringing, fully regulated designs already in Cisco's qualification process.

The Court find this reasoning hollow because Defendants fail to mention that the three qualified SynQor converters actually account for over 67% of Cisco's disclosed U.S. sales of end products containing the bus converters at issue. Dkt. No. 924-11 at 10, ¶ 23. Thus, despite Defendants' implication, SynQor is currently qualified for over two-thirds of the Impacted Cisco Products. Moreover, Cisco could actually conserve time and money by using SynQor's qualified bus converters instead of allocating resources to the qualification of bus converters that it contends is in the process of phasing out. The Court finds SynQor should be given the opportunity to make the sales to Cisco for the high-volume products on which it is already qualified; delaying the injunction will only delay this opportunity.

Cisco's second reason for not purchasing any further products from SynQor relates to Cisco's Master Purchase Agreement ("MPA"). According to Defendants, Cisco's MPA provides contingencies for on-time deliveries of components to Cisco. Cisco requires this because of the significant disruption that could occur if a part becomes unavailable for any reason. Thus, Defendants contend that Cisco cannot purchase these products solely from SynQor in the near term because SynQor continues to refuse to sign the MPA. The Court finds this explanation suspect because it is undisputed that when Cisco is in need of parts, it is willing to waive its

MPA requirement and purchase parts from SynQor. Moreover, the evidence shows that the MPA has never been acceptable to SynQor and the Court is not going to force it to agree to terms that it perceives are commercially unacceptable. In the Court's view, neither Cisco nor Defendants are in the position to tell the patent owner what terms it must accept in order to license its intellectual property. The Court will not reward Cisco and Defendants for their inaction. Thus, the injunction will take effect immediately and will not exempt the sales of any bus converters, except those provided by law. Because the injunction is to take immediate effect, any discussion about the damages that may be incurred during Defendants' proposed transition periods or payment into an escrow account are MOOT.

Accordingly, it is hereby ORDERED that:

Defendants are hereby restrained and enjoined, pursuant to 35 U.S.C. § 283 and Federal Rule of Civil Procedure 65(d), from any further infringement of one or more of U.S. Patent Nos. 7,072,190, 7,272,021, 7,269,034, 7,558,083 and 7,564,702 as stated in the Permanent Injunction Order issued today.

### B. Stay of the Injunction

Because the Court granted a permanent injunction that is effective immediately, Defendants request a stay of the permanent injunction to avoid suffering irreparable harm pending appeal. Bearing the traditional four factors for granting a stay of a permanent injunction, the Court now turns to the facts of this case to assess the propriety of a stay.

In support of their argument for a stay, Defendants only argument relates to the likelihood of success on appeal. Specifically, Defendants note that the U.S. Patent and Trademark Office has found that substantial new questions exist as to the patentability of all of

the claims asserted at trial. Further, six of the ten asserted claims currently stand formally rejected as unpatentable in issued Office Actions. For the other claims, the first official Office Actions in reexamination have yet to issue. Significantly, for one of the patents—the '034 Patent, which concerns "semi-regulated" bus converters—the Patent and Trademark Office has found that the patent is not entitled to the priority date that SynQor and its witnesses testified to at trial. Instead, the Patent and Trademark Office has now made an explicit finding that the priority date of the claims of the '034 Patent is the actual filing date, August 23, 2006. Using this reexamination information, Defendants argue that the Patent Office's finding on the issue of priority is strong evidence that SynQor does not enjoy a likelihood of success on appeal at least with respect to validity of the semi-regulated '034 patent.

SynQor argues that these types of early stage reexaminations do not justify a stay of a permanent injunction. *See, e.g., 02 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 2007 WL 2329833, *1 (E.D. Tex. Aug. 13, 2007) (denying motion to stay permanent injunction pending appeal where motion was based on the fact that the asserted claims were subject to a preliminary rejection in a pending reexam). Further, for all of the bus converters at issue, at least one claim has not been subject to even a preliminary rejection. The Court agrees that such preliminary and insignificant steps in the reexamination process do not warrant a stay of the injunction.

Defendants did not provide any additional arguments as they relate to the other three factors for granting a stay. Although there is some overlap in the questions whether a plaintiff is entitled to a permanent injunction and whether the defendant should receive a stay of the injunction on appeal, a finding that a permanent injunction is warranted does not preclude a

19

granting of a stay of that injunction pending appeal as both issues require different analyses. *See Extreme Networks, Inc. v. Enterasys Networks, Inc.*, 2009 WL 679602, *4 (W.D. Wis. Mar. 16, 2009). For example, the harm to the defendant is less important in the context of a motion for a permanent injunction. *Id.* However, the analysis changes in the context of a request for a stay on appeal because of the chance for reversal. *Id.* Taking this into consideration and based on its previous analysis, the Court finds that the other three factors tip in favor of denying the stay.

The problem is that Defendants did not provide any additional analysis as it relates to the remaining *Standard Havens* factors. Thus, for the reasons discussed above, the Court finds that the Defendants will not be irreparably harmed absent a stay. The Court also finds that for the reasons discussed above, SynQor would be substantially injured absent a stay. Finally, the Court finds that the public interest will not be further served by a stay. Accordingly, the Court DENIES Defendant's request for a stay of the permanent injunction pending appeal.

### IV. CONCLUSION

For the aforementioned reasons, the Court GRANTS SynQor's motion for a permanent injunction. The Court also DENIES Defendant's request for a stay of the permanent injunction pending appeal.

IT IS SO ORDERED.

SIGNED this 24th day of January, 2011.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE