**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| SYNQOR, INC, | § | |
| | § | |
| v. | § | CASE NO: 2:07-CV-497-TJW-CE |
| | § | |
| ARTESYN TECHNOLOGIES, INC., et al. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is SynQor, Inc.'s ("SynQor") Motion for Sanctions and an Assessment of Supplemental Damages on Recently Disclosed Sales by Delta Electronics, Inc. ("Delta"). (Dkt. No 1129.) For the following reasons, the Court GRANTS SynQor's requests for damages for the 17,000 additional sales of Delta's Q48SB9R650 converter to Cisco Systems, Inc. ("Cisco") that were not included in Delta's previous sales data for the period ending October 31, 2010, and the 2,000 sales of Delta's Q48SB9R650 converter to Cisco that were not included in Delta's previous sales data for the period from November 1, 2010 through January 24, 2011. Based on the damages model adopted by the jury, the Court awards $567,514.00 to SynQor for these sales by Delta. In addition, the Court holds that Delta is subject to sanctions for discovery violations as described below in this Memorandum Opinion & Order. The Court ORDERS Delta to pay $500,000.00 in civil contempt sanctions to SynQor in this case. Finally, the Court GRANTS SynQor's Motion for attorneys' fees and costs that are attributable to Delta's discovery abuses in this case.

## I.     Introduction

To understand the alleged discovery violations, it is important to understand the procedural posture of this case and the parties' positions at trial. In 2007, SynQor brought this patent lawsuit claiming that a number of defendants either directly infringed its patents or

1

induced infringement or contributed to the infringement of its patents.  Delta was one of the defendants alleged to directly and indirectly infringe the asserted patents.  As it relates to indirect infringement, Delta was alleged to induce and contribute to its customers Cisco's direct infringement of the asserted patents.  On December 21, 2010, the jury found that Delta directly infringed claim 1 of U.S. Patent No. 7,558,083 ("the '083 patent") and induced or contributed to infringement of claims 2, 8, 10 and 19 of U.S. Patent No. 7,072,190 ("the '190 patent), claims 21 and 30 of U.S. Patent No. 7,272,021 ("the '021 patent"), claim 1 of the '083 patent, claims 56 and 71 of U.S. Patent No. 7,564,702 ("the '702 patent"), and claim 9 of U.S. Patent No. 7,269,034 ("the '034 patent").  On January 19, 2011, SynQor moved the Court to enter an order establishing a procedure by which the Court could assess and award SynQor supplemental damages on each of the defendant's sales of infringing products that were not counted in the calculation of damages presented to the jury at trial. (Dkt. No. 917.)  In its motion, SynQor also moved the Court to assess and award supplemental damages covering infringing products that have been or will be sold post-verdict.

The Court then entered two orders requiring the defendants to disclose sales data for specific time period.  The first order was entered on April 11, 2011, and required each defendant to produce sales data for each of its unregulated and semi-regulated bus converters for the period from November 1, 2010 through January 24, 2011. (Dkt. No. 1102.)  The second order was entered on April 28, 2011, and required each defendant to produce worldwide sales data for each of its unregulated and semi-regulated bus converters for the period from November 1, 2010 through May 1, 2011. (Dkt. No. 1119.) It was only after the April 28th Order that Delta eventually disclosed the sales to Cisco that it had previously withheld.  SynQor then filed the present motion and the Court held a show cause hearing on June 15, 2011.

In the present motion, SynQor asks the Court to assess supplemental damages in the amount of $507,779 as a sanction for what it contends was a deliberate attempt by Delta to conceal sales of its bus converters.  The Court will also take under consideration Delta's omission of the 2,000 sales of Delta's Q48SB9R650 converters sold to Cisco for the period from November 1, 2010 through January 24, 2011[1].  SynQor moved for recovery of damages related to these sales in its motion for supplemental damages. (Dkt. Nos. 917 and 1127.)  In addressing that motion the Court explicitly excluded these sales, and finds that they are better addressed in this motion because Delta did not timely disclose these sales as required by the April 11th Order.

Delta's reasoning for not disclosing all of these sales was they were not relevant because Cisco privately agreed with Delta to not ship any of these bus converters into the United States. In the alternative, Delta's contends that it was under no duty to disclose these sales because SynQor did not object when Delta proposed a limited sales update.  The Court disagrees with both of Delta's contentions on why it did not produce the relevant discovery in a timely manner. For the following reasons, the Court finds that SynQor was severely prejudiced because these 17,000 additional sales of Delta's Q48SB9R650 converter to Cisco were not included in the damages model presented to the jury.  The Court also finds that Delta willfully and intentionally violated this Court's Discovery Orders when it failed to disclose these sales and the 2,000 sales of Delta's Q48SB9R650 converter to Cisco pursuant to the Court's April 11th Order.  Given this background, the Court will now address the appropriate sanctions for these discovery violations.

---

[1] In its briefing relating to supplemental damages, SynQor directed the Court to the briefing related to this motion and Mr. Reed's May 31, 2011 Declaration. (Dkt. No. 1147 at 8, Dkt. No. 1147-12 at 15-16.)  SynQor suggested that these documents further explained Delta's failure to disclose its sales of 2,000 Q48SB9R650 converters and 2,000 D48S9R650 to Cisco.  According to Mr. Reed's declaration, however, the sales of the 2,000 D48S9R650 to Cisco occurred after October 31, 2010, and SynQor does not appear to allege that Delta failed to disclose these sales pursuant to a Court order. (Dkt. No. 1147-12 at 45; Dkt. No. 1129 at 6.)  Therefore, the Court will not consider the sales of the 2,000 D48S9R650 to Cisco in this motion for sanctions.

## II.      Factual Background

1.       On May 16, 2008, the Court entered a Docket Control Order requiring fact discovery to be completed by August 2, 2010. (Dkt. No. 128.)  The close of fact discovery was later amended to August 23, 2010. (Dkt. No. 436.)

2.       On June 2, 2008, the Court entered a Joint Discovery Order requiring the parties to produce all relevant documents "without awaiting a discovery request." (Dkt. No. 138, ¶ 3(b).) Under this Order and the Federal Rules of Civil Procedure, the parties also had a duty to continuously supplement its production and responses to interrogatories. (Dkt. No. 138 at ¶ 8; Fed. R. Civ. P. 26(e).)

3.       On June 11, 2010 and June 28, 2010, over two years after the Court entered the Joint Discovery Order, Delta entered into the letter agreements with Cisco that it relies upon to contend that the undisclosed sales were irrelevant.  Specifically, Delta argues that the letter agreements "contractually bind" Cisco from shipping into the United States any of the bus converters sold pursuant to these agreements.

4.       From the date of the letter agreements forward, Delta did not disclose any sales it made to Cisco pursuant to these agreements.  Specifically, Delta did not disclose 17,000 additional sales of Delta's Q48SB9R650 bus converter to Cisco (hereafter "17,000 pre-verdict sales") for the period ending October 31, 2010.  In addition, Delta also did not disclose the letter agreements with Cisco until May 13, 2011.

5.       On August 23, 2010, fact discovery closed.

6.       On November 15, 2010, the parties submitted a Joint Final Pre-Trial Order, which included Delta's counsel certifying and acknowledging that "[f]ull and complete disclosure has been made in accordance with the Federal Rules of Civil Procedure and the Court's orders." (Dkt. No. 615.)

4

7.      On November 17, 2010, Delta produced updates sales data, but the sales data did not include the 17,000 pre-verdict sales.

8.      The jury trial started on December 13, 2010 and the jury reached a verdict on December 21, 2010.  The jury found that Delta's sales of its Q48SB9R650 bus converter directly infringed claim 1 of the '083 patent and induced or contributed to infringement of claims 2, 8, 10 and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083 patent, claims 56 and 71 of the '702 patent, and claim 9 of the '034 patent.

9.      On April 11, 2011, the Court ordered each defendant to produce sales data for each of its unregulated and semi-regulated bus converters for the period from November 1, 2010 through January 24, 2011.

10.     On April 18, 2011, Delta produced sales data in response to the Order, but the sales data did not include the 17,000 pre-verdict sales.  In addition, the data did not include 2,000 sales for Delta's Q48SB9R650 converter to Cisco (hereafter "2,000 Q48SB9R650 sales") that were not included in Delta's previous sales data for the period ending January 24, 2011.

11.     On April 29, 2011, the Court ordered each defendant to produce worldwide sales data for each of its unregulated and semi-regulated bus converters for the period from November 1, 2010 through May 1, 2011.

12.     On May 9, 2011, in response to the Court's April 29th Order, Delta disclosed for the first time the 17,000 pre-verdict sales and the 2,000 Q48SB9R650 sales.

13.     On May 13, 2011, Delta disclosed for the first time the letter agreements that it relies on to justify its failure to timely disclose the 17,000 pre-verdict sales and the 2,000 Q48SB9R650 sales.

14.     Based on Delta's post-verdict disclosure of pre-verdict sales, SynQor moves the

5

Court to assess supplemental damages in the amount of $507,779, and sanction Delta for its discovery violations.

### III.     The Law on Sanctions

Federal Rule of Civil Procedure 37 authorizes sanctions for failure to comply with discovery orders.  This Court may bar the disobedient party from introducing evidence, or it may direct that certain facts shall be "taken to be established for purposes of the action . . . ."  Rule 37 also permits this Court to strike claims from the pleadings and even to "dismiss the action . . . or render a judgment by default against the disobedient party."  *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 763 (1980).  "Rule 37 sanctions must be applied diligently both 'to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of such a deterrent.'" *Id.* at 763-64 (citation omitted).

Rule 37(b)(2) requires that any sanction be just and that the sanction must be related to the particular claim which was at issue in the order to provide discovery. *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 413 (5th Cir. 2004) (citations omitted) (sanction was a finding of alter ego rooted in party's behavior regarding discovery related to the alter ego issue). Further, the penalized party's discovery violation must be willful. *United States v. $ 49,000 Currency*, 330 F.3d 371, 376 (5th Cir. 2003).  Finally, a severe sanction under Rule 37 is only to be employed where a lesser sanction would not substantially achieve the desired deterrent effect. *Id.*

In addition to Rule 37, this Court also has inherent powers to enter sanctions.  The inherent powers of this Court are those which "are necessary to the exercise of all others." *Roadway Express,* 447 U.S. at 764 (citation omitted).   The contempt sanction is the most prominent inherent power, "which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court."  *Id.*

6

(citation omitted).   The Fifth Circuit has recognized that the inherent power "is necessarily incident to the judicial power granted under Article III of the Constitution." *Gonzalez v. Trinity Marine Group, Inc.,* 117 F.3d 894, 898 (5th Cir. 1997) (quoting *Woodson v. Surgitek, Inc*., 57 F.3d 1406 (5th Cir. 1995)).   When inherent powers are invoked, however, they must be exercised with "restraint and discretion."   *Id*.   Therefore, severe sanctions should be confined to instances of "bad faith or willful abuse of the judicial process."   *Id.*   In any event, when parties exploit the judicial process, a court may sanction conduct beyond the reach of other rules.   *Natural Gas Pipeline v. Energy Gathering, Inc.,* 2 F.3d 1397, 1407 (5th Cir. 1993).   That is, a district court is "free to fashion any sanction appropriate to punish recalcitrant parties and to deter those similarly situated." *Batson v. Neal Spelce Assoc., Inc.,* 765 F.2d 511, 516 (5th Cir. 1985).

Under Federal Rule of Civil Procedure 37(b)(2)(vii), the Court may "treat[] as contempt of court the failure to obey any order."   *Int'l Union, UMW v. Bagwell,* 512 U.S. 821, 833 (1994) (stating that a district court's finding of failure to comply with discovery orders is a finding of civil contempt).   Additionally, under the Court's inherent powers to impose sanctions, as noted above, the contempt sanction is the most prominent inherent power.   *See Roadway Express*, 447 U.S. at 764.   Judicial sanctions for civil contempt may be "employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained."   *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000).   "The district court 'has broad discretion in the assessment of damages in a civil contempt proceeding.'"   *Id.* (citations omitted).   "'The purpose is to compensate for the damages sustained.   The public rights that the said court orders sought to protect are important measures of the remedy.'"   *Id.* (citations omitted).   The Fifth Circuit has instructed that for sanctions under Rule 37(b)(2), "[f]irst, any sanction must be 'just'; second, the sanction must be specifically

7

related to the particular 'claim' which was at issue in the order to provide discovery." *Compaq*, 387 F.3d at 413.   For sanctions under the Court's inherent power, the Supreme Court has instructed that "[b]ecause inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." *Roadway Express*, 447 U.S. at 765.   Finally, the Fifth Circuit has recognized "that a district court always has jurisdiction to impose sanctions designed to enforce its own rules, even after that court no longer has jurisdiction over the substance of the case." *Fleming v. Assoc. v. Newby & Tittle*, 529 F.3d 631, 637 (5th Cir. 2008); *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395-396 (1990).

## IV.    The Court's Findings and Sanctions

In the light of the record in this case, the Court makes the following findings and determines that:

1.      Delta had in its possession, custody, and/or control certain relevant documents relating to the sales of 17,000 Delta Q48SB9R650 bus converters to Cisco for the period ending October 31, 2010.   Delta made the conscious and willful decision to withhold this relevant sales data from production in this case.   To be sure, Delta produced worldwide sales data for sales made to other customers, but did not produce this data as it related to the 17,000 pre-verdict sales made to Cisco after July 1, 2010.   It was not until May 9, 2011, well after the jury verdict, that Delta decided to finally produce this relevant sales data.

2.      Delta's decision to withhold this relevant data was based on two letter agreements it entered into with Cisco on June 11, 2010, and June 28, 2010.   Delta argues that these sales were irrelevant because these letter agreements contractually bound Cisco from importing these bus converters into the United States.   The Court rejects Delta's self-serving analysis on the relevancy of the sales data and letter agreements.   First, a contractual obligation does not relieve a party of its discovery obligation, at least not until the party moves, and the Court grants,

8

protection from its discovery obligation. The Court finds that Delta did not move the Court for protection from having to disclose the relevant sales data related to the two letter agreements and from having to disclose the letter agreement themselves. Moreover, to accept Delta's argument and analysis would be to condone a party's attempt to unilaterally contract out of its discovery obligations. Such a result would cripple and severely undermine this Court's integrity. No court can function if its discovery rules are disregarded. Accordingly, the Fifth Circuit has recognized that "a district court always has jurisdiction to impose sanctions designed to enforce its own rules, even after that court no longer has jurisdiction over the substance of a case...." *Fleming,* 529 F.3d at 637.

      3.     Likewise, even inadmissible evidence must be produced if it is likely to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26(b)(1) ("Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."). It is undisputed that all worldwide sales were discoverable given the allegations of induced infringement and Delta's purported lack of knowledge on whether its bus converters were ever sold back into the United States. Dkt. No. 1154-2 at 2-4; 290:13-292:15. Moreover, under Local Rule CV-26(d), information "relevant" to the claim or defense of any party includes, among other things, information that: "(3) …is likely to have an influence on or affect the outcome of a claim or defense; (4) …deserves to be considered in the preparation, evaluation or trial of a claim or defense; (5) …reasonable and competent counsel would consider reasonably necessary to prepare, evaluate or try a claim or defense." In its original and amended complaints, SynQor alleged that Delta actively induced and/or contributed to infringement of the asserted patents. Delta's worldwide sales data would, undoubtedly, be particularly relevant to SynQor's inducement claims. Accordingly, the Court rejects Delta's self-serving analysis of the

relevancy of the sales data and letter agreements.

    4.    The Court also rejects the argument that SynQor acquiesced to Delta withholding the sales data and agreements.  As indicated in the record, SynQor requested that the Fish Defendants[2] provide "financial information of the type previously provided by each party, bringing such information up-to-date through October 31, 2010." (Dkt. No. 1154-5, Oct. 27th Hankinson email).  The information "previously provided" included worldwide sales data for all unregulated and semi-regulated bus converters.  The Fish Defendants responded that "we will provide a supplement that is consistent with our obligations under the Local and Federal Rules." (*Id*. at 3, Nov. 4th Reichel email).  In response, SynQor requested that the Fish Defendants either provide "a representation that the supplement will include updated sales data and cost information of the type previously provided (plus the cost data for Delta that has not previously been produced); or (2) a description of what lesser population of data the Fish Defendants will agree to provide." (*Id*. at 2, Nov. 4th Hankinson email).  In response, the Fish Defendants sent the email upon which Delta now relies, where at the end it said: "we will not be wasting time gathering data for products that are not accused of infringing or that are not part of your expert's damages calculation." (*Id*. at 2, Nov. 6th Reichel email).  Other than this cryptic response, the Court does not find that Delta ever informed SynQor that it was withholding sales data for some of the accused products sold to Cisco.  Given that Delta had previously provided worldwide sales for these same products up to June 2010, the Court finds that SynQor was unaware that Delta decided to withhold this sales data and by no means acquiesced to Delta withholding this sales data.

---

[2] "Fish Defendants" refers to Defendants Delta Electronics, Inc., Delta Products Corp., Murata Electronics North America, Inc., Murata Manufacturing Co., Ltd., Murata Power Solutions, Inc., and Power-One, Inc.  These defendants are represented by the law firm Fish & Richardson P.C. and have been referred to by the parties as the Fish Defendants.

5.    The Court further finds that both the sales made pursuant to the letter agreements and the letter agreements themselves were highly relevant.  That is, the sales data and purported agreements are plainly "information that is likely to have an influence on or affect the outcome of a claim or defense."  Specifically, the damage model presented to the jury by Mr. Reed was based on importation rates for worldwide sales made by Defendants.  The parties do not dispute that the jury adopted Mr. Reed's damage model in reaching its verdict.  Given this, Mr. Reed could have multiplied the additional worldwide units by the import percentage that he applied at trial.  Alternatively, if Mr. Reed believed that the incremental Delta units would have been kept out of the United States by Cisco, pursuant to the letter agreements, then he could have determined that the lost U.S. volume would be filled by bus converters from other defendants that had been qualified for the same Cisco part number.  Indeed, it is undisputed that Astec and Power-One provided equivalent bus converter for the Cisco part numbers in which the Q48SB9R650 is qualified.  (Dkt. No. 1129-2 at 3.)  Regardless of how Mr. Reed could have used the data, the sales data and purported agreements are unquestionably "information that deserves to be considered in the preparation, evaluation or trial of [SynQor's] claim" and "information that reasonable and competent counsel would consider reasonably necessary to … evaluate … [SynQor's] claim."  At the very minimum, SynQor and its experts should have had the opportunity to evaluate the data and to take discovery regarding these letter agreements.  Delta's decision to withhold the information deprived SynQor of that opportunity.  In short, the Court rejects Delta's contention that the sales made pursuant to the letter agreements are irrelevant. The Court finds that SynQor was severely prejudiced because it was not able to take discovery and/or account for these worldwide sales in its damage model presented to the jury.

6.    Based on the damages model presented to the jury, the 17,000 additional sales of

Delta's Q48SB9R650 converter to Cisco made during the time period of July 1, 2010 through October 31, 2010, would result in $507,779.00 of damages in the form of lost profits. (Dkt. No. 1129-2 at 6.)  Accordingly, the Court awards $507,779.00 to SynQor for these sales by Delta.

7.     In addition, the Court finds that Delta had in its possession, custody, and/or control certain relevant documents relating to the sales of 2,000 Delta Q48SB9R650 bus converters to Cisco that were not included in Delta's previous sales data for the period ending January 24, 2011.  Delta made the conscious and willful decision to withhold this relevant sales data from production in this case after it was ordered to do so on April 11, 2011.

8.     Based on the damages model presented to the jury, the 2,000 additional sales of Delta's Q48SB9R650 converter to Cisco made during the time period of November 1, 2010 through January 24, 2011, would result in $59,735.00 of damages in the form of lost profits.[3] (Dkt. Nos. 1147-12 at 45; 1129-2 at 6.)  Accordingly, the Court awards $59,735.00 to SynQor for these sales by Delta.

9.     Based upon the record together with the arguments and statements made at the June 15, 2011 hearing, the Court finds that Delta willfully and intentionally violated the Court's discovery order, and that Delta's conduct constitutes discovery abuse. As sanction for Delta's conduct, the Court orders Delta[4] to pay $500,000.00 in civil contempt sanctions to SynQor in this case.  This civil sanction is to compensate SynQor for losses sustained due to Delta's discovery violations, including prejudgment interest.  *See Am. Airlines*, 228 F.3d at 574 (stating that civil

---

[3] The Court finds that Mr. Reed's lost profit damages calculation for the 2,000 Q48SB9R650 sales is not consistent with his lost profit damages calculation for the 17,000 pre-verdict sales. Specifically, Mr. Reed uses an importation rate of 41.4% for the 17,000 pre-verdict sales, but then uses an importation rate of 49% for the 2,000 Q48SB9R650 sales. *Compare* Dkt. No. 1192-2 at 6 *and* Dkt. No. 1147-12 at 45. Using the 41.4% importation rate results in a calculated damages amount of $59,735, which is (2,000*41.4%*75.15)-(4%* 2,000*41.4%*75.15).

[4] The sanctions in this Memorandum Opinion & Order are directed toward Delta and not its attorneys.

sanctions may be issued to compensate the complainant for losses sustained).   Under the guidelines the Fifth Circuit has given for Rule 37(b)(2) sanctions, the Court finds that the civil contempt sanction of $500,000.00 is "just" given the extreme prejudice SynQor suffered by not having access to this important sales data, and the related letter agreements, given that the damages model presented to the jury was based on worldwide sales data.   The sanction is also related to the particular claim which was at issue—the sanction compensates SynQor for additional recovery it could and would have received if Delta had met its discovery obligations. Therefore, this particular civil contempt sanction of $500,000.00 is appropriate under Rule 37(b)(2).   The undersigned judge must protect the integrity of this Court.   This sanction is intended to act as a deterrent to other patent litigants that might consider engaging in similar behavior. *See Roadway Express*, 447 U.S. at 764 (noting that sanctions must be applied "to deter those who might be tempted to such conduct in the absence of such a deterrent").   In addition, the $500,000.00 civil contempt sanction is appropriate under the Court's inherent power, although the Court need not use its inherent power to sanction for contempt in order to justify the $500,000.00.[5]

10.      Pursuant to Fed. R. Civ. P. 37, the Court awards attorneys' fees and costs to SynQor that are attributable to Delta's discovery abuses in this case.   In order to recovery such fees and costs, SynQor must, together with an application for such fees and costs, submit satisfactory proof that the fees and costs its seeks are attributable to Delta's discovery abuse. The Court will retain jurisdiction to enter the awarding of attorney fees even after final judgment is entered. *Fleming*, 529 F.3d at 637 ("[A] district court always has jurisdiction to impose sanctions designed to enforce its own rules, even after that court no longer has jurisdiction over

---

[5] The $500,000.00 sanction is for the Rule 37(b)(2) violation.

the substance of the case.").

## V.   CONCLUSION

In conclusion, the Court ORDERS Delta to pay SynQor $567,514.00 for the 17,000 additional sales of Delta's Q48SB9R650 converter to Cisco that were not included in Delta's previous sales data for the period ending October 31, 2010, and the 2,000 sales of Delta's Q48SB9R650 converter to Cisco that were not included in Delta's previous sales data for the period from November 1, 2010 through January 24, 2011. The Court holds that Delta is subject to sanctions for various discovery violations as described in this Memorandum Opinion & Order. The Court ORDERS Delta to pay $500,000.00 in civil contempt sanctions to SynQor in this case. The Court awards attorneys' fees and costs to SynQor that are attributable to Delta's discovery abuses in this case. The Court has considered lesser sanctions, but finds that such sanctions would be ineffective to cure the prejudice resulting from Delta's conduct and deter such conduct in the future.

It is so ORDERED.

SIGNED this 11th day of July, 2011.

_T. John Ward_

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE