**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| SYNQOR, INC, | § | |
| | § | |
| v. | § | CASE NO: 2:07-CV-497-TJW-CE |
| | § | |
| ARTESYN TECHNOLOGIES, INC., et al. | § | |

**ORDER**

Pending before the Court is SynQor, Inc.'s ("SynQor") Motion for Assessment of Supplemental Damages on Defendants' Uncounted Infringing Sales (Dkt. No. 917) and SynQor's Motion to Amend Partial Judgment to Award Supplemental Damages (Dkt. No. 1127). Defendants Artesyn Technologies, Inc. and Astec America Inc. (collectively "Astec"); Bel Fuse, Inc. ("Bel Fuse"); Cherokee International Corp. and Lineage Power Corporation (collectively "Lineage"); Delta Electronics, Inc. and Delta Products Corp. (collectively "Delta"); Murata Electronics North America, Inc. and Murata Manufacturing Co., Ltd. (collectively "Murata"); Murata Power Solutions, Inc. ("MPS"); and Power-One, Inc. ("Power-One")(collectively "Defendants") oppose the motions. Having carefully considered the parties' submissions, the record, and the applicable law, the Court finds that SynQor is entitled to supplemental damages for the time periods of November 1, 2010 through December 21, 2010, and December 22, 2010 through January 24, 2011. For the following reasons, the Court awards SynQor supplemental damages in the amounts stated below. In addition, the Court finds that for the time period of December 22, 2010 through January 24, 2011, the supplemental damages should be enhanced by 1.75 times.

## I.    Introduction

With jury selection scheduled on November 30, 2010, Defendants supplemented their production of sales data on the accused products at various points in November and December 2010. (*See* Dkt. No. 917-2, ¶ 5.)  SynQor's damages expert, Mr. Brett Reed, initially prepared his damages analysis and calculations in a report dated September 7, 2010, and updated that report on September 29, 2010, and December 2, 2010, as Defendants produced more sales data. (*Id.* ¶ 3.)  All of the defendants produced sales data that covered sales made at least through October 31, 2010.[1] (*Id.* ¶ 4.)  Thus, the damages model presented to the jury was based on sales made at least through October 31, 2010.

The parties selected a jury on November 30, 2010.  The trial commenced on December 13, 2010 and the jury reached a verdict on December 21, 2010.  The jury found that defendant, Artesyn Technologies, Inc. directly infringed claim 1 of U.S. Patent No. 7,558,083 ("the '083 patent") and induced or contributed to infringement of claims 2, 8, 10 and 19 of U.S. Patent No. 7,072,190 ("the '190 patent), claims 21 and 30 of U.S. Patent No. 7,272,021 ("the '021 patent"), claim 1 of the '083 patent, claims 56 and 71 of U.S. Patent No. 7,564,702 ("the '702 patent"), and claim 9 of U.S. Patent No. 7,269,034 ("the '034 patent"); that defendant, Astec America, Inc., directly infringed claim 1 of the '083 patent and induced or contributed to infringement of claims 2, 8, 10 and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083 patent, and claims 56 and 71 of the '702 patent; that defendant, Bel Fuse, Inc., directly infringed claims 2, 8, and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083 patent, and claims 56 and 71 of the '702 patent and induced or contributed to infringement of claims 2, 8, 10 and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083

---

[1] Bel Fuse produced sales data through November 8, 2010.

patent, and claims 56 and 71 of the '702 patent[2]; that defendant, Cherokee International Corp., directly infringed claim 1 of the '083 patent and induced or contributed to infringement of claims 2, 8, 10 and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083 patent, and claims 56 and 71 of the '702 patent; that defendant, Lineage Power Corp., directly infringed claim 1 of the '083 patent and induced or contributed to infringement of claims 2, 8, 10 and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083 patent, claims 56 and 71 of the '702 patent, and claim 9 of the '034 patent; that defendant, Delta Electronics, Inc., directly infringed claim 1 of the '083 patent and induced or contributed to infringement of claims 2, 8, 10 and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083 patent, claims 56 and 71 of the '702 patent, and claim 9 of the '034 patent; that defendant, Murata Power Solutions, Inc., directly infringed claim 1 of the '083 patent and induced or contributed to infringement of claims 2, 8, 10 and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083 patent, and claims 56 and 71 of the '702 patent; that defendants, Murata Electronics North America, Inc., and Murata Manufacturing Co., Ltd., directly infringed claim 1 of the '083 patent and induced or contributed to infringement of claims 2, 8, 10 and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083 patent, and claims 56 and 71 of the '702 patent; that defendant, Power-One, Inc., directly infringed claim 1 of the '083 patent and induced or contributed to infringement of claims 2, 8, 10 and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083 patent, claims 56 and 71 of the '702 patent, and claim 9 of the '034 patent.  The jury failed to find invalidity of any of the patents-in-suit.

---

[2] The Court previously determined that Bel Fuse directly infringed claims 2, 8, 10 and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 1 of the '083 patent, and claims 56 and 71 of the '702 patent.

On December 24, 2010, SynQor filed a motion seeking prejudgment interest on the jury's award, filing an amended motion on December 29, 2010. (Dkt. Nos. 874, 908.)  On December 29, 2010, the Court entered a partial judgment on the verdict ordering Defendants to pay the monetary damages awarded by the jury, which collectively totaled $95,224,863, of which approximately $87.1 million was lost profits and the balance of which was a reasonable royalty on units for which lost profits were not calculated. (Dkt. No. 907.)  At the close of trial, SynQor moved for a permanent injunction.  On January 7, 2011, SynQor filed its motion for a permanent injunction against Defendants. (Dkt. No. 913.)  The Court held a full evidentiary hearing on the issue of a permanent injunction that started on January 19, 2011 and ended on January 20, 2011. On January 24, 2011, the Court entered a memorandum opinion and order granting the permanent injunction. (Dkt. Nos. 931 and 932.)  Defendants filed an emergency motion to stay the permanent injunction pending interlocutory appeal. (Dkt. No. 933.)  The Court granted the emergency motion, and on January 31, 2011, the Court of Appeals for the Federal Circuit granted a temporary stay of the injunction.  On April 11, 2011, the Federal Circuit replaced its temporary stay with a partial stay of this Court's injunction.  Specifically, the Federal Circuit ordered that "[t]he stay of the injunction as set forth above will end at the earliest of: (1) this court's final determination of these consolidated appeals, (2) September 30, 2011, or (3) provision by SynQor of a technically qualified replacement."  Under the order, the injunction became permanent for any bus converters where SynQor provide an equivalent model, and was stayed for the remaining bus converters until September 30, 2011.  Defendants were ordered to pay into escrow a $12 royalty per unit rate sold for the bus converters sold under the protection of the stay.

On January 19, 2011, with its motion for a permanent injunction pending, SynQor moved the Court to enter an order establishing a procedure by which the Court could assess and award SynQor supplemental damages on Defendants' sales of infringing products that were not counted in the calculation of damages presented to the jury at trial. (Dkt. No. 917.)  In its motion, SynQor also moved the Court to assess and award supplemental damages covering infringing products that were sold post-verdict.  On April 11, 2011, the Court ordered each Defendant to produce sales data for each of its unregulated and semi-regulated bus converters for the period from November 1, 2010 through January 24, 2011. (Dkt. No. 1102.)  On April 28, 2011, the Court ordered each Defendant to produce worldwide sales data for each of its unregulated and semi-regulated bus converters for the period from November 1, 2010 through May 1, 2011. (Dkt. No. 1119.)  In the April 28th order, the Court scheduled an evidentiary hearing for June 15, 2011 (hereafter "June 15th hearing"), and set a briefing schedule. *Id.*  On June 10, 2011, five days before the June 15th hearing, SynQor moved the Court to amend the Partial Judgment to award supplemental damages. (Dkt. No. 1175.)  Given the short time frame, the Court denied the motion. (Dkt. No. 1200.)  The Court held a full evidentiary hearing on the issue of supplemental damages on June 15, 2011.

At the June 15th hearing, the Court directed the parties to focus their supplemental damages model to the one adopted by the jury for three specific time periods.  The first period is the pre-verdict time period, which includes November 1, 2010 through December 21, 2010 (hereafter "pre-verdict time period").  The second period is the post-verdict, pre-injunction time period, which includes December 22, 2010 through January 24, 2011 (hereafter "pre-injunction time period" or "post-verdict, pre-injunction time period").  The third period is the post-injunction time period, which includes January 25, 2011 through May 1, 2011 (hereafter "post-

injunction time period").[3]   Under this direction, SynQor provided a supplement declaration of Mr. Reed on June 15, 2011, which presented two additional damages models. (Dkt. No. 1194, filed June 16, 2011.)  The first model was based on the damages model adopted by the jury for all three time periods.  The second model was based on the damages model adopted by the jury for the pre-verdict and pre-injunction time periods, but applied a new royalty rate for the post-injunction time period.  As stated at the June 15th hearing, the Court will focus its supplemental damages analysis on these three time periods.  Given this background, the Court will now address the appropriate damages award for each of these time periods.

## II.    Pre-Verdict Time Period: November 1, 2010 through December 21, 2010

Defendants generally argue that SynQor waived its right to additional damages occurring during the pre-verdict time period because SynQor never pled for an accounting.  The Court disagrees and is not persuaded that SynQor waived its right to recover supplemental damages during the pre-verdict time period.  Specifically, in its Fourth Amended Complaint, SynQor alleged: "The [Defendant's] past and continued acts of infringement of the [patent] have injured SynQor and thus SynQor is entitled to recover compensatory damages for the infringement in an amount subject to proof at trial." (Dkt. No. 426, SynQor's Fourth Am. Compl. for Patent Infringement ¶¶ 26, 36, 51, 71, 91, 101, 116, 136, 146, 161, 171.)  Further, in the Request for Relief, SynQor requested: "that the Court . . . award compensatory damages in an amount to be determined at trial; . . . and . . . grant such other and further relief as the Court and the jury deem just and proper." (*Id.* at 31-33.)

The Court finds that this "compensatory damages" language was determined to be sufficient to preserve a plaintiff's entitlement to supplemental damages in *TiVo Inc. v. Echostar*

---

[3] The post-injunction time period extends only through May 1, 2011, because that is the cut-off date for the worldwide sales included in Defendants' most recent production.

*Communs. Corp.*, 2006 U.S. Dist. LEXIS 64291 (E.D. Tex. Aug. 17, 2006), *aff'd in part*, 516 F.3d, 1290, 1312 (Fed. Cir. 2008).  In *TiVo*, the Court stated that "[f]ailure to include a separate request for 'supplemental' damages does not result in waiver because such damages are a component of any request for compensatory damages."  *Id.* at *7.  Indeed, a failure to award these damages would grant an infringer a windfall by enabling it to infringe without adequately compensating the patentee for this infringement.  As explained in *Tivo*, "[a] patentee is entitled to damages for the entire period of infringement and should therefore be awarded supplemental damages for any periods of infringement not covered by the jury verdict." *Id.* at *6.  It would be unjust and improper to allow Defendants to shield 51 days of sales from the damages period just because Defendants could not produce updated sales data in time for trial. (*See, e.g.,* Dkt. No. 1151 at 6 ("[O]n October 27, SynQor asked Delta and the other Defendants to update their sales numbers to include sales through October 31, 2010. At the time, the parties were extremely busy preparing for trial.").)

### A.  Supplemental Damages Award for the Pre-verdict Time Period

Given that the Court has concluded that SynQor did not waive its right to damages during the pre-verdict time period, the remaining issue is to determine the appropriate amount to award SynQor as supplemental damages.  The parties do not dispute that the amount awarded should be determined using the same methodology used by Mr. Reed at trial.  The Court agrees that this is the correct methodology because the jury adopted Mr. Reed's damages model in reaching its verdict.  The jury's verdict, however, does not include an award of damages for sales occurring during the pre-verdict time period, November 1, 2010 and December 21, 2010.  Using Mr. Reed's damage model, the Court awards the following supplemental damages for the pre-verdict time period to SynQor from each defendant listed.

| Defendant | Pre-Verdict Supplemental Damages (11/01/2010 to 12/21/2010) |
|---|---|
| Astec (Emerson) | $1,960,067.00 |
| | |
| Bel Fuse | $583,626.00 |
| | |
| Lineage/Cherokee | $371,594.00 |
| | |
| Murata | $6,132.00 |
| | |
| MPS | $1,316,644.00 |
| | |
| Power One | $1,075,488.00 |
| | |
| Delta | $182,178.00 |
| | |
| Total | $5,495,729.00 |

### 1.   Specific Disputes Relating to the Pre-Verdict Time Period

As argued in the briefs and discussed during the June 15th hearing, the parties generally agree on the amounts of the pre-verdict supplemental damages once it was determined that SynQor did not waive its right to these damages. *Compare* Dkt. No. 1147-12 at 22 ("Total Damages" for 11/1/10 – 12/21/10) *and* Dkt. No. 1191-9 at 1 ("Pre-Verdict Supplemental Damages"). Some of the defendants, however, have raised specific disputes relating to the proper calculation of the damages award for the pre-verdict time period. The Court addresses each of these disputes as follows.

### a)   Lineage's Sale of SP773 and EBW020A0B Bus Converters

Lineage disputes $1,616.00 in damages for its sales of its SP773 and EBW020A0B bus converters. SynQor contends that the difference is because Mr. Napper, Defendants' damages expert, excludes damages for Lineage's sales of one SP773 part number and three EBW020A0B part numbers. (Dkt. No. 1141-13 at 1.) SynQor asserts that Lineage failed to identify these part

numbers during discovery and has not provided technical information related to these part numbers. SynQor notes that Lineage subsequently listed the EBW products on its website as semi-regulated bus converters and as being subject to the Court's permanent injunction. SynQor also states that Lineage included sales data for both the EBW and SP773 parts in response to the Court's order to produce sales data for all unregulated and semi-regulated bus converters. As such, SynQor argues that Lineage cannot reasonably dispute that had it produced information on these products to SynQor prior to trial the jury would have found included these sales in its damages award.

The Court disagrees and is not convinced that the jury would have included these sales in its damages award. Accordingly, the Court concludes that these sales should not be included in the supplemental damages and awards $371,594.00 to SynQor for Lineage's pre-verdict sales. This award does not include the $1,616.00 included in Mr. Reed's calculation. It is important to note that this is not a finding that these part numbers do not infringe the asserted patents. Instead, it is a finding that SynQor failed to provide sufficient evidence that the jury would have included these sales in its damages award.

### b) Importation Rate Applied to Murata's MPDNB001S-Y Part Number

Murata disputes $29,033.00 in damages for its sales of certain bus converters to Fujitsu Japan. For these sales, SynQor argues that Mr. Reed's use of a 90% importation rate was correct even though this was not the importation rate presented to the jury. SynQor argues that Murata's customer, Fujitsu, has conceded that this is the actual rate at which it imports Murata's infringing MPDNB001S-Y into the United States. SynQor further argues that if it had access to this actual importation rate at trial, the jury would have awarded damages for the MPDNB001SY at this importation rate. It contends that although it learned of the 90% importation rate as part of a settlement agreement with Fujitsu, post verdict, SynQor's witness testified that the 90% figure

represents the actual rate of importation rather than a negotiated term.  Dkt. No. 1147-2 at 6.

SynQor asserts that the 90% importation rate represents the "actual rate" of importation rather

than a negotiated rate.  SynQor concludes that the updated importation rate simply allows the

Court to award damages for the actual number of infringing units.

Murata responds that the supplemental pre-verdict damages are intended to be the

damages that the jury would have determined if the sales data had been current as of the verdict

date.   Thus, Murata argues that the supplemental calculation cannot take into account

information that did not exist on the verdict date—much less did not exist until more than four

months later.  Murata also notes that this was a settlement negotiation that it did not participate

in.  That is, the agreement is confidential and Murata contends that it still does not know the

terms of the agreement.  Murata further argues that this type of arrangement does not prove the

veracity of any term contained within.  For example, Murata argues that SynQor fails to address

why SynQor and Fujitsu considered a lower importation rate during the negotiation and later

agreed to 90% in the context of a package deal.  Finally, Murata argues that Fujitsu did not state

in the settlement agreement that it imported 90% during the pre-verdict period.

The Court agrees with Murata.  The importation rate used at trial and adopted by the jury

is the one that should be used for the pre-verdict time period.  Accordingly, the Court awards

$6,132.00 to SynQor for these sales by Murata.  This is the amount calculated by Mr. Reed when

the importation rate presented at trial is used to calculate the damages.  (Dkt. No. 1147-12 at 22.)

### c)   Delta's Pre-verdict Sales to Cisco that Were Not Previously Disclosed

Delta disputes $141,413.00 in damages for bus converter sales that were not disclosed

until after the jury's verdict.  Specifically, Delta waited until May 9, 2011, which was well after

the close of discovery and the jury's verdict, to disclose certain pre-verdict sale made to Cisco

pursuant to a letter agreement.  Delta contends that in June 2010, it informed Cisco that because

of the uncertainties and risks inherent in litigation it made a business decision to stop selling unregulated bus converters for use in the United States. Delta purports that it further informed Cisco that it wanted Cisco to confirm that bus converters shipped after June 21, 2010 would not be sold or used in the United States. In response to Delta's concerns, Cisco sent two letters to Delta, dated June 11, 2010 and June 28, 2010, confirming that Cisco would not ship or have shipped on its behalf into the United States any Cisco systems including Delta's unregulated bus converters having Cisco part numbers 341-0224-01 and 341-0214-03. These Cisco part numbers correspond to Delta's Q48SB9R650NN A and D48S9R650-1A unregulated bus converters. Delta asserts that all of its unregulated bus converter sales to Cisco after June 21, 2010 were made pursuant to the two Cisco letters. It represents that all of the bus converters were specifically marked by Delta as not for use in the United States. Thus, Delta argues that all unregulated bus converter sales made to Cisco after June 21, 2010 were used outside the United States and none were imported into the United States. It further argues that it was Delta's intent that each shipment of unregulated bus converters to Cisco made after June 21, 2010 would be used exclusively outside the United States. This includes the accused supplemental pre-verdict units of Delta's Q48SB9R650NN A and D48S9R650-1A sold to Cisco after October 31, 2010. Given this, Delta concludes that no supplemental damages for pre-verdict shipments to Cisco after October 31, 2010 should be assessed against Delta.

SynQor responds that Delta made the strategic choice to withhold these agreements and relevant sales data from SynQor during discovery, presumably because they would have expanded the damages base and helped SynQor prove the state of mind elements required for its liability case. SynQor contends that in choosing to withhold this highly relevant discovery from SynQor without any legal justification, Delta has waived any defense based upon its purported

11

agreements with Cisco. *See* Fed. R. Civ. P. 37(c)(1).  SynQor further argues that if Cisco really has refrained from incorporating these Delta converters into U.S.-bound products, then Cisco must have used a higher proportion of the other Defendants' converters instead to cover its U.S. needs, but those sales are not included in the damages calculation.  Thus, SynQor contends that allowing Delta to escape liability in spite of its discovery misconduct would cause SynQor to be undercompensated.

The Court agrees that additional damages and sanctions are warranted given Delta's conscious decision not to produce relevant sales data.  The Court, however, will determine the appropriate damages and sanctions in ruling on the pending motion (Dkt. No. 1129) related to this discovery violation.  Accordingly, the Court will not include these undisclosed sales in the supplemental damages award.  Thus, the Court awards $182,178.00 to SynQor for Delta's sales during this pre-verdict time period.  This is the amount calculated by Mr. Napper for Delta's pre-verdict sales. (Dkt. No. 1141-9 at 1.)   This amount is $141,413.00 less than the amount calculated by Mr. Reed, which includes the undisclosed pre-verdict sales by Delta for the time period of November 1, 2010 through December 21, 2010. (Dkt. No. 1147-12 at 45.)

## III.    Post-Verdict, Pre-Injunction Time Period: December 22, 2010 through January 24, 2011

As discussed above, Defendants do not dispute that SynQor is entitled to supplemental damages resulting from sales of the accused products that took place after the jury rendered its verdict. (Dkt. No. 922 at 1)("Defendants Bel Fuse, Inc., Cherokee International Corp., Lineage Power Corp., Delta Electronics, Inc., Delta Products Corp., Murata Electronics North America, Inc., Murata Manufacturing Co., Ltd., Murata Power Solutions, Inc., and Power-One, Inc. (collectively the 'Filing Defendants') do not dispute that SynQor is entitled to supplemental damages resulting from sales of the accused products that took place after the jury rendered its

verdict…); (Dkt. No. 986 at 2) ("Astec objects to and reserves its right to present argument and evidence on the methodology to be used for determining the quantum of damages during the 'supplemental' period.").   What the parties do dispute is the amount of damages, the methodology used to arrive at the calculated amounts, and whether SynQor has met its burden of proof establishing post-verdict infringement.

### A.  Legal Standard

Under the law, a patentee is entitled to be compensated for all infringement of its patents. *See* 35 U.S.C. § 284 ("When the damages are not found by a jury, the court shall assess them."). This includes damages that occur between a jury's verdict and the entry of judgment.  As this Court has recognized, "failure to award such damages would grant an infringer a windfall by enabling it to infringe without compensating a patentee for the period of time between the jury's verdict and the judgment." *Nat'l Instruments Corp. v. Mathworks, Inc.*, 2:01-CV-11, 2003 U.S. Dist. LEXIS 25863, at *12, 2003 WL 24049230, at *4 (E.D. Tex. June 23, 2003).  To assess post-verdict damages, this Court has previously applied the rate determined by the jury for the time period prior to a stay of an injunction.  *Smith and Nephew, Inc. v. Arthrex, Inc.*, No. 2:07-cv-335-TJW-CE, 2010 WL 2522428, at *6 n.3 (E.D. Tex. Jun. 18, 2010).  For the time period during a stay, the Court has applied a rate that was different from the adjudicated rate. *Id.*

Although the facts are not identical, the Court's findings in *Smith and Nephew* are consistent with the holdings of *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293 (Fed. Cir. 2007)(hereafter "*Paice II*").  In *Paice II*, the Federal Circuit determined that a party does not have a Seventh Amendment right to a jury trial simply because post-verdict monetary damages are at issue. *Id.* at 1316. ("[T]he fact that monetary relief is at issue in this case does not, standing alone, warrant a jury trial.").  Indeed, the panel remanded the case and instructed the district

court to "take additional evidence if necessary to account for any additional economic factors arising out of the imposition of an ongoing royalty." *Id.* at 1315. Likewise, in *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1361 (Fed. Cir. 2008), the Federal Circuit authorized a royalty during the stay of the injunction that differed from the reasonable royalty determined by the jury. Accordingly, a party opposing the award of post-verdict monetary damages does not have an automatic Seventh Amendment right to a jury. *See e.g., Ecolab, Inc. v. FMC Corp.,* 569 F.3d 1335, 1353 n.5 (Fed. Cir. 2009) (remanding the case to the district court to conduct an accounting to calculate and award damages for post-verdict sales). This is true regardless of whether the damages are supplemental compensatory damages under 35 U.S.C. 284 or equitable monetary relief under 35 U.S.C. 283.

A jury's finding of infringement, however, does not relieve a party of its burden of proving post-verdict damages. *Creative Internet Adver. Corp. v. Yahoo! Inc.*, 674 F. Supp. 2d 847, 855 (E.D. Tex. 2009). ("The burden for establishing future royalties post-trial should be little different than the burden that would be in place for establishing a royalty at trial.") Thus, to prove inducement after the verdict, a party has to prove that a defendant actively induces a party to infringe during the post-verdict time period. 35 U.S.C. § 271(b). Likewise, to prove contributory infringement after the verdict, a party must show that a defendant had knowledge that the device would be used to infringe the patent during the post-verdict time period. 35 U.S.C. § 271(c). In carrying its burden, a party is not limited to direct evidence, but may prove its claim by relying entirely on circumstantial evidence. *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986) ("It is hornbook law that direct evidence of a fact is not necessary. 'Circumstantial evidence is not only sufficient, but may also be more certain,

satisfying and persuasive than direct evidence.'") (quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960)).

If a party contends that the assessment of damages for infringement taking place after adjudication should take into account the determination of liability, it is that party's burden to establish a reasonable royalty that accounts for changes in the parties' bargaining positions and economic circumstances. *Creative Internet*, 674 F. Supp. 2d at 855 ("Therefore, in the absence of a permanent injunction, in order to establish future damages, the burden remains with the patentee to establish … a reasonable royalty that accounts for changes in the parties' bargaining positions and economic circumstances."). To carry its burden, a party may provide the court with additional evidence indicating the changes in the parties' bargaining positions and economic circumstances. *Paice II*, 504 F.3d at 1315 ("[T]he court may take additional evidence if necessary to account for any additional economic factors arising out of the imposition of an ongoing royalty."). Some examples of evidence that may be taken into account to include: "additional expert testimony, evidence of market changes, evidence of changes in the infringer's profit margin, evidence of other products released by the infringer, and evidence of additional patent licenses entered into by the patentee, the infringer's likelihood of success on appeal, and the infringer's ability to immediately comply with the injunction." *Creative Internet*, 674 F. Supp. 2d at 855 n.10 (citation omitted).

## B. Post-Verdict Damages Model

For the post-verdict time period, the parties presented multiple damages models. As indicated during the July 15th hearing, the Court found that the previously submitted post-verdict damages models were not the correct measure of post-verdict damages. This was because none of these models followed the damages model adopted by the jury. In general, the damages model presented to the jury included three main variables: a lost profit component, a reasonable

royalty component, and an importation rate component.  Under the methodology presented to the jury, the first step was to determine the base for each accused device by multiplying the worldwide sales data by the importation rates.  The base was then multiplied by either a lost profits figure or a reasonable royalty percentage.  That is, for bus converters where SynQor had an equivalent part number, the lost profit model was applied to the base.  The amount of lost profits varied depending on the particular model.  For bus converters where SynQor did not have an equivalent part number, the reasonably royalty percentage was applied.  With respect to the reasonably royalty damages, SynQor's expert presented, and the jury accepted, a two-tier reasonable royalty model.  Tier 1 was 50% of the lost profit "but for" pricing, and Tier 2 was $12.00 per unit sold.  Thus, at a high level, the damage model adopted by the jury included three main variables: a lost profit component, a reasonable royalty component, and an importation rate component.  The time period for determining the damages is the fourth variable the Court must consider.  This is because the pre-injunction time period and post-injunction time period may require different variations of the damages model adopted by the jury to account for changes in the parties' bargaining positions and economic circumstances in the post-verdict world.

Before the June 15th hearing, not one party submitted a damages model that followed the one adopted by the jury in reaching its verdict.  Both Mr. Reed and Mr. Napper changed one or more of the variables in the model.  For example, Mr. Reed changed all of the variables in his post-verdict damages model.  He did not account for lost profits, he applied new royalty rates, he increased the importation rates, and he calculated damages through May 1, 2011 for some sales and cut-off other sales at January 24, 2011.  Likewise, the post-verdict damages model used by Mr. Napper did not account for lost profits and only calculated damages for the single time period of December 22, 2010 through May 1, 2011.

At the June 15th hearing, the Court directed the parties that their post-verdict damages models needed to follow the one adopted by the jury for at least the post-verdict, pre-injunction time period.  With this guidance, SynQor provided a supplement declaration of Mr. Reed on June 15, 2011, which presented two additional damages models. (Dkt. No. 1194, filed June 16, 2011.) The first model was based on the damages model adopted by the jury for both the post-verdict and post-injunction time period.  The second model was based on the damages model adopted by the jury for the pre-injunction time period, but applied a new royalty rate for the post-injunction time period.  However, unlike the previous damages models, the second model calculated damages based on the importation rates submitted to the jury, but applied new royalty rates for these post-injunction sales.  With this background, the Court will address the supplemental damages award for the remaining two time periods.

## C.  SynQor has Proven that it is Entitled to Supplemental Damages for the Post-Verdict, Pre-Injunction Time Period

Defendants generally argue that to be liable for post-verdict bus converter sales made outside the United States, SynQor must show that each Defendant actively induced infringement or contributed to the infringement of the asserted patents through its overseas sales.  The Court agrees that it is SynQor's burden to prove post-verdict infringement.  Moreover, the Court finds that based on the direct and circumstantial evidence, SynQor has met its burden and has proven by a preponderance of the evidence that Astec, Bel Fuse, Lineage, Murata, and MPS actively induced infringement or contributed to the infringement of the asserted patents during the post-verdict, pre-injunction time period.[4]

---

[4] The Court will address SynQor's evidence and the awarding of supplemental damages for the post-injunction time period in a later section.

First, it cannot be reasonably disputed that underlying direct infringement has taken place in the post-verdict, pre-injunction time period. For example, Cisco—the largest customer of the bus converters at issue—has acknowledged that it is shipping product into the U.S. that include Defendants' bus converters in products that the jury found to infringe. *See, e.g.*, Dkt. No. 1157 at 6 ("Cisco's current sale [in the U.S.] of products implementing those three converters only use inventory that was purchased *before* April 11, 2011, before *any* injunction was in effect") (emphasis added), at 15-16 (Cisco has instructed its contract manufacturers to segregate only bus converters purchased after April 11, 2011 or April 28, 2011 for non-U.S. use, depending on the model).

Moreover, there can be no reasonable dispute that Defendants knew their actions would induce actual infringement of the asserted patents after the jury's verdict. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. ___ (2011) ("[W]e now hold that induced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement."); *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006) (*en banc*) ("The requirement that the alleged infringer knew or should have known his actions would induce actual infringement necessarily includes the requirement that he or she knew of the patent."). For instance, in opposing SynQor's oral motion for a permanent injunction on the day the jury reached its verdict, Defendants told the Court that sales should not be halted because "[t]here are customers who are depending on these products. They go into the internet; they go into the banking system; they go into Wall Street." 12/21/10 Morning Transcript at 176:17-19. Later, Defendants submitted a number of declarations from their customers about the impact that an injunction would have on their business and the general public. For example, Defendants submitted declarations from Cisco, Juniper, Enterasys, Cray, Radisys, and Fujitsu.

Defendants also presented extensive arguments about the impact an injunction would have on Cisco. Moreover, both Cisco and Defendants told this Court and the Federal Circuit that if Cisco did not have a "transition period" during which it could directly infringe, Cisco would be in a critical "line down" situation, would breach contracts with suppliers, and would otherwise be irreparably harmed. *See* Dkt. No. 1157 at 6 ("[O]nce Cisco's existing supply of converters is exhausted, the injunction will prevent Cisco from manufacturing and delivering these 200 critical products, will prevent its customers from deploying the products in hundreds of networks, and will cause substantial public harm to the hospitals, financial institutions, telecommunications providers, and other industries that depend on those networks").

Defendants further argued that Cisco products that incorporate these bus converters (hereafter "Impacted Cisco Products") were networking devices that were fundamental to the continuing operation of important operating networks. Specifically, Defendants argued that these Impacted Cisco Products are purchased and used by a wide cross-section of the public, including important governmental entities. For example, Defendants contended that Cisco customers included multiple branches of the United States armed forces, United States District Courthouses, key government agencies (such as the United States Postal Service, the Federal Bureau of Investigation, the Federal Aviation Administration, and the Departments of Defense, Justice, and State), government contractors, major financial institutions, global telecommunication service providers, and several cable service operators. Defendants then requested that the Court exempt sales of certain bus converters to certain customers at least until the termination of a transition period for each specified customer. Specifically, Defendants' proposed an exemption for certain enjoined products sold to Cisco until September 30, 2011; to Juniper until September 30, 2011; to Enterasys until September 30, 2011; to Cray until

19

September 30, 2011; to Radisys until July 31, 2011; and to Fujitsu until September 30, 2011. Dkt. No. 919-1 at 5-7.

In addition, Cisco's purchase of the products found to cause indirect infringement further confirms that it continued to directly infringe in the United States.  As Cisco has admitted, it increased its purchase volume prior to the entry of the permanent injunction. *See* Dkt. No. 1157 at 10 (admitting worldwide purchases of 179,898 for the quarter ending 10/31/10 compared with purchases of approximately 314,000 in the quarter ending 1/24/11). During the stay, Cisco continued purchasing bus converters at an elevated level. *Id.* (admitting worldwide purchases of approximately 226,000 bus converters for the quarter ending 4/30/11).  If Defendants truly believed that Cisco would not directly infringe by importing products containing bus converters into the U.S., they would have seen their sales to Cisco drop, not increase.  Moreover, Cisco now asserts that it is not liable for any sales made prior to April 11, 2011, because no injunction was in effect prior to April 11 when the stay was partially dissolved. *See, e.g.*, Dkt. No. 1157 at 6. Thus, once again, Defendants and Cisco want it both ways.  On the one hand, Cisco argues that it is not subject to the permanent injunction for any units that it purchased prior to April 11, 2011, and that it can import these units into the United States without violating the Court's orders.  On the other hand, Defendants ask the Court to ignore Cisco's claims and argue that there is no proof of inducement or contributory infringement even though Defendants have actively induced Cisco to import products into the United States that the jury found directly infringe the asserted patents.  Given the direct and circumstantial evidence, the Court rejects Defendants' arguments and concludes that SynQor has carried its burden in proving that sales made during the post-verdict, pre-injunction time period induced and contributed to a third-party directly infringing the asserted claims.  The Court will now turn to the specific arguments presented by each Defendant.

### 1.  Astec

Astec argues that SynQor has offered no independent evidence that Astec continues to induce its foreign-sale customers to infringe after the jury issued its verdict on December 21, 2010.   Specifically, Astec argues that the evidence presented at trial shows that Astec manufactures all of its accused bus converters outside of the United States and sells many of those converters outside the United States, to customers outside of the United States for use outside of the United States.   Astec also argues that immediately after the jury's verdict was received, it took steps to prevent the products found by the jury to infringe from being sold or imported into the United States.   Astec represents to the Court that in the early afternoon on December 22, 2010, Astec issued internally an immediate stop-ship instruction applicable to all Astec and Artesyn semi-regulated and unregulated bus converters with active purchase orders or forecasts, regardless of the location of the ship-to customer.   Astec contends that the stop-ship instruction was effective worldwide for all sales and shipments of the accused bus converters. Astec also represents that by close of business on December 23, 2010 in Hong Kong, Astec had implemented internal stop-ship processes for the accused products.

After issuing the internal stop-ship instructions, Astec contends that it sent letters to the affected customers explaining Astec's decision to stop shipments of accused bus converters.   The letters notified the customers that any future supply of the accused bus converters outside of the United States would be expressly conditioned on the customer's acceptance of a restriction not to incorporate the bus converter into a product that would be sold, offered for sale, or imported into the United States as part of an intermediate bus architecture system without first obtaining a license from SynQor.   After receiving Astec's letter, and prior to the issuance of any injunction by this Court, some of Astec's customers affected by the stop-ship instructions stated that they had no alternative source of supply for the accused bus converters and would be unable to meet

their contractual obligations for U.S. customers without further supply of the accused bus converters from Astec. (Dkt. No. 1138-1, ¶10.)

Astec states that it informed those customers that it would be willing to make sales of the required converters but only under certain conditions. Specifically, Astec contends that it conditioned the sales upon the customer either: (a) obtaining authorization from SynQor for the sales or (b) entering into an indemnification Agreement, in which the customer agreed to be financially responsible for any damage that may be caused to SynQor by Astec shipping the converters into the United States or the customer importing or selling its products in the United States. *Id.* Astec then entered into an indemnification agreement with Cisco Systems, Inc.; Juniper Networks, Inc.; Communication Automation Corporation; Cyan Optics, Inc.; and SANBlaze Technology, Inc. (Dkt. No. 1138-5.) Astec argues that it made it clear that any agreement required that, in the event the Court entered an injunction prohibiting such sales, Astec would cease such sales. *Id.*

Astec further argues that before any post-verdict sales were made by Astec to a foreign customer, Astec required the foreign customer to provide Astec with a written confirmation that the accused bus converters supplied by Astec outside of the United States would not be incorporated into products, as part of an intermediate bus architecture system that would be sold, offered for sale, or imported into the United States without first obtaining a license from SynQor. Astec concludes that because of these proactive steps taken by Astec after the jury verdict, there is no basis for any of Astec's post-verdict foreign sales to be subject to SynQor's supplemental damages claim. The Court disagrees.

First, Astec admits that its customers specifically informed Astec that they did not have an alternative source of supply for the accused bus converters and would be unable to meet their

contractual obligations for U.S. customers without further supply of the accused bus converters from Astec.  Thus, Astec knew that its customers were in dire straits and would need the bus converters to meet their contractual obligations for U.S. customers.  Specifically, Astec knew its customers needed the bus converters and had to import a percentage of these converters into the United States in products that the jury found directly infringed the asserted patents.  Armed with this knowledge, Astec then focused on protecting its own financial interest by entering into indemnification agreements in which the customers agreed to be liable for any damages that may be caused to SynQor because of Astec's inducement.  Thus, Astec knew that direct infringement would occur and planned for the liability that it would incur by inducing the direct infringement.

Astec also argues that the indemnification agreements provide its customers with the incentive to avoid direct infringement and to work with SynQor.  But these indemnification agreements were not drafted in a vacuum, and in fact, the circumstantial evidence establishes that Astec's customers had more incentive to violate the terms of indemnification agreement than to work with SynQor.  To be sure, the Court finds that the indemnification agreements relied on by Astec further support the finding that Defendants' customers directly infringe the asserted patents.  Accordingly, the Court finds that SynQor has carried its burden in proving that the sales made by Astec during the post-verdict, pre-injunction time period induced infringement or contributed to the infringement of its patents.  Consistent with the damages model adopted by the jury, the Court awards SynQor $1,556,441.00 in supplemental damages for sales made by Astec during the post-verdict, pre-injunction time period.

### 2.  Bel Fuse

Bel Fuse also responds that SynQor has not identified a single unregulated bus converter sold by Bel Fuse that has ever touched U.S. soil after the verdict.  Specifically, Bel Fuse argues

that it took immediate action after the verdict to prevent inducement or contributory infringement in the United States.  On December 21, 2010, Bel Fuse contends that it refused any new orders for the accused products and stopped shipments to all customers, regardless of whether the products were destined for the United States or Asia.  It also represents to the Court that it specifically notified Cisco of the verdict and stopped shipments to Cisco on December 22, 2010. It notes that on December 29, 2010, Bel Fuse sent a letter to Pete Holthausen, Cisco's Senior Legal Director, notifying him that Bel Fuse could continue shipping to Cisco in Asia provided that Cisco did not export the accused products to the United States.

Like Astec, Bel Fuse did not resume shipments to Cisco until the parties signed an indemnification agreement under which Cisco would indemnify Bel Fuse for any instances of patent infringement relating to these shipments.  Bel Fuse concedes that it resumed shipments to Cisco Asia after January 7, 2011 with the understanding that Cisco would not export the products to the United States.  Thus, Bel Fuse argues that it took appropriate actions to ensure that the sales of its unregulated bus converters did not infringe SynQor's U.S. patents.  That is, it refused to ship to any Cisco locations worldwide from December 21, 2010 to January 7, 2011, instructed Cisco not to ship the bus converters to the United States, and secured an indemnity agreement from Cisco for any unregulated bus converters that might "inadvertently reach" the United States.

As with Astec, the Court finds that Bel Fuse knew its customers needed the bus converters and had to import a percentage of these converters into the United States in products that the jury found directly infringe. Using this knowledge, Bel Fuse then protected its own financial interest by entering into indemnification agreements shielding it from liability.  Thus, Bel Fuse knew that direct infringement would occur and planned for the liability that it would

incur by inducing the direct infringement.   Again, the indemnification agreements were not drafted in a vacuum, and the circumstantial evidence establishes that Bel Fuse's customers had more incentive to violate the terms of indemnification agreement than to work with SynQor. Accordingly, the Court finds that SynQor has carried its burden in proving that the sales made by Bel Fuse during the post-verdict, pre-injunction time period induced infringement or contributed to the infringement of its patents.   Consistent with the damages model adopted by the jury, the Court awards SynQor $1,081,454.00 in supplemental damages for sales made by Bel Fuse during the post-verdict, pre-injunction time period.

### 3.  Lineage

Lineage's primary argument is that it has a Seventh Amendment right to a trial by jury on the legal remedy of compensatory damages.   As discussed above, the Court disagrees with Lineage's assertion. *See* 35 U.S.C. § 284 ("When the damages are not found by a jury, the court shall assess them.").   Lineage also represents to the Court that it "had written to all its customers … and advised them that it would be holding all shipments of unregulated and semi-regulated bus converters." However, it is not disputed that Lineage had not even "began preparing" to cease its infringing sales until after its corporate representative returned from a vacation for the holidays two weeks after the jury's verdict. (Dkt. No. 1140 at 9; Dkt. No. 1140-2, ¶ 2.)  Finally, Lineage argues that Dr. Reed's damages model submitted before the June 15th hearing contains multiple errors.   As discussed above, the Court has rejected as a whole the specific damages models submitted by Dr. Reed before the June 15th hearing as they relate to post-verdict supplemental damages.

In the light of all of the evidence, the Court finds that SynQor has carried its burden in proving that the sales made by Lineage during the post-verdict, pre-injunction time period

induced infringement or contributed to the infringement of its patents.  Consistent with the damages model adopted by the jury, the Court awards SynQor $236,871.33 in supplemental damages for sales made by Lineage during the post-verdict, pre-injunction time period.

### 4.  Murata

Murata argues that the jury awarded damages for the sales to Fujitsu America, but did not award any damages for the sales to Fujitsu Japan because SynQor did not request damages for these sales.  Murata admits that it did continue to sell bus converters to Fujitsu Japan after the verdict.  But Murata contends that it had every right to continue making sales outside the United States because SynQor did not allege and the jury did not find that these sales induced infringement.  The Court notes that Mr. Reed's June 15, 2011 supplemental declaration does not appear to claim damages for the sales to Fujitsu Japan.  Moreover, it appears that the parties agree that the amount of damages for the post-verdict time period should be $18,924.00. *Compare* Dkt. No. 1194-1 at 10 *and* Dkt. No 1220 at 6.  In the light of all of the evidence discussed above, the Court finds that SynQor has carried its burden in proving that the sales made by Murata during the post-verdict, pre-injunction time period induced infringement or contributed to the infringement of its patents.  Consistent with the damages model adopted by the jury, and the amount agreed to by the parties, the Court awards SynQor $18,924.00 in supplemental damages for sales made by Murata during the post-verdict, pre-injunction time period.

### 5.  MPS

MPS admits that after the verdict, MPS sold nearly all of its bus converters to one customer, Cisco.  MPS states that it sold these bus converters to help Cisco avoid an irreparable problem of being forced into a "line down" situation.  In other words, MPS does not deny that it

sold bus converters to Cisco knowing that they would be imported into the United States. Accordingly, the Court finds that SynQor has carried its burden in proving that the sales made by MPS during the post-verdict, pre-injunction time period induced infringement or contributed to the infringement of its patents.  Consistent with the damages model adopted by the jury, the Court awards SynQor $751,921.00 in supplemental damages for sales made by MPS during the post-verdict time period.

### 6.  Delta and Power One

Power-One represents to the Court that it has zero post-verdict sales. (Dkt. No. 1190.)  At the June 15th hearing and in Mr. Reed's subsequent corrected declaration, counsel for SynQor indicated that it accepts Power-One's representation. *See, e.g.,* Dkt. No. 1216 at 2.  Likewise, Delta represents to the Court that it stopped selling the accused bus converters to the United States as soon as the jury rendered its verdict. Again, SynQor does not contest this representation.  Therefore, Delta and Power-One have no post-verdict sales of the bus converters that have been found to induce infringement or contribute to the infringement of SynQor's patents.  Accordingly, the Court finds that SynQor has not suffered supplemental damages as a result of sales made by Delta and Power One for the post-verdict, pre-injunction period.

### D.  Enhanced Damages for the Post-verdict, Pre-Injunction Time Period

Under section 284 of Title 35, damages may be enhanced up to three times the compensatory award.  The enhancement of damages is left to the discretion of the district court. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed. Cir. 1992) ("An award of enhanced damages for infringement, as well as the extent of the enhancement, is committed to the discretion of the trial court."), *abrogated on other grounds by Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975 (Fed Cir. 1995).  As discussed above, the Court finds that Astec's, Bel Fuse's, Lineage's, Murata's, and MPS's conduct during the post-verdict, pre-injunction time period

warrants an enhancement of damages. *Id.* ("The paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances.").  As adjudicated infringers, these defendants did not cease sales of the products found to infringe, but instead continued to sell these products, and for some customers significantly increased the number of sales during this time period.  This not only had the effect of rendering SynQor's exclusivity right meaningless, but also deprived SynQor of the opportunity to develop goodwill with its customers and brand recognition of its products.  In the post-verdict world, SynQor should have been given the opportunity to capture these sales. Instead they were deprived of this opportunity as a result of these defendants' egregiousness conduct.  The Court finds that the post-verdict conduct of these defendants was intended to, and actually did harm SynQor.  Accordingly, the Court finds that for the time period of December 22, 2010 through January 24, 2011, the supplemental damages should be enhanced by 1.75 times.  The following table summarizes the post-verdict damages award to SynQor, both before and after enhancement, for induced and contributory infringement for the post-verdict, pre-injunction time period.

| | Post-Verdict Supplemental Damages (12/22/10 to 1/24/2011) | Enhanced Post-Verdict Supplemental Damages (12/22/10 to 1/24/2011) |
|---|---|---|
| **Astec (Emerson)** | $1,556,441.00 | $2,723,771.75 |
| | | |
| **Bel Fuse** | $1,081,454.00 | $1,892,544.50 |
| | | |
| **Lineage/Cherokee** | $236,871.33 | $414,524.83 |
| | | |
| **Murata** | $18,924.00 | $33,117.00 |
| | | |
| **MPS** | $751,921.00 | $1,315,861.75 |
| | | |
| **Power One** | $0.00 | $0.00 |
| | | |
| **Delta** | $0.00 | $0.00 |
| | | |
| **Total** | $3,645,611.33 | $6,379,819.83 |

## IV.    Post-Injunction Time Period: January 25, 2011 through May 1, 2011

As discussed above, SynQor bears the burden of proof of establishing that the sales made by Defendants during the post-injunction time period induced infringement or contributed to the infringement of its patents. *Creative Internet*, 674 F. Supp. 2d 855 ("The burden for establishing future royalties post-trial should be little different than the burden that would be in place for establishing a royalty at trial."). On June 10, 2011, five days before the June 15th hearing, SynQor moved the Court to amend the partial judgment to award supplemental damages. (Dkt. No. 1175.) Given the short time frame, the Court denied the motion. (Dkt. No. 1200.) In denying SynQor's motion, the Court was not precluding SynQor from presenting this type of evidence in the future. At this time, however, the Court does not have sufficient evidence to determine the appropriate damages for the post-injunction time period. *Paice II*, 504 F.3d at

1315 ("It [is] important . . . for the district court to provide a concise but clear explanation of its reasons for the fee award.") (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 437 (1983)).

If SynQor can prove that Defendants induced infringement or contributed to the infringement of its patents during the post-injunction time period, then it will be entitled to compensation for that infringement.  To be clear, the Court explicitly finds that SynQor has not waived it right to damages during the post-injunction time period.  Moreover, the Court is not making a determination on whether SynQor has carried its burden for this time period. In addition, the Court finds that any infringement by Defendants during the stay of the injunction is not willful.  *Amado v. Microsoft Corp.*, 517 F.3d at 1362 ("Here, the district court centered its damages assessment on willful infringement. But willfulness, as such, is not the inquiry when the infringement is permitted by a court-ordered stay.").  Instead, given that the parties are now fully informed of the amounts in dispute for the post-injunction time period, the Court encourages the parties to negotiate their own rate prior to the imposition of one by the Court.  *Paice II*, 504 F.3d at 1315 n.15 ("This process will also, presumably, allow the parties … the opportunity to negotiate their own rate prior to the imposition of one by the court.").  If the parties decide that the Court should determine the post-injunction rate and damage amounts, then they should move the Court to do so in the case that will be severed from this case to handle post-injunction issues. The Court is inclined to allow the parties to take additional discovery related to the post-injunction damages if requested.

## V.     Conclusion

For the reasons stated above, the Court awards SynQor the following damages to compensate it for Defendants' induced and contributory infringement of its patents.

| | Pre-Verdict Supplemental Damages (11/01/2010 to 12/21/2010) | Enhanced Post-Verdict Supplemental Damages (12/22/10 to 1/24/2011) | | Total |
|---|---|---|---|---|
| **Astec (Emerson)** | $1,960,067.00 | $2,723,771.75 | | $4,683,838.75 |
| | | | | |
| **Bel Fuse** | $583,626.00 | $1,892,544.50 | | $2,476,170.50 |
| | | | | |
| **Lineage/Cherokee** | $371,594.00 | $414,524.83 | | $786,118.83 |
| | | | | |
| **Murata** | $6,132.00 | $33,117.00 | | $39,249.00 |
| | | | | |
| **MPS** | $1,316,644.00 | $1,315,861.75 | | $2,632,505.75 |
| | | | | |
| **Power One** | $1,075,488.00 | $0.00 | | $1,075,488.00 |
| | | | | |
| **Delta** | $182,178.00 | $0.00 | | $182,178.00 |
| | | | | |
| **Total** | $5,495,729.00 | $6,379,819.83 | | $11,875,548.83 |

IT IS SO ORDERED.

SIGNED this 11th day of July, 2011.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE