IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SYNQOR, INC, | § | |
| | § | |
| v. | § | CASE NO: 2:07-CV-497-TJW-CE |
| | § | |
| ARTESYN TECHNOLOGIES, INC., et al. | § | |

## MEMORANDUM OPINION AND ORDER

**I. INTRODUCTION**

In this case, Plaintiff SynQor, Inc. ("SynQor") obtained a jury verdict of infringement against Defendants Artesyn Technologies, Inc. and Astec America Inc. (collectively "Astec"); Bel Fuse, Inc. ("Bel Fuse"); Cherokee International Corp. and Lineage Power Corporation (collectively "Lineage"); Delta Electronics, Inc. and Delta Products Corp. (collectively "Delta"); Murata Electronics North America, Inc. and Murata Manufacturing Co., Ltd. (collectively "Murata"); Murata Power Solutions, Inc. ("MPS"); and Power-One, Inc. ("Power-One")(collectively "Defendants") with respect to various claims of the patents-in-suit. (*See* Dkt. No. 889, Jury Verdict). The jury failed to find invalidity of any of the patents-in-suit.

In the Joint Pretrial Order, certain defendants presented two equitable defenses, prosecution laches[1] and inequitable conduct. On March 24, 2011, the court scheduled a bench trial regarding equitable issues for April 1, 2011. On March 28, 2011, Lineage and the Fish Defendants[2], the only defendants asserting inequitable conduct, moved the Court to dismiss their

---

[1] Lineage/Cherokee, Artesyn/Astec, and Bel Fuse did not specifically plead the affirmative defense of "prosecution laches." (Dkt. No. 437 at 9; Dkt. No. 438 at 9; Dkt. No. 522 at 29; Dkt. No. 588.) Lineage/Cherokee and Artesyn/Astec merely asserted "laches" (Dkt. No. 437 at 9; Dkt. No. 438 at 9; Dkt. No. 522 at 29), but only "prosecution laches" was included in the Joint Pretrial Order. Bel Fuse did not even assert laches. (Dkt. No. 588.)
[2] "Fish Defendants" refers to Defendants Delta Electronics, Inc., Delta Products Corp., Murata Electronics North America, Inc., Murata Manufacturing Co., Ltd., Murata Power Solutions, Inc.,

inequitable conduct claims. (Dkt. Nos. 1081 and 1089.) In addition, the Fish Defendants and Lineage requested that the Court decide the prosecution laches issue on the papers and cancel the hearing set for April 1, 2011. (Dkt. Nos. 1081 at 3; 1089 at 1.) The Court granted the motion to dismiss the inequitable conduct claims and canceled the hearing. (Dkt. Nos. 1093, 1095, and 1097.) The parties then submitted proposed findings of fact and conclusions of law for the prosecution laches issue, making it the only remaining equitable defense in this case. (Dkt. Nos. 1090, 1091, and 1092.) The Court has carefully considered the facts and arguments presented and the applicable law in this case. For the following reasons, the Court finds that the defendants have not proven by clear and convincing evidence that the patents-in-suit are unenforceable or invalid, and therefore rules in favor of SynQor.

## II. LEGAL STANDARD

Prosecution laches is an equitable doctrine that may be applied to bar enforcement of patent claims following "an unreasonable and unexplained delay in prosecution," even if the applicant technically complied with all pertinent statutes and rules. *Symbol Techs., Inc. v. Lemelson Med.*, 422 F.3d 1378, 1384-85 (Fed. Cir. 2005); *Aristocrat Tech. Australia Pty., Ltd. v. Int'l Game Tech.*, 543 F.3d 657, 664 n.4 (Fed. Cir. 2008) (citing *Symbol*, 422 F3.d at 1385, and noting that "prosecution irregularities" is distinct from "prosecution laches" and that "[p]rosecution laches stems not from any procedural lapse or irregularity during prosecution, but rather from an abuse of statutory provisions that results, as a matter of equity, in an unreasonable and unexplained delay in prosecution."). The Federal Circuit has cautioned that prosecution laches is a tool that has been used sparingly and "should be applied only in egregious cases of

---

and Power-One, Inc. These defendants are represented by the law firm Fish & Richardson P.C. and have been referred to by the parties as the Fish Defendants.

misuse of the statutory patent system." *Symbol*, 422 F.3d at 1385. Courts have employed the doctrine of prosecution laches to a patent very infrequently.

There are two elements to a prosecution laches defense. First, the defense requires proof of an "unreasonable and unexplained delay in prosecution that constitutes an egregious misuse of the statutory patent system under the totality of the circumstances." *Cancer Research Tech. Ltd. v. Barr Lab., Inc.*, 625 F.3d 724, 728 (Fed. Cir. 2010). Second, the defense requires proof that the defendants were prejudiced by the unreasonable and unexplained delay. *Cancer Research*, 625 F.3d at 729 ("We agree with Cancer Research that prosecution laches' requirement of an unreasonable and unexplained delay includes a finding of prejudice, as does any laches defense.") (citing *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992)). "[T]o establish prejudice an accused infringer must show evidence of intervening rights, *i.e.,* that either the accused infringer or others invested in, worked on, or used the claimed technology during the period of delay." *Id.*

In addition, "there are no strict time limitations for determining whether continued refiling of patent applications is a legitimate utilization of statutory provisions or an abuse of those provisions." *Symbol*, 422 F.3d at 1385. The Federal Circuit has explained that there are legitimate grounds for refiling a patent application, such as to file a divisional application in response to a requirement for restriction, to present evidence of unexpected advantages of an invention when that evidence may not have existed at the time of an original rejection, or to add subject matter in order to attempt to support broader claims as the development of the invention progresses. *Id.* Even in the absence of these reasons, one may still refile an application as long as the refiling is not "unduly successive or repetitive." *Id.* By contrast, "refiling an application solely containing previously-allowed claims for the business purpose of delaying their issuance

3

can be considered an abuse of the patent system." *Id.* The Federal Circuit has explained that "[t]aken singly, the delay in the prosecution on any one particular application will surely not appear to merit relief by the courts in equity. On the other hand, an examination of the totality of the circumstances, including the prosecution history of all of a series of related patents and overall delay in issuing claims, may trigger laches." *Id.* at 1385-1386.

### III. FINDINGS OF FACTS AND CONCLUSIONS OF LAW

1. Defendants argue that the patents-in-suit are unenforceable based on prosecution laches. The patents-in-suit claim priority to a 1997 provisional application but were not themselves filed until 2004 or later. Defendants contend that SynQor intentionally delayed the prosecution of the patents-in-suit in order to incorporate the activities of the marketplace into its patents. As further explained below, the Court disagrees with the defendants' view of the facts and the law.

#### A. **The Patents-in-Suit**

2. The five patents-in-suit[3] all claim priority to U.S. Provisional Application 60/036,245 filed by Dr. Schlecht in 1997. (PTX17 at SYN00852307.) In 1998, Dr. Schlecht filed his first utility application based upon and claiming priority to the 1997 provisional application. (PTX19 at SYN00851715.) As can be seen from a comparison of these two documents, the 1998 utility application largely mirrored the disclosure of the 1997 provisional application, with some additional exemplary embodiments of the previously disclosed inventions enumerated.

3. The '190 patent issued in 2006 from an application filed in 2004. (PTX1.) The '034 patent issued shortly thereafter in 2007 from an application filed in 2006. (PTX2.) The

---
[3] U.S. Patent Nos. 7,072,190 ("the '190 patent") (PTX1), 7,269,034 ("the '034 patent") (PTX2), 7,272,021 ("the '021 patent") (PTX3), 7,558,083 ("the '083 patent") (PTX5), 7,564,702 ("the '702 patent") (PTX4).

4

'083 and '702 patents both issued in 2009 from applications filed in 2007. (PTX4, PTX5). Each of the aforementioned applications were continuations of the 1998 utility application and claimed priority to the 1997 provisional application. (PTX1 at (60), PTX2 at (60), PTX4 at (60), PTX5 at (60).) Dr. Schlecht is the sole named inventor for the '190, '034, '083, and '702 patents. (PTX1 at (75), PTX2 at (75), PTX4 at (75), PTX5 at (75).)

4. The '021 patent issued in 2007 from an application filed in 2006. (PTX3.) This application was a combination of the disclosures of Dr. Schlecht's 1997 and 1998 applications and Dr. Richard Farrington's 2002 provisional application and the 2003 utility application (U.S. Application No. 10/729,430, filed December 5, 2003) claiming priority to it. (*Id.* at (60).) Dr. Schlecht and Dr. Farrington are the named inventors. (*Id.* at (75).) The '021 patent claims priority to Dr. Schlecht's 1997 provisional application and Dr. Farrington's 2002 provisional application. (*Id.* at (60).) The 2002 provisional application incorporates the contents of U.S. Patent No. 5,999,417 ("the '417 patent") that issued from the 1998 utility application by reference. (PTX20 at SYN00852349.)

5. The '190, '021, and '702 patents are generally directed to isolated, unregulated converters with various characteristics used to power two or more non-isolated, regulated stages or converters in what is known as an unregulated intermediate bus architecture (unregulated IBA). These isolated, unregulated converters are known today as unregulated or fixed ratio bus converters, and the two or more non-isolated stages/converters are commonly called point of load converters or POLs. The isolated, unregulated converters are called bus converters because they provide an intermediate voltage to other power converters—the POLs—that in turn power logic circuitry (also referred to as loads) on printed circuit boards (also called load boards). The '083 patent is directed at just the isolated, unregulated bus converter itself with characteristics

5

that make it suitable for unregulated IBA. The fifth patent (the '034) is directed at what is known as semi-regulated IBA. (*See, e.g.,* 12/13/2010 Afternoon Tr. at 11:19-13:11, 14:4-15:11, 40:7-52:25, 54:17-61:23 (Dr. Schlecht explaining that his claimed inventions are directed to unregulated and semi-regulated IBA); 12/14/2010 Afternoon Tr. at 97:7-18 (Mr. Ballenger agreeing that SynQor's patents are directed to unregulated and semi-regulated bus converters that are used to provide voltage to two or more non-isolated regulated converters and that this architecture is referred to as IBA); 12/17/2010 Afternoon Tr. at 39:12-21 (Mr. McAlexander agreeing that some of SynQor's claims were directed to semi-regulated IBA and some were directed to unregulated IBA); *id.* at 51:24-54:2 (agreeing that as the word IBA has come to be used it refers to one isolating non-regulating converter that feeds multiple non-isolated regulated converters and discussing the benefits and commercial success of IBA).)

6. At trial, defendants bore the burden of persuading the jury, by clear and convincing evidence, that the patents-in-suit are not entitled to claim priority to Dr. Schlecht's 1997 and 1998 applications. Defendants failed to meet this burden. The jury concluded that each of the patents-in-suit met the written description requirement. (*See* Dkt. 889 at 32 (special verdict form on written description).)

**B.** **Dr. Schlecht's Prosecution Strategy was Grounded in Legitimate Business Reasons and Not an Egregious Abuse of the Patent System.**

7. Given the breadth of the 1997 and 1998 applications, SynQor embarked on a patent strategy to protect its inventions. But, as Dr. Schlecht noted at trial, SynQor was a start-up company with limited resources that had to prioritize which patent claims to pursue at which times:

> Q. How did you decide what patent claims to pursue first?

> A. Every time you pursue a set of claims in a patent, it takes a certain amount of resource to do that. Certainly, it takes my time, and I usually was doing this all the time.
>
> It also takes money for the lawyer who is prosecuting these patents and for the Patent Office. So as a startup company, we had limited resources of both time and money, and we devoted ourselves to a priority of which of the inventions that were described in this teaching document in this specification, which ones to pursue claims for in some priority.

(12/13/2010 Afternoon Tr. at 27:2-14.)

8. As Dr. Schlecht further testified, SynQor chose to pursue patent claims at around the same time they were introducing, and the marketplace was adopting, specific products that were embodiments of those claims:

> And the priority I chose was to prioritize based on the kinds of products that we were making and the acceptance of those products in the marketplace. So, for instance, as I mentioned, we started by making converters that used a two-stage approach that both regulated and isolated. And that's what we were selling to the marketplace and what they were initially accepting. And so we pursued claims associated with that.
>
> As that patent then issued, we would pursue other sets of claims on other related inventions that are described here, again, always with priorities.

(*Id.* at 27:15-28:1; *see also generally id.* at 25:14-29:23.)

9. Defendants cross-examined Dr. Schlecht on his motivations for filing his various applications in the order in which he did, and Dr. Schlecht elaborated on SynQor's rationale for pursuing patent claims:

> A startup company doesn't make money right away in the beginning. And so it's -- the issue that I think is being addressed here is not how much revenue we have but what our profits are. And it was very difficult, as we were starting up and trying to build the company and spend the money on the things we needed to spend it on, to keep our nose above water, if you will, to try to not lose money.

>           And so every penny counted. We ran our company,
> SynQor, from the very first day, watching every single penny and
> making sure we didn't spend anything we didn't have to spend
> right at that time.
>
>           And then, of course, the other thing to mention here is, we
> were filing many other patents, including one on bus converters,
> unregulated bus converters, prior to that date.

(*Id.* at 159:6-23.)

10.    SynQor did, in fact, pursue this strategy. Before SynQor filed the 2004 application that resulted in the '190 patent, it filed applications based on the same 1997/1998 disclosures in 1998, 1999, 2001, and 2003 resulting in patents issuing roughly every two years between 1999 to 2004. (*See, e.g.*, PTX1 at (60); *see also* U.S. Patent Nos. 5,999,417 (PTX18) (issued 1999), 6,222,742 (Dkt. No. 1091-5) (issued 2001), 6,594,159 (Dkt. No. 1091-6) (issued 2003), and 6,731,520 (Dkt. No. 1091-7) (issued 2004).) SynQor also had other families of patent applications it was pursuing, in addition to those depending from the 1997/1998 applications.[4]

11.    Further, given the continuous allowance and issuance of patents between 1998 and 2004, it is also clear that SynQor and Dr. Schlecht did not unreasonably prolong the prosecution of claims once the claims were allowed by the examiner. Dr. Schlecht did not abandon his applications and continuously re-file the same claims in order to extend the time the applications were pending before issuance. Each issued patent between the time the '417 patent issued in 1999 and the '520 patent issued in 2004 had discrete sets of claims. (*See* PTX18 at col. 17, ln. 15 – col. 22, ln. 18; Dkt. No. 1091-5 ('742 patent) at col. 17, ln. 15 – col. 18, ln. 65; Dkt.

---

[4] *See also* U.S. Patent Nos. 6,545,890 (Dkt. No. 1091-8) (filed 2000, issued 2003), 6,894,468 (Dkt. No. 1091-9) (filed 2000, issued 2005), 6,577,109 (Dkt. No. 1091-10) (filed 2001, issued 2003), 6,927,987 (Dkt. No. 1091-11) (filed 2002, issued 2005), 6,896,526 (Dkt. No. 1091-12) (filed 2003, issued 2005), 7,050,309 (Dkt. No. 1091-13) (filed 2003, issued 2006), and 7,085,146 (Dkt. No. 1091-14) (filed 2003, issued 2006).

No. 1091-6 ('159 patent) at col. 17, ln. 22 – col. 18, ln. 57, and Dkt. No. 1091-7 ('520 patent) at col. 17, ln. 21 – col. 18, ln. 65.)

12. As for the defendants' assertions that he tailored his claims to their products, Dr. Schlecht testified that he did not specifically draft the claims at issue to cover defendants' products:

> Q. Okay. Let me change to a different topic. When you wrote the claims that you're asserting in this case, your intention was to cover the Defendants' bus converters; isn't that right?
>
> A. No. The intention was to, with the claims, describe the invention that I had created.

(12/14/2010 Morning Tr. at 57:11-16.)

13. Dr. Schlecht's testimony also contradicts the defendants' suggestion that he did not file the applications that led to the patents-in-suit until he saw defendants making substantial sales. According to Dr. Schlecht:

> Q. Now, the Defendants were making much out of the fact yesterday that you did not file the '190 patent earlier than you did. So I'd like to go back to that, if I could, okay?
>
> A. All right.
>
> Q. Now, they seemed to suggest that you sat back and watched lots of sales of unregulated bus converters being made between 2002 and 2004. What, in fact, was happening in the marketplace during those years?
>
> A. In fact, the sales did not really pick up for unregulated bus converters, as far as my understanding of it, until the year 2006 and later.
>
> During the -- if I remember, the '190 patent claims were filed in the 2005 timeframe, a year earlier than that. And during that period there and in 2004 and before, people were still adopting the idea of unregulated bus architecture. They were designing them. They were qualifying things in, but they had not yet reached a point, as far as I understand, where they were buying a great deal of them.

> As that began to become apparent it was going to happen, as these people were -- these customers were qualifying parts in, that's when I began to understand that the idea had been adopted, and there was going to be a good market for it. And based on my -- my approach to prioritizing the patent, that's when I decided to file the patents in 2005.

(12/14/2010 Afternoon Tr. 17:20-18:22.)

14. Defendants have failed to meet their burden of proving the defense of prosecution laches. The Court finds Dr. Schlecht's testimony regarding the timing of the prosecution of the patents-in-suit credible, and that he and SynQor did not unreasonably delay prosecuting the patents-in-suit.

15. The Court further finds that the defendants failed to present sufficient evidence of prejudice from the alleged delay. SynQor filed routine continuation applications, as permitted by the statutory patent system, and was active in pursuing claims as its product line evolved. Any "delay" was based on legitimate business and financial reasons and was not an egregious misuse of the patent system that renders the patents unenforceable. In sum, Dr. Schlecht's and SynQor's prosecution strategy for the patents-in-suit did not result in unreasonable delay and did not constitute an egregious abuse of the patent system.

### C. There was No Unreasonable Delay.

16. There is no evidence of an unreasonable delay. The jury concluded that the patents-in-suit satisfied the written description requirement and were all entitled to a 1997 and/or 1998 priority date. (*See* Dkt. 889 at 32 (special verdict form on written description).) At trial, SynQor also presented evidence explaining the timeline on which Dr. Schlecht chose to prosecute his patent applications. (12/13/2010 Afternoon Tr. at 25:14-29:23, 159:6-23.) As a startup company, SynQor had limited resources and had to prioritize which claims to pursue at which times. (*Id.* at 27:2-14, 159:6-23.) As various patents would issue, SynQor would move

on to pursue the next set of claims related to the products it was selling substantial volumes of at the time. (*Id.* at 27:15-28:1.)

17. Defendants have presented no evidence showing that this type of strategy is unreasonable. This is not the type of situation shown in *Symbol* where the patentee intentionally kept valid claims from issuing in order to prolong the life of his patents. *Symbol,* 422 F.3d at 1385-86.

18. Further, defendants cannot point to any "unexplained gap" in the overall prosecution in the priority chain. From 1997 to 2004, SynQor continuously filed patent applications. The longest any application was in the Patent Office prior to issuance was 27 months. Defendants have produced no evidence that any of these time periods were unreasonable in light of typical practices before the Patent Office. Additionally, SynQor obtained patents based on their other priority chains in this period. SynQor was not sitting on its hands.

19. In an effort to support their defense, defendants essentially argue that Dr. Schlecht "lied in wait" while the market copied his invention. The Court disagrees and finds that Dr. Schlecht did not specifically draft patent claims to cover defendants' products. (12/14/2010 Morning Tr. at 57:11-16.) Instead, his focus was on writing patent claims covering SynQor's products and their uses. When it became apparent that the unregulated and semi-regulated bus architecture that Dr. Schlecht taught the market was being adopted, SynQor focused its next set of claims from the broad disclosure of the 1997/1998 applications on SynQor's bus converters and the IBA systems utilizing them.

20. Even if Dr. Schlecht drafted patent claims to cover the defendants' products, this would not by itself require a finding of prosecution laches. There is nothing unusual or improper

about drafting claims to cover a competitor's product, as long as there is a basis in the pending application. *See Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988) ("[T]here is nothing improper, illegal, or inequitable in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market,"); *PIN/NIP, Inc. v. Platte Chemical Co.*, 304 F.3d 1235, 1247 (Fed. Cir. 2002) ("While it is legitimate to amend claims or add claims to a patent application purposefully to encompass devices or processes of others, there must be support for such amendments or additions in the originally filed application."). This is not the type of "egregious" misuse of the patent system the doctrine of prosecution laches was designed to remedy.

21. The broad disclosure in the 1997/1998 applications set the table for all future claims in that family, and SynQor chose to pursue claims in that family in line with the types of products that it was currently manufacturing and the market was adopting in volume. There is no evidence in the record indicating that such a strategy is unreasonable. SynQor presented ample evidence that Dr. Schlecht and SynQor chose to file the continuation applications at issue over the course of a number of years because of legitimate business and financial reasons. The timetable on which Dr. Schlecht and SynQor filed the applications that led to the patents-in-suit was neither unreasonable nor unexplained. Accordingly, the Court holds that the defense of prosecution laches is not appropriate in this case.

### D. There is a Lack of Sufficient Evidence of Prejudice.

22. Defendants' prosecution laches defense thus also fails for lack of sufficient evidence of prejudice, an essential element of the defense. In response to SynQor's Interrogatory No. 16, each defendant provided purported reasons for the unreasonableness of the supposed

delay.[5] But not a single defendant identified any evidence of prejudice in its interrogatory responses. Moreover, the defendants elected not to proceed with a bench trial on equitable issues after the Court scheduled a hearing. There is a lack of sufficient evidence in the record that any defendant has been prejudiced by any purported "delay."

23. The Court has considered the totality of the circumstances in this case and finds that defendants have not met their burden of proving that there was an unreasonable delay by SynQor in the prosecution of the applications of the patents-in-suit. SynQor has provided reasonable explanations for its prosecution strategy. In summary, the defendants have not shown why SynQor's actions are to be considered an abuse of the patent system or are so egregious as to invoke the doctrine of prosecution laches. *Symbol*, 422 F.3d at 1385. The Court finds that this is not a case where there was "an unreasonable and unexplained delay in prosecution." *Id.* Further, the Court also finds that the defendants have not proven that they have been prejudiced by any actions of SynQor. Thus, the Court finds that the patents-in-suit should not be held unenforceable under the doctrine of prosecution laches. The Court also finds that SynQor's requests for attorneys' fees and costs relating to the equitable issues in this case should be denied.

---

[5] Murata Elecs. N. Am, Inc. & Murata Manufacturing Co., Ltd.'s Third Suppl. Answer to SynQor, Inc.'s Interrog. No. 16 to Defs. (Jan. 9, 2009) (Dkt. No. 1091-16) at 10-11; Murata Power Solutions, Inc.'s Third Suppl. Answer to SynQor, Inc.'s Interrog. No. 16 to Defs. (Jan. 9, 2009) (Dkt. No. 1091-17) at 10-11; Power-One, Inc.'s Second Suppl. Answer to SynQor, Inc.'s Interrog. No. 16 to Defs. (Jan. 9, 2009) (Dkt. No. 1091-18) at 10-11; Delta Elecs., Inc. & Delta Prods Corp.'s Third Suppl. Answer to SynQor, Inc.'s Interrog. No. 16 to Defs. (Jan. 9, 2009) (Dkt. No. 1091-19) at 10-11; Def. Bel Fuse Inc.'s Suppl. Objections and Answers to Pl's. Interrog. Nos. 4 & 11-18 (Nov. 17, 2009) (Dkt. No. 1091-20) at 39, 41-42; Artesyn Techs., Inc.'s Eighth Suppl. Responses to SynQor's First Set of Interogs. to Defs. (Aug. 23, 2010) (Dkt. No. 1091-21) at 55; Astec Am., Inc.'s Eighth Suppl. Responses to SynQor's First Set of Interogs. to Defs. (Aug. 23, 2010) (Dkt. No. 1091-22) at 53-54; Lineage's & Cherokee's Joint Further Suppl. Responses to SynQor's Interog. Nos. 3-4, 10, 14, 16-19, 22, 24, 24, 26, & 28-29 (Aug. 23, 2010) (Dkt. No. 1091-23) at 22-23.

24. The Court makes these findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52. The Court's findings of fact are based on the admissible evidence. Any finding of fact that is actually a conclusion of law should be treated as such. Any conclusion of law that is actually a finding of fact should be treated as such.

## IV. CONCLUSION

The Court finds that the defendants have not proven by clear and convincing evidence that SynQor committed prosecution laches during prosecution of the applications in the patents-in-suit. Thus, the Court finds that the patents-in-suit are not invalid or unenforceable and therefore rules in favor of SynQor. The Court DENIES SynQor's requests for attorneys' fees and costs relating to the equitable issues in this case.

IT IS SO ORDERED.

SIGNED this 13th day of July, 2011.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE