**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| SYNQOR, INC, | § | |
| | § | |
| v. | § | CASE NO: 2:07-CV-497-TJW-CE |
| | § | |
| ARTESYN TECHNOLOGIES, INC., et al. | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

## I.    INTRODUCTION

Pending before the Court are Defendants' Lineage Power Corporation ("Lineage") and

Cherokee International Corporation ("Cherokee") motions for judgment as a matter of law

("JMOL") on the issues relating to pre-suit induced and contributory infringement with respect

to U.S. Patent Nos. 7,072,190 ("the '190 patent"), 7,272,021 ("the '021 patent"), and 7,269,034

("the '034 patent") (Dkt. Nos. 809 and 956), and motions for JMOL on the issues relating to

infringement of the patents-in-suit[1] (Dkt. Nos. 820 and 955).  Also pending before the Court are

Defendants' Astec America, Inc. ("Astec") and Artesyn Technologies, Inc. ("Artesyn") motions

for JMOL on the issues relating to infringement of the patents-in-suit (Dkt. Nos. 812 and 956).

Also pending before the Court are Defendants' Delta Electronics, Inc., Delta Products Corp.,

Murata Electronics North America, Inc., Murata Manufacturing Co., Ltd., Murata Power

Solutions, Inc., and Power-One, Inc. (collectively the "Fish Defendants") motions for JMOL on

the issues relating to infringement of the patents-in-suit (Dkt. Nos. 813 and 963).  Also pending

before the court are Defendant's Bel Fuse, Inc. ("Bel Fuse") motions for JMOL on the issues

relating to infringement of the patents-in-suit (Dkt. Nos. 814 and 975), and motions for JMOL on

---

[1]  U.S. Patent Nos. 7,072,190 ("the '190 patent") (PTX1), 7,269,034 ("the '034 patent") (PTX2), 7,272,021 ("the '021 patent") (PTX3), 7,558,083 ("the '083 patent") (PTX5), 7,564,702 ("the '702 patent") (PTX4).

the issues relating to pre-suit induced and contributory infringement with respect to the '190 patent, the '021 patent, and the '034 patent (Dkt. Nos. 815 and 975). Because the Court has only entered a partial judgment on the verdict, the Court considers all of these pending motions as motions for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). Having carefully considered the parties' submissions, the record, and the applicable law, the Court finds that the motions should be DENIED.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

Near the close of Plaintiff's case-in-chief, the Court inquired on whether the parties were willing to stipulate to filing their JMOLs in writing before the close of trial. (*See* 12/16 PM Tr. at 53:24-54:21.) The parties agreed to stipulate that any JMOL filed by close of business on December 21, 2010, would be considered timely filed. (*See* 12/20 AM Tr. at 163:23-167:9.) The Court then instructed the parties that they were to file their JMOLs in writing by close of business on December 21, 2010. (*See id*.) The Court allowed this stipulation to preserve the parties right to file a post-trial Rule 50(b) motion. *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 471 (5th Cir. 2000). The Court then overruled all JMOLs made by the parties with respect to sufficiency of the evidence or lack of the evidence, and informed the parties that they could renew their JMOLs after the verdict if they wished. (*See* 12/20 9:30 PM Tr. at 3:22-4:4; 12/21 A.M. Tr. at 11:12-13:18.)

On December 21, 2010, the jury reached a verdict finding that Defendants Artesyn Technologies, Inc. and Astec America Inc. (collectively "Astec"); Bel Fuse, Inc. ("Bel Fuse"); Cherokee International Corp. and Lineage Power Corporation (collectively "Lineage"); Delta Electronics, Inc. and Delta Products Corp. (collectively "Delta"); Murata Electronics North America, Inc. and Murata Manufacturing Co., Ltd. (collectively "Murata"); Murata Power

Solutions, Inc. ("MPS"); and Power-One, Inc. ("Power-One")(collectively "the Fish Defendants") infringe various claims of the patents-in-suit. (*See* Dkt. No. 889, Jury Verdict). The jury failed to find invalidity of any of the patents-in-suit.

## III.  LEGAL STANDARD

A motion for JMOL is a procedural issue not unique to patent law; thus, such motions are reviewed under the law of the regional circuit. *Summit Tech., Inc. v. Nidek Co.*, 363 F.3d 1219, 1223 (Fed. Cir. 2004). In the Fifth Circuit, JMOL may only be granted if "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Hiltgen v. Sumrall*, 47 F.3d 695, 700 (5th Cir. 1995) (internal citation omitted); *see also* Fed. R. Civ. P. 50(a)(1) (stating that JMOL may be granted only if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [an] issue."). In ruling on a motion for JMOL, the court reviews all the evidence in the record and must draw all reasonable inferences in favor of the nonmoving party. *See Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150-51 (2000). The court, however, may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *Id.* That is, the court grants "great deference to a jury's verdict" and it should be overturned "only if, when viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion." *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 838 (5th Cir. 2004).

## IV.  DISCUSSION

### A.  Pre-suit Induced and Contributory Infringement

As the party asserting infringement, SynQor bears the burden of proving that Defendants indirectly infringed the patents-in-suit. *See Applied Medical Resources Corp. v. U.S. Surgical*

*Corp.*, 448 F.3d 1324, 1333 (Fed. Cir. 2006). "In order to succeed on a claim of inducement, the patentee must show first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Symantec Corp. v. Computer Assocs. Int'l., Inc.*, 522 F.3d 1279, 1292 (Fed. Cir. 2008) (internal quotation marks omitted). "The requirement that the alleged infringer knew or should have known his actions would induce actual infringement necessarily includes the requirement that he or she knew of the patent." *DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006) (en banc); *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. ___ (2011) ("[W]e now hold that induced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement.").

To succeed on a contributory infringement claim, it "requires a showing that the alleged contributory infringer knew that the combination for which his component was especially designed was both patented and infringing." *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 488 (1964); *see also Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469 n. 4 (Fed. Cir. 1990) (plaintiff must establish that the alleged infringer had "not only knowledge that the component was especially made or adapted for a particular use but also knowledge of the patent which proscribed that use."). Knowledge may be proven by either direct or circumstantial evidence. *See, e.g., DSU*, 471 F.3d at 1306 ("While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice.") (quoting *Water Tech. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1998)). Applying this legal standard to the record in this case, the Court concludes that the jury had a legally sufficient evidentiary basis for finding that Defendants had actual pre-suit knowledge of the '190 patent, the '021 patent, and the '034 patent, and that Defendants indirectly infringed the patents-in-suit.

Defendants argue that SynQor did not introduce any direct evidence of Defendants' actual knowledge of the '190, '034, or '021 patents prior to the filing of SynQor's complaint. Instead, Defendants argue that SynQor only had circumstantial evidence that Defendants had any pre-suit knowledge based upon SynQor's marking of certain products. As discussed, knowledge of the patents may be proven by either direct or circumstantial evidence. The jury was properly informed of this when the Court noted in its opening instructions to the jury that "the law actually makes no distinction in a civil case as the weight to be given direct or circumstantial evidence. It is up to [the jury] to decide what weight is to be given any particular evidence." (12/13 AM Tr. at 19:1-6.) For the following reasons, the Court concludes that the jury had a legally sufficient evidentiary basis for finding that Defendants had actual pre-suit knowledge.

In general, SynQor presented testimony and documentary evidence that its bus converters and datasheets are marked with its patents once they issue. (*See, e.g.*, 12/13 PM Tr. at 87:4-11 (Dr. Schlecht testifying that SynQor datasheets are marked with patents and made available on SynQor's website); 12/13 PM Tr. at 87:16-25 (Dr. Schlecht testifying that SynQor marks its products with patents).) SynQor's infringement expert, Dr. Leeb, also presented his conclusion that in the extremely competitive bus converter industry, it is common for the Defendants to understand each others' products and to review each others' datasheets. (12/15 AM Tr. at 19:12-20:10.) For example, Dr. Leeb, gave his expert opinion, based on a review of each Defendant's documents and deposition testimony, that there was a significant effort by the Defendants in this case to cross/imitate SynQor's products. (*Id.* at 17:2-19:11.) Dr. Leeb also testified that the competitors in this industry obtain each others' products and even perform physical "tear downs" to examine and reverse engineer the products. (*Id*. at 20:11-21:15.) Dr. Leeb further testified that SynQor marks its products and datasheets with its patent numbers, and that a skilled engineer

would understand from those markings that the product is protected by SynQor's patents. (*Id.* at 21:16-22:9.) Thus, the Court finds that based on at least this evidence, the jury had a legally sufficient evidentiary basis for finding that Defendants had actual pre-suit knowledge. But this was not the only evidence provided, and the Court will now address the evidence presented as to each defendant's actual knowledge of the '190, '034, or '021 patents prior to the filing of SynQor's complaint.

### 1. Astec/Artesyn

Artesyn and Astec argue that SynQor has not introduced any direct evidence of Artesyn's or Astec's actual knowledge of the '190, '034, or '021 patents prior to the filing of SynQor's complaint. As explained, direct evidence is not the only type of evidence and SynQor presented sufficient circumstantial evidence from which a reasonable jury could infer that Artesyn and Astec had actual pre-suit knowledge of the '190, '034, or '021 patents prior to the filing of SynQor's complaint. Moreover, SynQor did present direct evidence of Artesyn/Astec's pre-suit knowledge of the '190 patent. SynQor presented the deposition testimony of Artesyn/Astec witness Mark Rice, who testified that an Artesyn/Astec employee had downloaded the '190 patent into a database in April or May of 2007. (12/14 PM Tr. at 140:4-141:10, 142:8-19.) Mr. Rice testified that the patent was put "into a database for the library, so if anybody wanted to access it, they could." (*Id.* at 140:19-25.) SynQor thus presented evidence that Artesyn/Astec accessed, retrieved, and possessed the '190 patent before this suit was filed. Accordingly, there was sufficient direct evidence from which a reasonable jury could infer that Artesyn/Astec had actual pre-suit knowledge of the '190 patent.

In addition, Dr. Leeb testified about representative documents from both Artesyn and Astec that supported his opinion that Artesyn/Astec's competitive activities included following

SynQor's products and obtaining SynQor's marked products and datasheets. (12/15 AM Tr. at 22:22-24:24 (Dr. Leeb discusses PTX133, an e-mail chain between Astec employees, and testifies that Astec conducted a significant redesign to "chase SynQor"); *id.* at 24:25-26:13 (Dr. Leeb discusses PTX142, an Artesyn bus converter evaluation report, and explains that it reveals Artesyn obtained and tested a physical sample of a SynQor bus converter); *id.* at 26:14-28:6 (Dr. Leeb discusses PTX1351, an Astec e-mail attaching SynQor's datasheet marked with U.S. patent 5,999,417 ("the '417 patent")).) Further supporting Dr. Leeb's testimony, Artesyn/Astec's witness Mark Rice admitted at trial that Astec obtained samples of SynQor's bus converters while developing its own bus converters. (12/20 PM Tr. at 10:6-11:4.)

The Court finds that a reasonable jury could infer that, in the course of monitoring SynQor's products and datasheets, both Artesyn and Astec learned of the SynQor patents marked on those products and datasheets, including the '417 patent which is parent to the patents-in-suit. Indeed, Artesyn/Astec's 30(b)(6) designee testified at trial via deposition that Artesyn/Astec was aware of the '417 patent as far back as 2000. (12/14 PM Tr. at 141:16-142:7.) Given Artesyn/Astec's competitive activities and the competitive nature of this industry, a reasonable jury could conclude that Artesyn/Astec continued to closely monitor SynQor's products and datasheets after the issuance of the '190 patent and therefore learned of the '190 patent in the same manner that it learned of the '417 patent. A reasonable jury could conclude that when Artesyn/Astec downloaded the '190 patent in 2007, it was part of this same monitoring process.

Artesyn /Astec argues that because the '417 patent claims regulated bus converters and does not list SynQor as the assignee, a person reviewing the '417 patent would not "have had any reason to know or suspect that the application for the '417 patent might later spawn a series of patents on semi- and unregulated bus converters." (Dkt. No. 966 at 4.) However, the jury

concluded that the '417 patent specification discloses and supports the unregulated and semi-regulated bus converter and IBA inventions later claimed by the patents-in-suit. There was evidence at trial that continuation patents are common, and a person of skill in the industry would have recognized that a continuation application could potentially be filed to claim these inventions that were described in the specification of the '417 patent. (*See, e.g.*, 12/17 PM Tr. at 184:9-24 (Power-One witness Dennis Roark testifying that he is "certainly" aware that multiple continuation patents can issue from one specification).) Based on this evidence, a jury could reasonably conclude that Artesyn/Astec monitored SynQor's patents and thus learned of the '190 patent once it issued. Moreover, although SynQor is not listed as the assignee of the '417 patent, SynQor's president, Dr. Schlecht, is listed as the inventor and the patent was listed on SynQor's datasheets.

Finally, a reasonable jury could infer that Artesyn/Astec would have continued to monitor SynQor's products and datasheets after issuance of the '190 patent, especially based on the testimony that this was common industry practice. When they continued to do so, they would have discovered the patents-in-suit marked on SynQor's products and datasheets in the same manner that they learned of the '417 patent. In such a highly competitive industry where competitors closely monitor each other, it was reasonable for the jury to conclude that Artesyn/Astec discovered SynQor's '190 patent around the time it issued. Furthermore, this conclusion is supported by the direct evidence that Artesyn actually downloaded the '190 patent in 2007, before suit was filed. Accordingly, the Court finds that the jury had a legally sufficient evidentiary basis for finding that Artesyn and Astec had actual pre-suit knowledge of the '190 patent, the '021 patent, and the '034 patent, and that these defendants indirectly infringed the patents-in-suit.

### 2. The Fish Defendants

The Fish Defendants argue that there was no direct evidence that any of the Fish Defendants had actual knowledge of the patents-in-suit prior to the filing of the lawsuit on November 13, 2007.  As discussed, direct evidence is not the only type of evidence, and SynQor presented sufficient circumstantial evidence from which a reasonable jury could infer that the Fish Defendants had actual pre-suit knowledge of the '190, '034, or '021 patents prior to the filing of SynQor's complaint.  Specifically, SynQor presented evidence sufficient to support an inference that each of the Fish Defendants acquired pre-suit knowledge of the '190 patent.  Dr. Leeb guided the jury through a series of exhibits that supported his opinion regarding the Fish Defendants' competitive activities.  For Delta, Dr. Leeb showed the jury a 2002 Delta e-mail (PTX 381) that discussed the specification for a new bus converter and attached a SynQor datasheet marked with the '417 patent. (*See* 12/15 AM Tr. at 40:12-42:5.)  Dr. Leeb also showed the jury a 2006 Delta e-mail (PTX 378) that attached another SynQor datasheet marked with additional SynQor patents. (*Id.* at 42:6-44:8.)  Dr. Leeb explained that one of skill in the art would therefore understand that SynQor was continuing to obtain new patents to protect its products. (*Id.* at 44:9-15.)  Dr. Leeb also explained to the jury another Delta e-mail from 2002 (PTX 384) that showed Delta was interested in acquiring a sample of a SynQor bus converter. (*Id.* at 44:16-45:17.)  Dr. Leeb also walked the jury through a 2002 Delta e-mail (PTX 385) that attached a picture of a SynQor bus converter that the author stated was "worthy of reference." (*Id.* at 45:18-46:16.)

For MPS/Murata, Dr. Leeb guided the jury through a 2002 MPS new product plan (PTX570) describing an unregulated bus converter that stated the new converters "must be functionally and mechanically equivalent … with SynQor's BusQor series." (*Id.* at 46:17-47:23.)

Dr. Leeb explained to the jury a 2006 MPS e-mail exchange (PTX 581) that showed MPS was interested in getting copies of SynQor patents, considered signing up for a patent digest service, and suggested putting a patent review as a step in their new product development process. (*Id.* at 47:24-50:3.) Dr. Leeb further showed the jury a 2006 MPS e-mail (PTX 573) that suggested using information from SynQor's datasheets to debug MPS's products. (*Id.* at 50:4-24.)

SynQor also presented testimony from MPS's Gary Baker that if he had a SynQor datasheet while developing MPS's bus converters, he would have looked at it. (12/16 PM Tr. at 110:12-24.) Mr. Baker also testified that if he saw a patent marked on a datasheet, he would have looked it up. (*Id.* at 114:24-116:3.) Mr. Baker further testified regarding a presentation he put together for MPS (PTX 536) showing that MPS read SynQor's press release announcing the release of one of its bus converters and stating that MPS wanted to create an equivalent of SynQor's bus converter. (*Id.* at 111:2-113:25.) SynQor also presented testimony from Murata's Seiichi Takahashi discussing an e-mail (PTX 495) indicating that Murata planned to conduct a "broad and careful" patent search for patents covering an unregulated IBA system. (12/14 PM Tr. at 172:10-174:15.) Dr. Leeb stated that he considered Mr. Takashi's testimony and explained to the jury that in a highly competitive industry such as power electronics, it would be common to conduct a search for patents when developing a product. (12/15 AM Tr. at 50:25-52:15.)

For Power-One, Dr. Leeb showed the jury a Power-One document (PTX 691) that reported results of testing performed on a SynQor bus converter. (*Id.* at 52:16-53:24.) Dr. Leeb also explained to the jury a 2003 Power-One e-mail (PTX 695) that attached an analysis of a SynQor bus converter that included details indicating that Power-One obtained a physical sample of SynQor's bus converter. (*Id.* at 53:25-55:6.) Dr. Leeb also showed the jury a 2003 Power-One e-mail (PTX 703) that included a SynQor datasheet as an attachment. (*Id.* at 55:7-57:9.) SynQor

also elicited several relevant admissions from Power-One's Dennis Roark on cross-examination. For example, Mr. Roark admitted that he was aware of and had seen SynQor's '417 patent. (12/17 PM Tr. at 181:23-184:4.) Mr. Roark also testified that he is aware that continuation patents can issue with the same specification as an earlier specification, and so he was aware that SynQor could have obtained additional continuation patents from the parent '417 patent. (*Id.* at 184:5-24.) Mr. Roark also admitted that Power-One generally tries to be aware of its competitors' patents and technology. (*Id.* at 193:8-18.) The evidence indicates a highly competitive industry in which each of the Fish Defendants closely followed SynQor's technology and obtained access to its products and datasheets. SynQor also presented evidence that each of the Fish Defendants, in the course of their competitive activities, learned of the '417 patent, which is parent to the patents-in-suit. A reasonable jury could readily infer that the Fish Defendants continued to closely monitor SynQor's products and datasheets after the issuance of of the '190, '034, or '021 patents and therefore learned of theses patent in the same manner that they learned of the '417 patent.

The Fish Defendants also argue that knowledge of the '417 patent cannot be used to show knowledge of the '190 patent. However, the jury correctly concluded that the '417 patent specification discloses and supports the unregulated and semi-regulated bus converter and IBA inventions later claimed by the patents-in-suit. Power-One's Dennis Roark admitted at trial that a person of skill in the industry would have recognized that a continuation application could potentially be filed to claim these inventions that were described in the specification of the '417 patent. (12/17 PM Tr. at 184:9-24.) Based on this evidence, a jury could reasonably conclude that the Fish Defendants monitored SynQor's patents and thus learned of the '190 patent once it issued.

The Fish Defendants present two pieces of counter-evidence to rebut SynQor's evidence of pre-suit knowledge. They note that Power-One's Dennis Roark testified that Power-One first became aware of the patents-in-suit when the lawsuit was filed. (12/17 PM Tr. at 167:7-10.) However, Mr. Roark admitted on cross-examination that he had never asked any of the dozen or so engineers who had worked at Power-One between July 2006 and November 2007 but had since left the company whether they had ever come across SynQor's '190 patent. (*Id.* at 186:13-187:13.) A reasonable jury could therefore discount Mr. Roark's testimony regarding Power-One's knowledge because he lacked sufficient foundation to say whether anyone at Power-One had come across the '190 patent or not.

The Fish Defendants also point to testimony from Murata's Seiichi Takahashi that MPS conducted a patent search in October 2006 and did not uncover SynQor's '190 patent. (12/14 PM Tr. at 171:20-172:2.) However, Mr. Takahashi refused to answer, on privilege grounds, whether that search was only limited to Japanese patents. (*Id.* at 172:3-9.) Mr. Takahashi also testified that Murata had told its customer Fujitsu that it was conducting a "broad and careful" patent search, but refused to answer whether the "broad and careful" search was the same October 2006 search that did not uncover SynQor's '190 patent. (*Id.* at 173:23-174:15.) A reasonable jury could conclude from this evidence that while Murata may not have uncovered the '190 patent when it conducted one (potentially limited) search, it learned of the '190 patent when it later conducted a "broad and careful" patent search. And even if the jury did not conclude that Murata/MPS discovered the '190 patent during a patent search, it could conclude that Murata/MPS came across the '190 patent when it accessed SynQor's datasheets and samples of its products. Accordingly, the Court finds that the jury had a legally sufficient evidentiary basis for finding that Delta, Power-One, Murata, and MPS had actual pre-suit knowledge of the '190

patent, the '021 patent, and the '034 patent, and that these defendants indirectly infringed the patents-in-suit.

### 3. Bel Fuse

Bel Fuse argues SynQor failed to carry its burden of proof on the question of whether Bel Fuse had knowledge of the asserted patents between July 4, 2006, when the '190 Patent was issued, and November 13, 2007, when SynQor filed this action. In addition, Bel Fuse argues that SynQor offered no proof of direct infringement for third-party systems that incorporated Bel Fuse unregulated bus converters prior to July 7, 2009, the issuance date of the '083 Patent. The Court concludes that there was sufficient circumstantial evidence from which a reasonable jury could find that Bel Fuse had actual pre-suit knowledge of the '190 patent. Specifically, Dr. Leeb guided the jury through several representative exhibits that supported his opinion regarding Bel Fuse's competitive activities. Dr. Leeb showed the jury an e-mail (PTX 223) that revealed that Bel Fuse received a SynQor datasheet as the specification to follow from its customer HP when developing one of its unregulated bus converters. (12/15 AM Tr. At 29:3-30:18.) Dr. Leeb also walked the jury through a 2002 e-mail exchange (PTX 228) that revealed that a SynQor product was used as a benchmark for the development of a bus converter at Bel Fuse. (*Id.* at 30:19-32:12.) Dr. Leeb further showed the jury a 2005 Bel Fuse e-mail exchange (PTX 233) that indicated Bel Fuse obtained a sample of a SynQor bus converter for benchmarking and potential reverse engineering. (*Id.* at 32:13-34:17.)

SynQor also presented testimony from Bel Fuse witnesses that supports an inference of pre-suit knowledge of the '190 patent. Bel Fuse's Mark Jutras admitted that Bel Fuse obtained a SynQor datasheet during development of Bel Fuse's bus converters and was aware that SynQor protected its technology with patents. (12/14 PM Tr. at 169:1-170:8.) Mr. Jutras testified that

Bel Fuse benchmarks its bus converters against SynQor's and accesses SynQor's datasheets. (12/17 PM Tr. at 114:7-23.) Mr. Jutras further admitted that Bel Fuse did not just access SynQor's datasheets when it first developed its products, but continued to look at SynQor datasheets afterwards for benchmarking purposes. (*Id*. at 124:7-12.) Mr. Jutras also testified that if Bel Fuse saw on a datasheet that a competitor's product was patent-protected, he would expect Bel Fuse to search to see what patents the competitor has, because this is the ethical thing to do. (12/17 PM Tr. at 122:18-123:1.)

The Court finds that a reasonable jury could infer that, in the course of monitoring and benchmarking SynQor's products and accessing its datasheets, Bel Fuse learned of the SynQor patents marked on those products and datasheets, including the '417 patent which is the parent to the patents-in-suit. Given Bel Fuse's competitive activities and the highly competitive nature of the industry, a reasonable jury could infer that Bel Fuse continued to closely monitor SynQor's products and datasheets after the issuance of the '190 patent and therefore learned of the '190 patent in the same manner that it learned of the '417 patent.

Bel Fuse contends that "SynQor failed to introduce any evidence … that even suggests, let alone proves" that Bel Fuse had pre-suit knowledge of the '190 patent. (Dkt. No. 975 at 9.) Bel Fuse bases this claim on its argument that because the e-mails that Dr. Leeb discussed with the jury were sent prior to the issuance of the '190 patent, they cannot be used to support a finding of pre-suit knowledge. But as explained above, these e-mails are circumstantial evidence from which a jury could infer that Bel Fuse continued to follow SynQor's products and obtained knowledge of the '190 patent once it issued. Nothing more is required to support the jury's verdict. Knowledge may be proven by either direct or circumstantial evidence. *See, e.g., DSU*, 471 F.3d at 1306 ("While proof of intent is necessary, direct evidence is not required; rather,

circumstantial evidence may suffice.")

The jury also could have concluded that Bel Fuse discovered the '190 patent based on the fact that it admittedly reviewed datasheets marked with the '417 patent and would have looked up patents marked on a datasheet. The jury concluded that the '417 patent specification discloses and supports the unregulated and semi-regulated bus converter and IBA inventions later claimed by the patents-in-suit. Based on all of the evidence presented, a jury could reasonably conclude that Bel Fuse monitored SynQor's patents after seeing the '417 patent and thus learned of the '190 patent once it issued.

Bel Fuse also argues that the testimony of Mark Jutras proves that Bel Fuse did not have pre-suit knowledge of the '190 patent. (Dkt. No. 975 at 4.) However, SynQor presented Mr. Jutras's deposition to the jury, during which he testified that he did not know whether Bel Fuse identified the '190 patent before suit was filed. (12/14 PM Tr. at 170:9-12.) Mr. Jutras also testified on cross examination that he didn't ask any of the former engineers who had worked on Bel Fuse's bus converter designs, but had since left Bel Fuse, whether they had knowledge of the '190 patent. (12/17 PM Tr. at 126:3-19.) The jury could therefore have reasonably discounted Mr. Jutras's testimony regarding Bel Fuse's knowledge because he lacked a sufficient foundation to say whether anyone at Bel Fuse had come across the '190 patent or not. Accordingly, the Court finds that the jury had a legally sufficient evidentiary basis for finding that Bel Fuse had actual pre-suit knowledge of the '190 patent, the '021 patent, and the '034 patent, and that this defendant indirectly infringed the patents-in-suit.

### 4. Lineage/Cherokee

Lineage/Cherokee contend that SynQor did not introduce any direct or circumstantial evidence of Lineage's or Cherokee's actual knowledge of the '190, '034, or '021 patents prior to

the filing of SynQor's complaint. The Court disagrees and finds that SynQor presented sufficient evidence that Lineage/Cherokee would have contemporaneously reviewed SynQor datasheets while competing against SynQor. Dr. Leeb specifically walked through representative documents from Lineage and Cherokee that supported his opinion that Lineage/Cherokee's competitive activities include following SynQor's products and obtaining SynQor's marked products and datasheets. (*See* 12/15 AM Tr. at 34:21-36:22 (Dr. Leeb explaining that PTX 293 shows that Cherokee was interested in SynQor's products); *Id.* at 37:6-38:15 (Dr. Leeb explaining that PTX 463 is a Lineage e-mail circulating a SynQor datasheet for review, and that the datasheet is marked with the parent '417 patent); *Id.* at 38:16-40:11 (Dr. Leeb explaining that PTX 473 is a Lineage e-mail sharing information about a SynQor bus converter in which a Lineage employee states that she will "do my best to get [information about SynQor's bus converter] without having to break any laws").)

SynQor further presented testimony from Lineage and Cherokee witnesses establishing that they did, in fact, monitor SynQor's datasheets and conduct competitive testing using samples of SynQor's products. (*See, e.g.,* 12/14 PM Tr. at 182:17-183:22 (Cherokee's 30(b)(6) designee Michael Wagner testifying that at the time that Cherokee developed its unregulated bus converters, SynQor had one on the market, and Cherokee obtained datasheets of the unregulated bus converters of its competitors for its R&D to learn and see what others were doing; Wagner also testified that this is "very, very common" in the industry); Dkt. No. 956-2 at 142:15-23 (Lineage and Cherokee witness Michael Wagner testifying that when confronted with patent markings, "I would agree we would look at – we would look at any kind of information that could be infringing"); 12/17 PM Tr. at 140:4-141:7 (Cherokee witness Michael Wagner testifying that Lineage/Cherokee routinely performs teardowns on competing products, including

SynQor's); 12/14 PM Tr. at 178:11-179:5 (Lineage's 30(b)(6) designee Vijayan Thottuvelil testifying about a Lineage employee trying to find out as much as she could about SynQor's unregulated eighth-brick bus converter without breaking any laws); 12/14 PM Tr. at 177:2-20 (Lineage's 30(b)(6) designee Vijayan Thottuvelil testifying about PTX0462, and specifically saying that during the development of Lineage's QUK-240 product, the technical manager for that project forwarded a SynQor datasheet to another Lineage engineer); 12/14 PM Tr. at 177:21-178:10 (Lineage's 30(b)(6) designee Vijayan Thottuvelil testifying about PTX0472 and specifically saying that Lineage compared its QUK-240 product to SynQor's BQ-55 unregulated bus converter).)

The court finds that a reasonable jury could infer that, in the course of monitoring SynQor's products and datasheets, Lineage and Cherokee learned of the SynQor patents marked on those products and datasheets, including the '417 patent, which is the parent to the patents-in-suit. Given Lineage/Cherokee's competitive activities and the competitive nature of this industry, a reasonable jury could conclude that Lineage and Cherokee continued to closely monitor SynQor's products and datasheets after the issuance of the '190 patent and therefore learned of the '190 patent in the same manner that they learned of the '417 patent.

Lineage and Cherokee point to their witness Michael Wagner's testimony asserting that Lineage and Cherokee did not have pre-suit knowledge of the '190 patent. (Dkt. No. 956-2 at 137:16-20.) However, Mr. Wagner also testified on cross-examination that he did not talk to the people who worked at Lineage and Cherokee between July 4, 2006 (when the '190 patent issued) and the time SynQor filed suit to see if any of them had observed SynQor's patent numbers in connection with their teardown activities. (Dkt. No. 956-2 at 142:24-143:4.) The jury could thus have reasonably discounted his testimony that Lineage and Cherokee lacked pre-suit knowledge

of the patent.  Mr. Wagner had no foundation to say that Lineage and Cherokee lacked such knowledge because he never asked the very people who were most likely to have come across SynQor's patents.  Accordingly, the Court concludes that the jury had a legally sufficient evidentiary basis for finding that Lineage and Cherokee had actual pre-suit knowledge of the '190 patent, the '021 patent, and the '034 patent, and that Lineage and Cherokee indirectly infringed the patents-in-suit.

Finally, Lineage and Cherokee contend that SynQor inappropriately relies on the "deliberate disregard of a known risk" standard from *SEB S.A. v. Montgomery Ward & Co., Inc.*, 594 F.3d 1360, 1377 (Fed. Cir. 2010).  Lineage and Cherokee correctly note that the Supreme Court's recent decision in *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. ___ (2011) overturned the Federal Circuit's "deliberate disregard of a known risk" standard for knowledge of a patent for the purposes of liability for induced infringement.  However, the Supreme Court's decision has no bearing on either (1) Lineage's and Cherokee's Motion for Judgment as a Matter of Law Regarding Pre-Suit infringement and for a Remittitur or New Trial on Damages Pursuant to Fed. R. Civ. P. 50(b) and 59(a) (Dkt. No.  956); or (2) Lineage and Cherokee's Motion for a New Trial Pursuant to Fed. R. Civ. P. 59 (Dkt. No. 957).  The Court made no instruction to the jury directed to *SEB*'s deliberate disregard of a known risk standard.  The Court set out an additional, bright-line rule helpful to Defendants, that if a Defendant "had no reason to be aware of the existence of the patent," it "cannot be liable for inducing infringement." (12/21 AM Tr. at 138:15-17.)  This instruction had nothing to do with *SEB*'s "deliberate indifference to a known risk" standard, and it is fully consistent with *Global-Tech Appliances*.  Moreover, the Court did instruct the jury that there was a knowledge requirement for inducement liability, explaining that Plaintiff must prove "that the Defendants actively and knowingly aided and abetted that direct

infringement." (12/21 AM Tr. at 138:7-8.)  Accordingly, the Court DENIES Defendants' motion

for JMOL as they relate to the issues of pre-suit knowledge of the '190 patent, the '021 patent,

and the '034 patent, and Lineage's and Cherokee's indirect infringement.

### B. Infringement

"[W]hoever without authority makes, uses, offers to sell, or sells any patented invention,

within the United States or imports into the United States any patented invention during the term

of the patent therefor, [directly] infringes the patent." 35 U.S.C. § 271(a) (2006).  Patent

infringement, whether literal or by equivalence, is an issue of fact, which the patentee must prove

by a preponderance of the evidence. *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc*.,

424 F.3d 1293, 1310 (Fed. Cir. 2005) ("To prove direct infringement, the plaintiff must establish

by a preponderance of the evidence that one or more claims of the patent read on the accused

device literally or under the doctrine of equivalents."); *see also SRI Int'l v. Matsushita Elec.

Corp. of Am*., 775 F.2d 1107, 1123 (Fed. Cir. 1985) (en banc) ("The patentee bears the burden of

proving infringement by a preponderance of the evidence.").  "Literal infringement requires that

each and every limitation set forth in a claim appear in an accused product." *Frank's Casing

Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc*., 389 F.3d 1370, 1378 (Fed. Cir. 2004)

(internal citation omitted). Applying this legal standard, and the legal standards relating to

indirect infringement discussed above, the Court concludes that the jury had a legally sufficient

evidentiary basis for finding that Defendants infringed the patents-in-suit.

Defendants argue that a reasonable jury would not have a sufficient evidentiary basis to

conclude that the Defendants either directly or indirectly infringed the patents-in-suit.

Specifically, Defendants make the following arguments:

(1)      Astec and Artesyn contend that there is no sufficient evidentiary basis by which a

reasonable jury could have found that Astec or Artesyn directly infringed claim 1 of the '083 patent.

(2)     Astec and Artesyn contend that SynQor introduced no evidence by which a reasonable jury could conclude that Astec products IBC38AQT4812; IBC60AQN4896; IBC32AEN4896; TQN20A48S12; and AED/ALD17Q50 directly infringed claims 21 and 30 of the '021 Patent.  Astec and Artesyn also contend that SynQor introduced no evidence by which a reasonable jury could conclude that Artesyn and Astec encouraged or specifically taught customers to use bus converters in a manner that would infringe claims 21 or 30 of the '021 patent.

(3)     Astec and Artesyn contend that SynQor introduced no evidence by which a reasonable jury could conclude that Astec products IBC38AQT4812; IBC60AQN4896; TQN20A48S12; AED/ALD17Q50; and IBC32AEN4896 directly infringed claims 2 and 19 of the '190 Patent.  Astec and Artesyn also contend that SynQor introduced no evidence by which a reasonable jury could conclude that Artesyn and Astec encouraged or specifically taught customers to use bus converters in a manner that would infringe claims 2 and 19 of the '190 patent

(4)     Astec and Artesyn contend that SynQor introduced no evidence by which a reasonable jury could conclude that Astec products TQN20A48S12; and AED/ALD17Q50 directly infringed claim 8 of the '190 patent.  Astec and Artesyn also contend that SynQor introduced no evidence by which a reasonable jury could conclude that Artesyn and Astec encouraged or specifically taught customers to use bus converters in a manner that would infringe claim 8 of the '190 patent.

(5)     Astec and Artesyn contend that SynQor introduced no evidence by which a

reasonable jury could conclude that Astec products IBC38AQT4812 and TQN20A48S12 directly infringed claim 10 of the '190 patent. Astec and Artesyn also contend that SynQor introduced no evidence by which a reasonable jury could conclude that Artesyn and Astec encouraged or specifically taught customers to use bus converters in a manner that would infringe claim 10 of the '190 patent.

(6) Astec and Artesyn contend that SynQor introduced no evidence by which a reasonable jury could conclude that Astec products TQN20A48S12 directly infringed claim 56 of the '702 patent. Astec further contends that SynQor introduced no evidence by which a reasonable jury could conclude that Astec products IBC60AQN4896; TQN20A48S12; AED/ALD17Q50; and IBC32AEN4896 directly infringed claim 71 of the '702 patent. Astec and Artesyn also contend that SynQor introduced no evidence by which a reasonable jury could conclude that Artesyn and Astec encouraged or specifically taught customers to use bus converters in a manner that would infringe claims 56 and 71 of the '190 patent.

(7) Astec contends that SynQor introduced no evidence by which a reasonable jury could conclude that Astec products IBC17AEN4812; IBC20AES4812; IBC28AQW4812; ATC210; Compaq LB25; Compaq vertical LB25; HP LB40; and Sun LB40 directly infringed claim 9 of the '034 patent. Astec and Artesyn also contend that SynQor introduced no evidence by which a reasonable jury could conclude that Artesyn and Astec encouraged or specifically taught customers to use bus converters in a manner that would infringe claim 9 of the '034 patent.

(8) Astec and Artesyn contend that SynQor presented no evidence to the jury that a list of products were used in any directly-infringing system. (See Dkt. No. 965-3.) Thus, Astec and Artesyn contend that there is no sufficient evidentiary basis by which a reasonable jury could

have found that Astec or Artesyn indirectly infringed the asserted claims of the '021, '190, '702, and '034 patents through acts related to these specific accused bus converters.

(9)     Power-One contends that SynQor introduced no evidence by which a reasonable jury could conclude that its QTS48T45080 or QKS48T21120 converters were ever used in a third-party system in the United States.

(10)     Murata contends that SynQor introduced no evidence by which a reasonable jury could conclude that its MPDNB001S product was ever directly shipped to the United States or that a third-party system incorporating the MPDNB001S was ever shipped into the United States.

(11)     Murata contends that SynQor introduced no evidence by which a reasonable jury could conclude that a third-party system incorporating the MPS QBC 12/22 converter was ever shipped into the United States.

(12)     Delta contends that SynQor introduced no evidence by which a reasonable jury could conclude that a third party system incorporating the Q48SB12020-NRFH converter was ever shipped into the United States.  Delta further contends that there is no evidence that this converter itself has been made, used, sold, offered for sale in the United States or imported into the United States.

(13)     Delta contends that SynQor introduced no evidence by which a reasonable jury could conclude that a third party system incorporating the Q48SH12025 converter was ever shipped into the United States.

(14)     The Fish Defendants contend that SynQor has failed to establish infringement for any of the accused systems manufactured by Fujitsu, and that the accused Fujitsu end products do not include a DC power source.

(15)     The Fish Defendants contend that SynQor has pointed to no evidence to establish

that an HP Superdome sx2000 was ever made, used, sold, or offered for sale in the United States, or imported into the United States. The HP Superdome sx2000 product is the accused third-party system that SynQor alleged incorporated the MPS QUS20120NVDR converter.

(16)    The Fish Defendants contend that SynQor has provided no evidence that the Delta Q48SB12020-NRFE variant or DPSN-470AP products infringe any asserted claims of the '021, '083, and '702 patents. The Fish Defendants also contend that SynQor provided no evidence that the Delta DPSN-470AP products and the Q48SB12020 bus converter incorporated therein produce a "nonregulated output" as required by the asserted claims of the '021, '083, and '702 patents.

(17)    The Fish Defendants contend that SynQor has failed to establish any instances of direct infringement of any Nortel end product systems incorporating the Delta Q48SB12020-NRFE variant or DPSN-470AP.

(18)    The Fish Defendants contend that SynQor has failed to establish any instances of direct infringement for the third-party systems Huawei TN52NS3 and WP11PAIU, which SynQor alleged incorporated the Delta Q48SH12033. The Fish Defendants also contend that SynQor has pointed to no evidence to establish that the TN52NS3 and WP11PAIU products were ever made, used, sold, or offered for sale in the United States, or imported into the United States.

(19)    The Fish Defendants contend that SynQor has failed to establish any instances of direct infringement by various "small customers and distributors." (Dkt. No. 963 at 9-10.) The Fish Defendants argue that SynQor has pointed to no evidence to establish that the accused end products by "small customers and distributors" were ever made, used, sold, or offered for sale in the United States, or imported into the United States.

23

(20)     The Fish Defendants contend that SynQor failed to establish that either the Fish Defendants or a third-party directly infringed the '083 patent because SynQor never established that the Fish Defendants' bus converters provided an unregulated output as required by the claims.

(21)     The Fish Defendants contend that the Cisco end products do not include a DC power source, DC input, or rectified source of power.

(22)     The Fish Defendants contend that SynQor failed to prove that any end products meet the "non-regulated" output limitations of the asserted claims of the '021 and '702 patents.

(23)     The Fish Defendants contend that SynQor failed to establish the presence of each limitation on which the Court granted summary judgment.

(24)     The Fish Defendants contend that SynQor failed to prove that each and every limitation of asserted claim limitation has been met by each accused third-party system.

(25)     The Fish Defendants contend that SynQor failed to establish that the Fish Defendants directly infringe the asserted system claims for which SynQor sought, and received, a finding of indirect infringement.

(26)     The Fish Defendants contend that they are entitled to judgment as a matter of law that they have not infringed the '083 patent for any bus converters made overseas and shipped overseas.

(27)     The Fish Defendants contend that SynQor failed to establish that the Fish Defendants infringe the asserted claims under the doctrine of equivalents.

(28)     The Fish Defendants contend that they are entitled to judgment as a matter of law that they have not infringed the asserted claims for any directly infringing activity occurring overseas.

(29)     Bel Fuse contends that SynQor did not offer any evidence to prove direct infringement by any end products incorporating Bel Fuse's unregulated bus converters prior to the issue date of the '083 patent.

(30)     Lineage and Cherokee contend that SynQor failed to establish by a preponderance of the evidence that the accused end product systems satisfy the DC power source limitations in claims 2, 8, 10, and 19 of the '190 patent, claims 21 and 30 of the '021 patent, claim 9 of the '034 patent, claim 1 of the '083, claims 56 and 71 of the '702 patent.

(31)     Lineage and Cherokee contend that SynQor failed to establish by a preponderance of the evidence that Lineage's and Cherokee's accused bus converters satisfy the controlled and uncontrolled rectifier limitations in claim 1 of the '083 patent and claims 56 and 71 of the '702 patent.

(32)     Lineage and Cherokee contend that SynQor failed to establish by a preponderance of the evidence that the output of the isolation stage in the accused end product systems is "about 12 volts" as required by claim 10 of the '190 patent.

(33)     Lineage and Cherokee contend that SynQor failed to establish by a preponderance of the evidence that Lineage's and Cherokee's semi-regulated bus converters include the "control circuit" required by Claim 9 of the '034 patent.

(34)     Lineage and Cherokee contend that SynQor failed to establish the presence of "a rectified source of power that is a DC input" in the accused end product systems that incorporate Lineage's and Cherokee's accused bus converters as required by claims 56 and 71 of the '702 patent.

(35)     Lineage and Cherokee contend that SynQor failed to establish by a preponderance of the evidence that Lineage's and Cherokee's bus converters include "a control circuit that

senses a voltage in the primary transformer winding circuit to provide a feedback control signal without bridging an isolation barrier between the primary and secondary transformer winding circuits, the feedback control signal controlling semi-regulation by control of duty cycle of a transistor in the primary transformer winding circuit" as required by claim 9 of the '034 patent.

(36)    Lineage and Cherokee contend that SynQor failed to present any evidence that Cherokee CBE14, CBQ53, and SP603 infringed claim 1 of the '083.

(37)    Lineage and Cherokee contend that SynQor failed to present any evidence of direct infringement by any end product system using Cherokee's CBE14, CBQ53, and SP603 and Lineage's EUE120 or EUE200 bus converters as required by the asserted claims of the '190, '021, and '702 patents.

(38)    Lineage and Cherokee contend that SynQor failed to present any evidence of direct infringement by any end product system using Lineage's QBK020, QSK033, QSW025, and QSW033 bus converters as required by asserted claim 9 of the '034 patent.

(39)    Lineage contends that SynQor presented no evidence as to infringement of the '190, '021, '702, and/or '034 patents by any end product systems using certain accused Lineage and Cherokee bus converters.

(40)    Lineage and Cherokee contend that SynQor failed to present any evidence of direct infringement of claim 9 of the '034 patent by any Hewlett-Packard end product system using Lineage's QBK025 bus converters sold to Hewlett-Packard.

(41)    Lineage and Cherokee contend that SynQor presented no evidence as to infringement of the '190, '021, '702, and/or '034 patents by any end product system made by certain end customers.

(42)    Lineage and Cherokee contend that SynQor failed to present any evidence that

Cisco's identified accused end product systems use Lineage's EUK240 bus converters as required by the asserted claims of the '190, '021, and '702 patents, or that Cisco's identified accused end product systems use Lineage's QBK033 bus converters as required by the asserted claims of the '034 patent.

(43)   Lineage contends that it is entitled to judgment as a matter of law that they do not infringe any of the asserted claims of the '190, '021, '034, '083, and '702 patents by the doctrine of equivalents.

Having carefully considered the record, and the parties' arguments, the Court concludes that the jury had a legally sufficient evidentiary basis for finding that each of the Defendants infringed the asserted claims of the patents-in-suit.   Accordingly, the Court rejects Defendants' arguments and DENIES Defendants' motion for JMOL as they relate to these issues of infringement.

In addition to the arguments presented above, Defendants Astec and Artesyn contend that SynQor failed to present any evidence of infringement for a list of accused products. (Dkt. No. 965-2.)   Specifically, Astec and Artesyn contend that the products on the list were accused of infringement by way of SynQor infringement contentions.[2]   Astec and Artesyn argue that SynQor's infringement case was presented by its technical expert, Dr. Steven Leeb, who provided a listing of the accused products in PTX2288.   Based on this list, Astec and Artesyn argue that there can be no dispute that SynQor produced no evidence of infringement concerning

---

[2] Astec and Artesyn represent to the Court that SynQor served its infringement contentions pursuant to P.R. 3-1 on May 16, 2008.   Subsequently, SynQor served its first amended infringement contentions on June 30, 2009, covering the three original asserted patents ('190, '021, and '034).   SynQor served its infringement contentions with regard to the '083 Patent on July 7, 2009, and with regard to the '702 Patent on July 21, 2009.  It is the Court's understanding that no further modifications, supplements, or amendments to SynQor's infringement contentions have been made since that time. (Dkt. No. 812 at 2-3.)

any accused product not listed in PTX2288. Similarly, the Fish Defendants argue that SynQor failed to present any evidence of infringement at trial for a list of accused products. (Dkt. No. 963 at 4-5.) Like Astec and Artesyn, the Fish Defendants contend that the products on the list were accused of infringement by way of SynQor infringement contentions. (*See* Dkt. No. 963-1.)

SynQor responds that the other part numbers and families of part numbers included in Astec/Artesyn's and the Fish Defendant's lists are merely different part numbers for its accused unregulated or semi-regulated bus converters. SynQor argues that it did not explicitly address these part numbers at trial because they had de minimus/pre-issuance sales. SynQor further argues that it did address other part numbers, for Astec/Artesyn's and the Fish Defendants' products that were sold during the damages periods, and that those products/part numbers are not colorably different than the products/part numbers that these defendants did not sell. The Court finds that the jury had a legally sufficient evidentiary basis for finding that Defendants induced or contributed to infringement. Accordingly, the Court DENIES Defendants' motion for JMOL as it relates to these units. However, SynQor is not entitled to damages for units on Defendants' lists that were sold before the Court entered the permanent injunction. If necessary, the Court can address post-injunction sales of units that are not colorably different than the ones on the list presented by Dr. Leeb at trial in contempt proceedings.

Artesyn and Astec also move for JMOL that a list of Artesyn and Astec products do not contribute to infringement of the asserted patents. (Dkt. No. 965-8). Artesyn and Astec contend that SynQor's expert witness Dr. Leeb provided no testimony that would provide a legally sufficient evidentiary basis for a reasonable jury to find that the accused products do not have substantial non-infringing uses. SynQor responds that this list of various Artesyn and Astec bus converters was explicitly addressed at trial, including through Dr. Leeb's testimony. Dr. Leeb

explained that there are no substantial non-infringing uses for Defendants' unregulated and semi-regulated bus converters and "if the bus converters are being sold, they are being used in infringing systems." (12/15 AM Tr. at 146:4-151:6.) In addition, Dr. Leeb specifically identified three examples of what he thought Defendants might argue were non-infringing uses, explained to the jury why these were not evidence of a substantial non-infringing use, and why he concluded that there were no substantial non-infringing uses in light of all the evidence that he reviewed. (12/15 AM Tr. at 146:25-151:6 (Dr. Leeb explains to the jury three examples that "could conceivably be quibbles" with his opinion that there are no substantial non-infringing uses of the Defendants' unregulated or semi-regulated bus converters and why each was not evidence of a substantial non-infringing use of Defendants' bus converters).) Accordingly, the Court concludes that the jury had a legally sufficient evidentiary basis for finding that Artesyn's and Astec's products included on the list had no substantial non-infringing uses. Thus, the Court DENIES the motion for JMOL as it relates to products on this list.

Lineage and Cherokee contend that there are 25 customers of Lineage and/or Cherokee whose end product systems were not accused of direct infringement by Dr. Leeb. (Dkt. No. 955 at 14-15.) Lineage and Cherokee argue that SynQor has proffered no evidence whatsoever of direct infringement by any of these customers. Thus, Lineage and Cherokee argue that they are entitled to judgment as a matter of law that they have not indirectly infringed the '190, '021, '702, and/or '034 patents as to accused bus converters sold to the customers identified in its list.

SynQor responds that circumstantial evidence of direct infringement is all that SynQor is required to provide in order to succeed on its claims for induced and contributory infringement. It contends that it met its burden of proving indirect infringement by Lineage, and it is not required to prove direct infringement by every customer in Lineage's sales data. SynQor argues

that the direct and circumstantial evidence that it produced at trial is more than sufficient to support the jury's conclusions on infringement. This includes the Lineage bus converter family part numbers that Dr. Leeb explicitly addressed at trial (those listed in his slides) for which he had no direct evidence of direct infringement (including sales to the customers identified in Lineage and Cherokee). Instead, Dr. Leeb relied upon circumstantial evidence (the lack of non-infringing uses for the accused bus converters) to reach his conclusion of direct infringement. SynQor contends that the jury's verdict reflects that there are no substantial non-infringing uses for Lineage's and Cherokee's bus converters. The Court agrees and DENIES Lineage's and Cherokee's motion for JMOL as they relate to these issues of infringement.

Finally, the Fish Defendants' JMOL requests that the Court review the briefing filed for their Motion For Partial Summary Judgment of Non Infringement (Dkt. No. 525), and rule that the Fish Defendants have not infringed the system patents as a matter of law. For the reasons stated in the order denying the Fish Defendants' motion, that request is DENIED.

## V.    CONCLUSION

The Court DENIES Defendants' motions for JMOL on the issues related to infringement of the patents-in-suit because the Court concludes that sufficient evidence supports the jury's verdict on these issues.

It is so ORDERED.

SIGNED this 17th day of August, 2011.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE