IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SYNQOR, INC, | § | |
| | § | |
| v. | § | CASE NO: 2:07-CV-497-TJW-CE |
| | § | |
| ARTESYN TECHNOLOGIES, INC., et al. | § | |

**MEMORANDUM OPINION AND ORDER**

## I.     INTRODUCTION

Pending before the Court are Defendants' Delta Electronics, Inc., Delta Products Corp., Murata Electronics North America, Inc., Murata Manufacturing Co., Ltd., Murata Power Solutions, Inc., and Power-One, Inc. (collectively the "Fish Defendants") motions for a new trial (Dkt. Nos. 840 and 972).  Also pending before the Court is Defendants' Astec America, Inc. ("Astec") and Artesyn Technologies, Inc. ("Artesyn") motion for a new trial (Dkt. No. 970). Also pending before the Court is Defendants' Lineage Power Corporation ("Lineage") and Cherokee International Corporation ("Cherokee") motion for a new trial (Dkt. No. 957).  Also pending before the court is Defendant's Bel Fuse, Inc. ("Bel Fuse") motion for a new trial (Dkt. No. 977).  In general, Defendants argue that they are entitled to a new trial based on: (1) erroneous jury instructions; (2) a prejudicial verdict form; (3) prejudicial instructions and comments made by the Court about the defendants and their case; (4) the exclusion of certain evidence and testimony; and (5) inadequate amount of time to present evidence.  Having carefully considered the parties' submissions, the record, and the applicable law, the Court finds that the motions should be DENIED.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

On December 13, 2010, a jury trial commenced in this case.  On December 21, 2010, the

jury reached a verdict finding that Defendants Artesyn Technologies, Inc. and Astec America Inc. (collectively "Artesyn/Astec"); Bel Fuse, Inc. ("Bel Fuse"); Cherokee International Corp. and Lineage Power Corporation (collectively "Lineage/Cherokee"); Delta Electronics, Inc. and Delta Products Corp. (collectively "Delta"); Murata Electronics North America, Inc. and Murata Manufacturing Co., Ltd. (collectively "Murata"); Murata Power Solutions, Inc. ("MPS"); and Power-One, Inc. ("Power-One") infringe various claims of the patents-in-suit[1]. (*See* Dkt. No. 889, Jury Verdict). The jury failed to find invalidity of any of the patents-in-suit. On December 29, 2010, the Court entered a partial judgment on the verdict ordering Defendants to pay the monetary damages awarded by the jury, which collectively totaled $95,224,863, of which approximately $87.1 million was lost profits and the balance of which was a reasonable royalty on units for which lost profits were not calculated. (Dkt. No. 907.)

At the close of trial, SynQor moved for a permanent injunction. On January 7, 2011, SynQor filed its motion for a permanent injunction against Defendants. (Dkt. No. 913.) The Court held a full evidentiary hearing on the issue of a permanent injunction that started on January 19, 2011 and ended on January 20, 2011. On January 24, 2011, the Court entered a memorandum opinion and order granting the permanent injunction. (Dkt. Nos. 931 and 932.) Defendants filed an emergency motion to stay the permanent injunction pending interlocutory appeal. (Dkt. No. 933.) The Court granted the emergency motion, and on January 31, 2011, the Court of Appeals for the Federal Circuit granted a temporary stay of the injunction. On April 11, 2011, the Federal Circuit replaced its temporary stay with a partial stay of this Court's injunction.

---

[1] U.S. Patent Nos. 7,072,190 ("the '190 patent") (PTX1), 7,269,034 ("the '034 patent") (PTX2), 7,272,021 ("the '021 patent") (PTX3), 7,558,083 ("the '083 patent") (PTX5), 7,564,702 ("the '702 patent") (PTX4).

## III. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 59(a) the court "may, on motion, grant a new trial on all or some of the issues–and to any party . . . after a jury trial for any reason for which a new trial has heretofore been granted in an action at law in federal court . . ." Fed. R. Civ. P. 59(a). The regional circuit law generally applies to motions for new trials. *See Riverwood Intern. Court v. R.A. Jones & Co., Inc.,* 324 F.3d 1346, 1352 (Fed. Cir. 2003); *Sulzer Textil A.G. v. Picanol N.V.,* 358 F.3d 1356, 1362-1363 (Fed. Cir. 2004) ("[W]e will apply [Federal Circuit] law to both substantive and procedural issues "intimately involved in the substance of enforcement of the patent right."") (quoting *Viam Corp. v. Iowa Exp.-Imp. Trading Co.*, 84 F.3d 424, 428 (Fed. Cir. 1996)). In the Fifth Circuit, a court may grant a new trial if it finds the verdict is against the great weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed. *See*, *e.g.*, *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir. 1985). "The decision to grant or deny a motion for a new trial is within the discretion of the trial court and will not be disturbed absent an abuse of discretion or a misapprehension of the law." *Prytania Park Hotel, Ltd. v. General Star Indem. Co.*, 179 F.3d 169, 173 (5th Cir. 1999).

## IV. DISCUSSION AND ANALYSIS

Defendants generally argue that they are entitled to a new trial based on: (1) erroneous jury instructions; (2) a prejudicial verdict form; (3) prejudicial instructions and comments made by the Court about the defendants and their case; (4) the exclusion of certain evidence and testimony; and (5) inadequate amount of time to present evidence. The Court will now address each of these topics and the numerous subtopics raised by Defendants in their voluminous briefing on their motions for a new trial.

### A.  The Jury's Verdict was not Against the Great Weight of the Evidence

A motion for new trial based on the sufficiency of the evidence should not be granted "unless the verdict is against the great weight of the evidence, not merely against the preponderance of the evidence." *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 838-39 (5th Cir. 2004).  Having carefully considered the parties' submissions, the record, and the applicable law, the Court finds that the verdict was not against the great weight of the evidence. The Fish Defendants argue that the jury's damages award was grossly excessive and not supported by substantial evidence.  Similarly, Artesyn/Astec contend that the Court should grant a new trial because the damages the jury awarded against Artesyn and Astec are so excessive that they should shock the judicial conscience of the Court. *See Palmer v. City of Monticello*, 31 F.3d 1499, 1508 (10th Cir. 1994).  In the alternative, Astec and Artesyn request that the Court should suggest that Plaintiff accept a remittitur to an award of 5% of the sales price of the accused bus converters sold by Artesyn and Astec because the jury's award against Artesyn and Astec of $13,927,553 is excessive.  The Court disagrees with these contentions and denies defendants' motion for a new trial, as well as Artesyn/Astec's request for remittitur for the following reasons.

The Court first notes that when there is a substantial evidentiary basis for the award, a verdict is not excessive merely because a jury awards every dollar requested by the plaintiff. The Court finds that there was substantial proof supporting the jury's damages award and that the verdict was not excessive.  For example, the jury heard evidence from SynQor's witnesses, Defendants' witnesses, and customers that the patented technology was sufficiently valuable and was deployed on a widespread basis in the industry within a few short years of its introduction by Dr. Schlecht.  The jury also heard that SynQor became a significant competitor in the power electronics industry, with revenues growing from zero in 1998 to more than $40 million by 2004.

(12/13 PM Tr. at 158:18-159:5.)  For example, by 2006, SynQor sold more than $20 million in DC-DC converters to Cisco alone, and Cisco rated SynQor its number one supplier. (*See* 12/13 PM Tr. at 115:4-14, 119:22-120:6.)  Moreover, the jury learned that Dr. Schlecht is one of the world's leading experts in the field of power electronics. (12/17 PM Tr. at 31:15-17; 12/14 PM Tr. at 110:4-17.)  The jury also learned that SynQor was able to charge prices for its bus converters that are in line with the price in its damages model (prices in the range of $60-$110 per unit) only to see Defendants offer "look-alike, imitation products" at lower and lower prices. (12/13 PM Tr. at 123:17-124:18.)  In addition, Dr. Schlecht explained at trial his frustration that "[SynQor] had brought [Cisco] what I thought was a very valuable idea, unregulated IBA," and that Cisco proceeded to "adopt[] it in almost every board they were making in this particular [business unit]," while SynQor was "systematically being designed out of [Cisco's] products" in favor of lower-priced products from competitors. (12/14 AM Tr. at 41:5-12.)  And the jury learned that after the issuance of SynQor's patents, SynQor did not enjoy the exclusivity that it should have because its patent rights were not respected. (*Id.* at 37:16-25.) However, in the spring and summer of 2010, when Cisco could not obtain unregulated bus converters from Defendants, Cisco turned to SynQor for supply.  Specifically, the jury learned that Cisco purchased about 18,000 unregulated bus converters from SynQor during this time frame at $70 and $81 per unit. (12/20 PM Tr. at 53:21-54:16.)  The jury also learned that SynQor was not interested in licensing its patents to competitors, and instead SynQor wanted to use its technology to grow and compete and "increase [its] position in the market." (*See, e.g.*, 12/15 PM Tr. at 188:18-25, 189:2-11.)

Against this backdrop, SynQor's damages expert, economist Mr. Brett Reed, conducted his analysis and calculated damages that would adequately compensate SynQor. Mr. Reed

analyzed the record in light of the *Panduit* factors and concluded that there was demand for the infringing products, that there were not acceptable non-infringing alternatives for most of the infringing units sold by Defendants, and that SynQor had ample capacity to make the Defendants' sales. (12/15 PM Tr. at 194:25-203:18; 12/16 AM Tr. at 4:11-19:10.) Mr. Reed then calculated lost profits by determining the prices SynQor would have commanded in the "but for" world as the sole supplier of these products, and determined the number of units that SynQor would have sold at those prices. (12/16 AM Tr. 19:11-76:24.) Where the evidence suggested a reason SynQor may not have been in a position to make the sale of a particular unit sold by Defendants at but-for prices, Mr. Reed excluded that unit from his lost profits calculation and instead calculated an appropriate reasonable royalty award for that unit, thereby ensuring that SynQor would receive at least the statutory minimum recovery on all infringing sales. (*See, e.g.*, 12/15 PM Tr. at 189:13-23.) Mr. Reed provided the jury with a detailed analysis breaking down the damages to be awarded on a customer-by-customer, product-by-product basis, separately calculating lost profits for most infringing sales and reasonable royalties for the balance. *See* PTX 2169, 2172-2179 (lost profits by Defendant); PTX 2170, 2188-2196 (reasonable royalties by Defendant). After hearing all the evidence on the value of the technology, what transpired in the real world, and Mr. Reed's expert analysis of the damages SynQor suffered, and after assessing the credibility of all of the witnesses and evidence presented, the jury agreed with Mr. Reed's assessment and awarded SynQor the damages it sought. Accordingly, the Court finds that there was substantial proof supporting the jury's damages award and that the verdict was not excessive.

Artesyn/Astec also argue that the evidence is insufficient to support the jury's answer to the following questions: (1) Jury Question No. 1 and 2 concerning infringement of the '083

patent; (2) Jury Question Nos. 10 through 13 concerning indirect infringement of the '190 patent, the '021 patent, the '083 patent, the '702 patent, and the '034 patent; (3) Jury Question Nos. 28 through 32 concerning invalidity of the asserted claims; and (4) Jury Question Nos. 34 and 35 concerning monetary damages. Other than providing this basic listing, Artesyn/Astec fail to explain why the evidence was allegedly insufficient or why the Court's rulings and instructions were erroneous. Moreover, Artesyn/Astec fail to explain why any of the alleged errors were not harmless. Simply stated, a barebones list of objections is insufficient to support a grant of a new trial. Accordingly, the Court concludes that the verdict is not against the great weight of the evidence and DENIES Defendants' motions for a new trial as they relate to sufficiency of the evidence.

### B. The Jury Was Properly Instructed

To grant a new trial on the basis of an erroneous jury instruction, the Fifth Circuit uses a two-part test. The challenger must first demonstrate that "the charge as a whole creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Z4 Technologies, Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1353 (Fed. Cir. 2007) (quoting *Hartsell v. Doctor Pepper Bottling Co.*, 207 F.3d 269, 272 (5th Cir. 2000)). Then, even if the charge was erroneous, a new trial will not be granted if the court determines "based on the entire record, that the challenged instruction could not have affected the outcome of the case." *Id.* Moreover, with respect to a motion for a new trial predicated upon erroneous jury instructions in a patent infringement case, the Federal Circuit has explained as follows:

> The question of whether a jury instruction on an issue of patent law is erroneous is a matter of Federal Circuit law and is reviewed de novo. A jury verdict will be set aside, based on erroneous jury instructions, if the movant can establish that "those instructions were legally erroneous," and that "the errors had prejudicial effect." In reviewing jury instructions, the full trial record and the

> jury instructions in their entirety must be examined because "instructions take on meaning from the context of what happened at trial, including how the parties tried the case and their arguments to the jury."

*Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363 (Fed. Cir. 2004) (citations omitted). Having carefully considered the parties' submissions, the record, and the applicable law, the Court finds that Defendants have not demonstrated the jury charge was erroneous or that the alleged errors had prejudicial effect.

### 1. The Jury Was Properly Instructed On Lost Profits

The Fish Defendants argue that the jury instruction on lost profits was deficient and resulted in an improper lost profits award because the Court failed to set out the standard for what is required for a non-infringing alternative to be "acceptable" and "available." The Court disagrees and notes that it properly instructed the jury that it was to consider "whether or not, if the Defendants' infringing products were not available, some or all of the people who bought from the Defendants would have bought a different, noninfringing product from the Defendants or somebody else rather than buy from the Plaintiff." (12/21 AM Tr. at 156:24-157:4.) The Court instructed the jury that if "acceptable non-infringing substitutes were available from suppliers," then SynQor is only entitled to "a portion of the infringing sale." (*Id.* at 157:18-23.) The Court also instructed the jury:

> In deciding whether or not people who bought from the Defendants would have bought a non-infringing product, you should consider whether or not there was such a demand for the patented aspect of the infringing products that the purchaser would not have bought a non-infringing product.

*Id.* at 157:5-10. This instruction informed the jury that a non-infringing alternative could be different than the accused product and still be acceptable. The key is whether the customer's demand is driven by the patented feature. *See TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895,

901 (Fed. Cir. 1986) ("A product lacking the advantages of that patented can hardly be termed a substitute 'acceptable' to the customer who wants those advantages.") (citation omitted).

The Fish Defendants also contend that the Court's instructions did not sufficiently inform the jury that an alternative could have been "available" in the but-for world even if there were no real-world sales. However, the Court instructed the jury that the key for determining lost profits was the but-for test. (12/21 AM Tr. at 155:12-19.) And SynQor's damages expert, Mr. Reed explained the but-for inquiry to the jury. Specifically, Mr. Reed explained that "we have to envision a world that didn't exist" and ask "[b]ut for infringement, what would have happened if the Defendants had honored SynQor's patent rights?" (12/15 PM Tr. at 191:5-19.) Mr. Reed further explained that the relevant question is "in the but-for world, would there be some other product that the Defendants would have tried to sell or that the customers of the Defendants would have turned to?" (*Id.* at 194:3-7.) He explained that the focus is on "in this but-for world, this world but for infringement, what would customers do and what would the Defendants do." (12/16 AM Tr. at 8:8-10.) Mr. Reed also agreed on cross-examination that "[i]f the product could be made earlier" it would qualify as an available alternative. (*Id.* at 161:6-15.) Accordingly, the Court finds that the jury was sufficiently informed that an alternative could have been "available" in the but-for world even if there were no real-world sales.

Artesyn/Astec and Lineage/Cherokee contend that the Court's lost profits instruction is legally incorrect because it does not include the four-part *Panduit* test, and that the instruction does not appear to be based on any set of model patent jury instructions or any published case. The Federal Circuit has explicitly held that the *Panduit* test is not required in assessing lost profits. In *King Instruments Corp. v. Perego*, 65 F.3d 941, 952 (Fed. Cir. 1995), the court stated that "[t]his court has prescribed no one particular method by which the patent owner must meet

[the] burden [of proving lost profits]; 'the methodology of assessing and computing damages is committed to the sound discretion of the district court.'" (quoting *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1576-77 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1022 (1990)); *see Micro Chemical, Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003) ("This court has not restricted patentees to any one particular method of proving 'but for' causation.") (citations omitted).

In fact, the Federal Circuit has explicitly endorsed a flexible approach to analyzing the market "but for" the infringement in assessing the appropriateness and amount of lost profits:

> The "but for" inquiry therefore requires a reconstruction of the market, as it would have developed absent the infringing product, to determine what the patentee "would ... have made." ... Within this framework, trial courts, with this court's approval, consistently permit patentees to present market reconstruction theories showing all of the ways in which they would have been better off in the "but for world," and accordingly to recover lost profits in a wide variety of forms.

*Grain Processing Corp. v. Am. Maize-Products Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999) (emphasis added) (citations omitted). Given this authority, Artesyn/Astec's and Lineage/Cherokee's conclusory argument fails to show that the instructions were legally erroneous and that they had a prejudicial effect. Indeed, Artesyn/Astec and Lineage/Cherokee do not point to a single specific flaw in this instruction. As discussed, the *Panduit* test can be used, but so can other analyses. In the present case, the Court properly instructed the jury to decide whether the Plaintiff had proven that "it would have made additional profits if the Defendants had not infringed." (12/21 AM Tr. at 156:13-15.) The Court further instructed the jury that SynQor could only receive lost profits for "products that compete with the Defendants' products that you find infringe," that the jury "must also consider" any available non-infringing alternative that would have been purchased instead of SynQor's products, and that the jury

10

should consider the market demand for the patented aspect of the infringing products. (12/21 AM Tr. at 156:16-157:13.) The Court also properly instructed the jury that SynQor must show a reasonable probability of lost sales and that the amount of lost profits must also be proven to a reasonable probability and not be merely speculation. (*Id.* at 157:24-158:9.) The Court finds that the instructions provided an accurate and helpful explanation of the "but for" inquiry specifically endorsed in *Grain Processing* and other Federal Circuit decisions. *See, e.g.*, *Grain Processing*, 185 F.3d at 1350; *King Instruments*, 65 F.3d at 952-53.

Moreover, the Court's instruction did not give rise to any prejudice because Lineage/Cherokee admits in its Motion that both sides' damages experts expressly used the *Panduit* test in explaining their lost profits analyses to the jury, and nothing in the Court's instruction precludes consideration of those analyses. Accordingly, the jury considered the experts' *Panduit* analyses and there was certainly no ineradicable or prejudicial effect on the case based on the Court's instructions. Artesyn/Astec and Lineage/Cherokee fail to point to a single specific error in the Court's instruction, and fails to identify any specific prejudice caused by it. Accordingly, Defendants' motions for a new trial as they relate to the jury instruction on lost profits are DENIED.

### 2. The Jury Was Properly Instructed On Inducement

The Fish Defendants contend that the Court's instruction on inducement was erroneous because the Court failed to instruct the jury regarding several critical elements of an inducement charge. Specifically, the Fish Defendants argues that the court failed to instruct the jury that an inducement finding requires: (1) A specific intent to encourage another's direct infringement; (2) a showing of culpable conduct; and (3) actual knowledge of the asserted patents; and (4) a causal relationship between the defendant's activities and the third party's direct infringement.

Essentially, the Fish Defendants' motion boils down to a complaint that the Court did not read the jury every potentially helpful phrase that appears in the Federal Circuit's opinion in *DSU Medical Corporation v. JMS Corporation*, 471 F.3d 1293 (Fed. Cir. 2006).

The Fish Defendants first argue that the Court did not instruct the jury that "an inducement finding requires: A specific intent to encourage another's direct infringement; [a] showing of culpable conduct; [and] [a]ctual knowledge of the asserted patents." (Dkt. No. 972 at 21.) This argument is untenable because the jury instruction on induced infringement did include language addressing the knowledge/intent/culpability requirement of an induced infringement allegation. Specifically, the Court instructed the jury that Plaintiff must prove "that the Defendants *actively and knowingly* aided and abetted that direct infringement." (12/21 AM Tr. at 138:7-9) (emphasis added). This instruction specifically requires knowledge of the direct infringement that is being aided and abetted, and follows Federal Circuit precedent regarding inducement. *See Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, (Fed. Cir. 1988) ("Thus, a person infringes by actively and *knowingly* aiding and abetting another's direct infringement."), *cited with approval in Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005), *and in DSU Medical*, 471 F.3d at 1305-06.

The Fish Defendants also argue that this instruction was insufficient because the instruction in *DSU* also first stated that inducement requires "proof that the defendant knowingly induced infringement with the intent to encourage the infringement." Dkt. No. 1044 at 10. But the Federal Circuit in *DSU* explained exactly what the intent requirement means: "the plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements." *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006) (quoting *Manville Sales Corp. v.*

*Paramount Systems, Inc.*, 917 F.2d 544, 554 (Fed. Cir. 1990)); *see also ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007) ("Specific intent requires 'a showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements.'") (quoting *DSU*). This is precisely the instruction given by the Court. Specifically, the Court instructed the jury that the "Plaintiff must show that the Defendants actually intended to cause the acts that constitute direct infringement and that the Defendants knew or should have known that its actions would induce actual infringement." (12/21 AM Tr. at 138:10-14.) Consistent with *DSU* and its progeny, the Court's instruction was an explication of the intent requirement, and fully informed the jury that it needed to find that the Fish Defendants had the intent to induce infringement. If the Defendants intended to cause the acts that constitute direct infringement and knew or should have known that their actions would induce actual infringements (as the Court instructed the jury), then the Defendants necessarily knowingly induced infringement and acted with the intent to encourage infringement. Read as a whole, the Court is not persuaded that the challenged instruction affected the outcome of the case.

The Fish Defendants also fail to explain any prejudice that resulted from what they contend was the erroneous jury instruction. SynQor presented evidence at trial that the Fish Defendants promoted and encouraged the use of their bus converters in an infringing manner, knew that their bus converters were being used in an infringing manner, and had knowledge of the patents-in-suit. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. ___ (2011) ("[W]e now hold that induced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement."). This evidence is more than sufficient to show that the Fish Defendants intended to induce infringement. *See Astrazeneca LP v. Apotex, Inc.*, 633 F.3d 1042,

1059 (Fed. Cir. 2010) ("[E]vidence of active steps … taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe") (quoting *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 935 (2005)).

Artesyn/Astec, Lineage/Cherokee, and Bel Fuse also contend that the Court's instruction on inducement was erroneous because the Court omitted the requirement that SynQor prove that each defendant had knowledge of the patent. Specifically, these defendants contend that the charge read to the jury stated that "[a] Defendant also cannot be liable for inducing infringement if it had no reason to be aware of the existence of the patent." (12/21 AM Tr. at 138:15-17.) They contend that the Court should have adopted the following instruction pertaining to inducement: "To prove that a particular Defendant induced patent infringement, SynQor must prove by a preponderance of the evidence that . . . [t]he patent had issued, and that Defendant knew of the patent at the time of the active encouragement or instruction." (*See* Dkt. No. 613 - Joint Proposed Jury Instructions at 37.)

The Court finds that Artesyn/Astec's, Lineage/Cherokee's, and Bel Fuse's arguments regarding the Court's inducement instruction have no merit. These defendants ignore the substance of the Court's instruction, instead focusing on one small part, where the Court correctly stated that "[a] Defendant also cannot be liable for inducing infringement if it had no reason to be aware of the existence of the patent." (12/21 AM Tr. at 138:15-17.) Artesyn/Astec, Lineage/Cherokee, and Bel Fuse do not dispute that this statement is accurate. Instead, they argue that the statement does not go far enough in laying out the requisite level of knowledge that must be shown to prove that a party has induced patent infringement. But Artesyn/Astec's, Lineage/Cherokee's, and Bel Fuse's arguments are refuted by a simple examination of the rest of

the Court's instruction.

The Court's jury instruction on induced infringement includes the knowledge requirement that Artesyn/Astec, Lineage/Cherokee, and Bel Fuse claim is missing. That is, the Court instructed the jury that the plaintiff must prove "that the Defendants actively and *knowingly* aided and abetted that direct infringement." (12/21 AM Tr. at 138:7-8) (emphasis added). This instruction specifically requires knowledge of the direct infringement that is being aided and abetted, and follows Federal Circuit precedent regarding inducement as discussed above. Thus, the Court's instruction did include the knowledge requirement that Artesyn/Astec, Lineage/Cherokee, and Bel Fuse seek.

Moreover, the very case these defendants cite, *DSU,* affirmed an inducement instruction very similar to the one given in this case. *See* 471 F.3d at 1305-06. In the present case, the Court instructed the jury that "[t]he Plaintiff must show that the Defendants actually intended to cause the acts that constitute direct infringement *and that the Defendants knew or should have known that its actions would induce actual infringement.*" (12/21 AM Tr. at 138:10-14) (emphasis added). In *DSU*, the court affirmed the district court's instruction that to induce infringement, "[t]he defendant must have intended to cause the acts that constitute the direct infringement and must have known or should have known than [sic] its action would cause the direct infringement." *See*, 471 F.3d at 1305-06.

Further, the specific sentence criticized by Artesyn/Astec, Lineage/Cherokee, and Bel Fuse in its Motion actually sets forth an additional bright line rule helpful to Defendants that if a Defendant "had no reason to be aware of the existence of the patent," it "cannot be liable for inducing infringement." (12/21 AM Tr. at 138:15-17.) This statement advantages Defendants, not SynQor, and Defendants cannot dispute its accuracy. For at least these reasons, Defendants'

motions for a new trial as they relate to the jury instructions on inducement are DENIED.

### 3. The Jury Was Properly Instructed That Defendants had the Burden of Proving Invalidity by Clear and Convincing Evidence

The Fish Defendants' contend that the Court's instruction on invalidity was erroneous because the Court instructed the jury that the defendants were required to prove invalidity by "clear and convincing evidence." The Supreme Court recently affirmed that an accused infringer has the burden of proving invalidity by clear and convincing evidence in *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238 (2011). Based on the state of the law, both then and now, there is no basis for granting a new trial. Accordingly, the Fish Defendants' motion for a new trial as it relates to the jury instructions on invalidity is DENIED.

### 4. The Court's Jury Instructions Were Proper

In addition to the jury instructions discussed above, the Fish Defendants provide a conclusory list of alleged jury instruction errors in Section II(G) of their motion. (Dkt. No. 972 at 28-30.) Specifically, the Fish Defendants contend that the following jury instructions were legally erroneous and adversely affected the jury verdict: (1) the Court failed to seek an advisory opinion regarding prosecution laches, including the underlying factual inquiries regarding whether SynQor's delay in prosecution was unreasonable and unexplained, and caused prejudice to the defendants; (2) the Court failed to instruct the jury that even though the Patent Office has allowed the claims of a patent, the jury has the ultimate responsibility for determining whether the claims of the patent are valid; (3) the Court failed to instruct the jury that to anticipate, a reference's disclosure does not have to be in the same words as the claim, and that the requirements of the claim may be either stated or necessarily implied, so that someone of ordinary skill in the field of power electronics, looking at one reference, would be able to make and use at least one embodiment of the claimed invention; (4) the Court failed to instruct the jury

that anticipation occurs when the claimed invention inherently results from the practice of what is disclosed in the written reference even if the inherent disclosure was unrecognized or unappreciated by one of ordinary skill in the field of the invention; (5) the Court failed to provide a complete instruction on obviousness, and in particular where a teaching, motivation, or suggestion to combine prior art references may be found; (6) the Court failed to instruct the jury that a showing of a nexus is required for SynQor to rely on secondary considerations to show non-obviousness. (7) the Court failed to provide a complete instruction regarding the test for written description, including that the specification must describe an invention understandable to that skilled artisan and must show that the inventor actually invented the invention claimed; (8) the Court failed to properly instruct the jury regarding the burden of proof in establishing the priority date for the asserted claims; (9) the Court improperly instructed the jury that upon an infringement finding the jury could consider demand for the accused products to be equivalent to demand for the patented invention; (10) the jury instructions failed to sufficiently indicate to the jury that it was required to consider liability separately for each defendant, including whether each defendant had knowledge of the patents-in-suit and/or had the requisite specific intent and/or culpable conduct necessary for an indirect infringement finding.

The Court first notes that the Fish Defendants provide no legal or factual citations for the purported errors. Second, the Court's jury instructions were proper with respect to the listed issues, and in many cases provide the very instructions that the Fish Defendants claim are missing. Accordingly, the Fish Defendants' motion for a new trial as it relates to these jury instructions is DENIED.

### C.  The Court's Evidentiary Rulings Were Correct

Defendants argue that they are entitled to a new trial because the Court made an erroneous

evidentiary resulting in substantial prejudice. A new trial on the basis of trial error should only be granted if "after considering the record as a whole, the court concludes that manifest injustice will result from letting the verdict stand." *Learmonth v. Sears, Roebuck and Co.*, 631 F.3d 724, 731 (5th Cir. 2011). Having carefully considered the parties' submissions, the record, and the applicable law, the Court finds that Defendants have not demonstrated that manifest injustice will result from letting the verdict stand or that they have been substantially prejudiced.

### 1. The Exclusion of the Cisco Awards and Cisco's Migration to Non-infringing Fully Regulated Bus Converters

The Fish Defendants and Artesyn/Astec contend that the Court erred by excluding from the jury evidence concerning Cisco's migration to non-infringing fully regulated bus converters and the products awards (hereafter "Cisco Awards") made to several of the defendants concerning replacement fully regulated bus converters. The evidence of the Cisco Awards was first addressed when the Court granted SynQor's motion *in limine* on the subject. (Dkt No. 750.) That evidence related to Cisco's eleventh-hour effort to design allegedly non-infringing fully regulated bus converters into its product line by "awarding" Defendants the right to develop fully regulated bus converters for Cisco. In its Motion *In Limine* #20, SynQor moved to exclude any evidence regarding the Cisco Awards and other alleged non-infringing alternatives that were not identified during fact discovery because SynQor was deprived from taking discovery on these alleged non-infringing alternatives or addressing them in its expert reports. (Dkt No. 599 at 33-38.)

As previously determined by the Court, the motion *in limine* was well-grounded in fact and law. Under Federal Rule of Civil Procedure 37, a party who fails to provide information as required by Rule 26(e) is not allowed to use that information at trial unless the failure was substantially justified or harmless. Federal Rule of Civil Procedure 26(e) provides that a party

who has responded to an interrogatory must supplement its disclosure or response in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. The tardy disclosure of the Cisco Awards evidence was unfair, and the Court accordingly granted SynQor's motion.

Specifically, the Court determined that in order for SynQor's technical experts to assess the acceptability and/or availability of regulated bus converter as a drop-in replacement for an accused bus converter (and to assess whether it was truly non-infringing), they would have to examine technical documents and/or the bus converters themselves to determine whether they were capable of delivering the specified power in a range of operating conditions, without generating too much heat, and without compromising system stability. Having been deprived of a reasonable opportunity to conduct that highly technical discovery, SynQor would have been left in the untenable position of rebutting evidence of the acceptability of products that may never be developed.

Further, as SynQor pointed out, even if Defendants make acceptable regulated bus converters sometime in the near future, that fact was not probative of the availability of acceptable alternatives during the damages period. (*See* 12/15 AM Tr. at 185:5-186:4.) The evidence was uncontroverted that component improvements led to significant improvements in converter performance characteristics (such as efficiencies) in 2010 (*see id.* at 186:5-19), and there is therefore no basis to conclude that the high performing fully regulated converters that Defendants were working on in late 2010 could have been developed any earlier. The Defendants had every incentive to design non-infringing substitutes before late 2010, and they did not. For all these reasons, the Court concludes that it was correct to prohibit Defendants

from making reference to these awards as evidence of an alleged non-infringing alternative or of Cisco's willingness or ability to use such products.

Moreover, it appears that the exclusion of the evidence was harmless in any event. As the Court now knows from Cisco's submissions in connection with the permanent injunction hearing, the allegedly non-infringing products Cisco "awarded" were still more than eight months away from being ready as of mid-January 2011. (*See, e.g.*, Dkt. No. 919-8 at 6, Decl. of Robert Ballenger at ¶ 17.) So the excluded development awards amounted to nothing more than documents suggesting a plan to develop substitute products in the future, which may or may not be successful and which may or may not ultimately be adopted. The Cisco Awards evidence related to products that were in the infancy of their development. It would have been unfairly prejudicial to admit evidence of those awards because SynQor was denied a fair opportunity to take discovery regarding to the awards. The Court finds that there was nothing prejudicial about the exclusion of this evidence and that Defendants have not demonstrated that manifest injustice will result from letting the verdict stand. Accordingly, Defendants' motions for a new trial as they relate to the exclusion of this evidence is DENIED.

### 2. The Exclusion of Evidence Relating to the Reexaminations

The Fish Defendants and Artesyn/Astec contend that the Court erred by excluding from the jury evidence about their state of mind in defense of SynQor's inducement allegations. Specifically, the excluded evidence included ongoing reexaminations before the Patent Office. The Fish Defendants also contend that the Court erred by excluding their written opinions on invalidity.

The Court first notes that at the time the evidence was excluded, the Patent Office had not made any final or conclusive determinations or substantively considered SynQor's responses to

the preliminary reexamination actions. Thus, admitting evidence relating to the reexaminations would have created a distracting sideshow that would have only confused the jury. In excluding this evidence, the Court determined that "the prejudicial nature of evidence concerning the ongoing parallel re-examination proceeding outweighed whatever marginal probative or corrective value it might have had in this case." *Calloway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1343 (Fed. Cir. 2009). Moreover, evidence relating to the reexaminations also would have inevitably undermined the statutory presumption of validity. For these reasons, the Federal Circuit has held that it is proper to exclude reexamination evidence. *See Calloway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1343 (Fed. Cir. 2009); *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1584 (Fed. Cir. 1996). The Court therefore concludes that it correctly excluded the evidence related to the reexamination.

The Court also was correct to exclude the opinions of counsel because of the circumstances by which they were obtained. The Fish Defendants obtained their opinions of counsel nearly a year after this litigation commenced. The opinion counsel was also hired by trial counsel and only invited to bid for the work if he would agree with the Defendants' Invalidity Contentions. (*See* Dkt No. 599-9 at 2.) Under these circumstances, the opinions of counsel have no real probative value. *See, e.g., Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,* 725 F. Supp. 2d 474, 478 (D. Del. 2010) ("[T]he court finds [the opinions] to be of marginal value both because of their post-litigation timing and because the content of each opinion is deficient to render it objective and competent advice of counsel.") (citation omitted). Additionally, both the reexaminations and opinions of counsel were properly excluded because of Defendants' late disclosures. The Fish Defendants did not disclose their reliance on opinions of counsel as a defense to inducement prior to the close of fact discovery,

even though SynQor served interrogatories requesting this information. (*See* Dkt No. 599, Exs. 9-15.) Nor did they disclose their reliance on the reexaminations. *Id.* SynQor only learned of these defenses when the Defendants served their expert reports. This late disclosure prejudiced SynQor by preventing it from seeking discovery relating to the Defendants' alleged reliance on the reexaminations and opinions of counsel and from obtaining its own expert to put the opinions and reexamination proceedings in their proper perspective. Fed. R. Civ. P. 37(c) authorizes the exclusion of both the reexaminations and the opinions of counsel under these circumstances. Especially in light of the minimal relevance of this evidence, as noted above, and the Court find that it was correct to exclude this evidence.

### 3. The Exclusion of Evidence Relating to Offers of Proof

The Fish Defendants contend that a new trial is warranted because of the Court's exclusion of the following evidence: Offer of Proof re Mweene (Dkt. No. 804); Offer of Proof re Chen-Jen Hu (Dkt. No. 805); Offer of Proof re Godici (Dkt. No. 816); Offer of Proof re Cisco Awards (Dkt. No. 818); Offer of Proof re Specific Intent (Dkt. No. 819); Offer of Proof re Cusanelli (Dkt. No. 848); and Supplemental Offer of Proof re Cisco Awards (Dkt. No. 870). The Fish Defendants' mere listing of evidence that the Court excluded does not provide sufficient grounds for the Court to grant a new trial. The Fish Defendants offer only a generic allegation of prejudice with no specific explanation of why the Court's rulings were erroneous, what the excluded material contains, why it is non-cumulative over the evidence that Court did admit, or how it could have materially affected the jury's verdict. Thus, the Court finds that Defendants have not demonstrated that manifest injustice will result from letting the verdict stand. *Learmonth*, 631 F.3d at 731. Accordingly, the Fish Defendants' motion for a new trial as it relates to the exclusion of this evidence is DENIED.

#### 4.  The Exclusion of Mweene Testimony

Artesyn/Astec contend that the Court erred by excluding from the jury testimony from witness Mweene.  Artesyn/Astec do not identify any specific testimony from Dr. Mweene the exclusion of which would entitle them to a new trial.  (Dkt No. 970 at 2)(stating only that "relevant testimony from witness Mweene" was excluded).  Moreover, the Court notes that substantial deposition testimony from Dr. Mweene was played to the jury. (12/16 PM Tr. at 157:24-177:3.)

To the extent Artesyn/Astec are contending that additional portions of Dr. Mweene's testimony that were excluded by the Court's ruling on SynQor's motion *in limine* no. 5 (Dkt No. 703) and the Court's Dec. 15 Order (Dkt No. 795) should have been played to the jury, the argument has no merit.  As previously ruled on by the Court, it is not appropriate for authors of alleged prior art references to improperly fill gaps in references.  It is also not appropriate for such authors to offer expert testimony regarding what the references would teach to one of skill in the art where, as here, those individuals did not submit timely expert reports in compliance with Fed. R. Civ. P. 26.  Thus, the Court's evidentiary rulings regarding Mweene were appropriate.  Accordingly, Artesyn/Astec's motion for a new trial as it relates to the exclusion of this evidence is DENIED.

#### 5.  The Exclusion of Arduini Testimony

As with Dr. Mweene's testimony, Artesyn/Astec does not identify any specific testimony that Mr. Arduini would have presented that they contend was improperly excluded. (Dkt No. 970 at 2) (stating as alleged error only that "relevant testimony concerning witness Arduini" was excluded).  Testimony from Mr. Arduini was subject to SynQor's Motion *In Limine* No. 5 and was precluded except to the extent the testimony related to facts necessary to prove that Mr.

Arduini's reference was prior art. (Dkt No. 703 at 1.)  At trial, SynQor stipulated that the Arduini reference qualified as prior art and the jury was so instructed. (12/20 AM Tr. at 3:21-4:7) (informing the jury that the parties had "reached an agreement that Mr. Arduini's paper is prior art and that Mr. Arduini does not need to testify.").  Artesyn/Astec point to nothing else that Mr. Arduini would have properly testified to at trial. As explained above, to the extent Defendants planned to have Mr. Arduini fill gaps in his reference or explain what it would mean to one of ordinary skill in the art (without providing an expert report in the case), such testimony is improper.  Accordingly, Artesyn/Astec's motion for a new trial as it relates to the exclusion of this evidence is DENIED.

### 6.  The Exclusion of Reed Testimony

Artesyn/Astec and Lineage/Cherokee contend that the Court erred by denying the Defendant's Joint Daubert Motion to Preclude the Testimony of Brett L. Reed. (Dkt. Nos. 561 and 776.)    The Court disagrees and finds that it correctly denied Defendants' *Daubert* motion and allowed the testimony of SynQor's damages expert Brett Reed.  In denying the motion, the Court noted that it would evaluate the evidence at trial and ultimately determine at that time whether or not the underlying factual predicates had been sufficiently developed to warrant the submission of Mr. Reed's opinions to the jury.  As discussed extensively above, the underlying factual predicates were developed and Mr. Reed provided the jury with a detailed analysis breaking down the damages to be awarded on a customer-by-customer, product-by-product basis, separately calculating lost profits for most infringing sales and reasonable royalties for the balance. *See* PTX 2169, 2172-2179 (lost profits by Defendant); PTX 2170, 2188-2196 (reasonable royalties by Defendant).    Accordingly, Artesyn/Astec's and Lineage/Cherokee's motions for a new trial as they relate to this issue are DENIED.

### 7. The Exclusion of Dr. Mercer's Obviousness Opinion

Lineage/Cherokee contend that the Court erred by excluding Dr. M. Ray Mercer's obviousness opinion. The Court disagrees and finds that it properly precluded Dr. Mercer from providing an obviousness opinion to the jury regarding claim 9 of the '034 patent given the lack of any explanation of the basis for any such opinion in his expert report. (*See* 12/20 AM Tr. at 56:18-57:11) (bench conference concluding that summary statement regarding obviousness in Dr. Mercer's expert report without any analysis was "not sufficient" as "[t]he Court has consistently held for 12 years"). In his expert report, Dr. Mercer's entire "opinion" regarding the obviousness of claim 9 over Arduini (which was the only obviousness opinion for claim 9 that Defendants sought to offer at trial) was the following one-sentence conclusory statement contained in the introduction to his claim chart based on Arduini: "To the extent that any difference between the subject matter of the identified claims and Arduini can be identified, those differences would have been obvious." (Dkt. No. 1019-14 at 2-27.) Such a conclusory, unsupported statement falls far short of the disclosure requirements that must be satisfied to present expert testimony to the jury.

Fed. R. Civ. P. 26(a)(2)(B)(i) requires an expert to provide a report that gives "a complete statement of all opinions the witness will express and the basis and reasons for them." Conclusory opinions in expert reports, such as the one offered by Dr. Mercer, do not satisfy these requirements and properly lead to the exclusion of the expert's testimony. *See, e.g.*, *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1376 n.4 (Fed. Cir. 2008) ("Conclusory expert reports, eleventh-hour disclosures, and attempts to proffer expert testimony without compliance with Rule 26 violate both the rules and principles of discovery, and the obligations lawyers have to the court. Exclusion and forfeiture are appropriate consequences to avoid repeated occurrences

of such manipulation of the litigation process."). Accordingly, Dr. Mercer's proposed obviousness testimony was properly excluded and there is no basis for granting Lineage/Cherokee a new trial on the issue of validity of the '034 patent

### D. The Verdict Form Was Proper

The Fish Defendants contend that the verdict form was improper and failed to identify the alleged infringement in a meaningful way. Specifically, they argue that the Court's verdict form was deficient because it failed to: (1) separately address the question of third-party direct infringement; (2) identify any specific third parties or third-party products; (3) separately address the Defendants' individual products accused of being incorporated into allegedly infringing systems; (4) did not require a showing of direct infringement for each finding of indirect infringement, either induced or contributory; (5) separately address, on a Defendant-by-Defendant basis, the specific third parties allegedly induced by any particular Defendant, and (6) include a separate question on the issue of pre-suit knowledge, which pertains to both liability and damages prior to the filing date of the lawsuit.

Similarly, Artesyn/Astec contend that the verdict form submitted by the Court to the jury did not include separate interrogatories for each combination of an end product system and bus converter accused of infringing the '190, '034, '021, and/or '702 patents (the "system patents"), as requested by Artesyn/Astec. Likewise, Lineage/Cherokee contend that the verdict form was prejudicial because it did not include separate interrogatories for each accused end-product system. In Defendants' opinion, the Court should have included separate interrogatories for each combination of an end product system and bus converter accused of infringing the system patents. They argue that including separate interrogatories for each combination of an end product system and bus converter accused of infringing the system patents would have allowed

the jury to distinguish between accused bus converters and end product systems where SynQor met its burden, and those where it failed to proffer any evidence whatsoever or failed to produce sufficient evidence.

The Court rejects the arguments that the verdict form was somehow deficient. Defendants cite no persuasive authority for the necessity of such special interrogatories. As noted by SynQor, general verdicts on main issues are sufficient, and a court is not required to use special interrogatories on particular underlying factual issues. Both the Federal Circuit and the Fifth Circuit allow more general verdicts, and where they are used, the jury is presumed to have made the necessary underlying factual determinations. *See, e.g., Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1343 (Fed. Cir. 2008) ("[E]ven when the jury is given an essentially black box verdict form … we presume all factual disputes were resolved in favor of the verdict.") (citation omitted); *Control Components, Inc. v. Valtek, Inc.*, 609 F.2d 763, 767 (5th Cir. 1980) (holding that where "jury findings on the factual underpinnings were implicit in the general verdict … we will presume that the disputed matters of fact have been resolved favorably to the prevailing party in accordance with the trial judge's instructions.") (citations and internal quotation omitted). Indeed, even where some accused products infringe directly and other accused products infringe indirectly, all such accused systems can properly be addressed by the same general verdict of infringement. Thus, the Court is not persuaded that the 41-page verdict form in this case was legal error. Moreover, the verdict form addressed direct infringement, induced infringement, and contributory infringement separately for each Defendant for each asserted claim of SynQor's patents.

In addition, these defendants' arguments ignore the detailed Appendix to Verdict Form that the Court provided to the jury. (*See* Dkt 889-1, Appendix to Verdict Form.) The Appendix

to Verdict Form specifically explained to the jury that "[i]t is your job to determine" a host of subsidiary factual issues, including whether the accused products, and the third-party products into which they are incorporated, meet the disputed claim limitations of the asserted claims. *See id.* In light of this detailed appendix, Defendants incorrectly argue that the jury was not advised to consider individual accused products and the third-party end-products into which they are incorporated. Accordingly, there is no legal error in the verdict questions propounded by the Court. Thus, the Court finds that Defendants have not demonstrated that manifest injustice will result from letting the verdict stand. *Learmonth*, 631 F.3d at 731. Accordingly, the Fish Defendants' and Artesyn/Astec's motions for a new trial as they relate to the verdict form are DENIED.

### E. The Court's Limitations On Trial Time Were Fair And Reasonable

As background, SynQor proceeded to trial against 11 defendants represented by four distinct groups of law firms. The four groups were the Fish Defendants (consisting of six defendants), Lineage/Cherokee (consisting of two defendants), Artesyn/Astec (consisting of two defendants), and Bel Fuse (consisting of one defendant). The Fish Defendants contend that they were not given adequate time to present their defenses in this case. They argue that it was unfair to award the defendants a total of 20 hours to present their defenses, even though the Court limited SynQor to 17 hours to present its case. Likewise, Artesyn/Astec contend that the court should grant a new trial because the Court limited the 11 defendants to a total trial time of 20 hours, or 1.8 hours of trial per defendant, limited the 11 Defendants combined opening statement to 60 minutes and limited the 11 Defendants combined closing argument to 65 minutes. Artesyn/Astec contends that this limited amount of time was objectively unreasonable given the complexity of this case. Artesyn/Astec, as well as other defendants, also argue that they made

offers of proof concerning evidence that would have been presented had Artesyn and Astec had a reasonable amount of trial time. In addition, the Fish Defendants argue that the Court artificially limited the defendants to 40 prior art references in presenting their invalidity defense.

The Court's finds that its decision to limit the parties' available time at trial was reasonable and not unduly prejudicial. "A district judge has broad discretion in managing his docket, including trial procedure and the conduct of trial." *Thanedar v. Time Warner, Inc.*, 352 Fed. App'x 891, 896 (5th Cir. 2009), *cert. denied* 131 S.Ct. 2383 (2010), (quoting *Sims v. ANR Freight Sys., Inc.*, 77 F.3d 846, 849 (5th Cir. 1996)). This discretion extends to setting reasonable time limits. *See id.*; *Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir. 2001) ("Trial courts have broad authority to impose reasonable time limits" to "prevent undue delay, waste of time, or needless presentation of cumulative evidence.") (quoting *Amarel v. Connell*, 102 F.3d. 1494, 1513 (9th Cir. 1997)). Time limits may be particularly useful in focusing the presentation of the evidence in a complex patent case. *See Applera Corp. v. MJ Research Inc.*, 389 F. Supp. 2d 344, 348 (D. Conn. 2005) ("A timed trial is an appropriate tool to focus both parties' presentation of evidence, and is particularly helpful in cases of this kind, where the issues are complex and an unduly long trial would unnecessarily burden jurors.").

First, Defendants cannot reasonably complain that they were given inadequate time at trial. Defendants submitted a joint letter estimating the amount of time required for trial on November 1, 2010. They collectively estimated that they would need 25 hours to present their evidence. (Dkt. No. 1021-24.) This estimate amounts to 2.27 hours for each of the 11 defendants, or just over 4.5 hours for Artesyn/Astec combined and just over 13.5 hours for the Fish Defendants combined. SynQor submitted its own letter, also requesting 25 hours to present its case. (Dkt. No. 1021-25.) Later, in their joint pre-trial order, the parties accordingly estimated

that trial would require a total of 50 hours. (Dkt No. 615 at 9.) When the Court issued its order on trial time, it limited the Defendants to 20 hours, only twenty percent less time than they had requested. In contrast, the Court limited SynQor to 17 hours, a thirty-two percent reduction from its requested allocation.

Moreover, at the time Defendants gave their estimate of the trial time required, there were many more issues still active in the case than were eventually presented at trial. SynQor initially planned to assert 22 different claims at trial. *See* (Dkt. No. 1021-24.) But the Court later limited the claims SynQor could assert to 10. (Dkt No. 699.) SynQor also initially asserted that the Defendants were liable for willful infringement. Before trial, SynQor dismissed its willfulness claim. (Dkt. No. 740.) Furthermore, at the time Defendants gave their estimations the Court had not yet ruled on SynQor's motions for partial summary judgment of infringement. The Court later granted-in-part these motions, thereby narrowing the issues to be resolved regarding direct infringement. (Dkt. No. 752; Dkt. No. 753; Dkt. No. 760.) Accordingly, the Court was well within its discretion to take into account the Defendants' estimated requirements and the narrowing of the issues when fashioning its time limits. *See Thanedar*, 352 Fed. App'x at 896 (district court's timing error was not erroneous when it "considered each party's estimate of the time needed" and "continually reminded both parties of the time used and the time remaining for presentation").

Additionally, the Court's timing order was equally fair to both sides. *United States v. Gray*, 1997 U.S. App. LEXIS 12983 (5th Cir. 1997) (holding trial court's strict management of trial was not error when "the trial court imposed these requirements with equal diligence" on both parties). SynQor was required to prove direct infringement involving dozens of bus converters used in hundreds of end products. It was required to prove induced and contributory

infringement, which involved separately evaluating the activities of each Defendant. It had to prove its entitlement to lost profits and it had to rebut Defendants' invalidity case. Yet the Court limited SynQor to only 17 hours. When SynQor requested one or two additional hours, the Court denied its request. (*See* 12/16 PM Tr. at 193:23-194:14; 12/17 PM Tr. at 204:9-22 (noting that because the Court had narrowed the issues on summary judgment, SynQor did not need all the time it initially requested). Yet, SynQor was able to meet its burdens in the 17 hours allocated. Defendants were afforded an additional three hours beyond what SynQor was allowed, but as the Court noted, they simply failed to use their time wisely. (*See* 12/16 PM Tr. at 194:16-21) ("I don't think [SynQor's counsel] have been bad about repetitious testimony, but I do believe some of the Defense counsel are pretty bad about asking the same questions over and over."). By limiting SynQor even more strictly, the Court demonstrated that there was no improper bias or prejudice from the time limits. Accordingly, the time limits provide no basis for a new trial.

In addition, the Fish Defendants' objection to being limited to 40 prior art references also cannot support a request for a new trial. To begin, the Court only limited the number of asserted prior art references as a reciprocal measure after the Fish Defendants successfully moved to limit the number of claims SynQor would be permitted to assert. (*See* Dkt. No. 373; Dkt. No. 389; Dkt. No. 408.) If the Fish Defendants believed it to be appropriate to limit the number of claims that SynQor could assert, they cannot reasonably complain that they were required to similarly streamline their asserted references. Moreover, the Fish Defendants do not point to a single reference that that would have offered if not limited to the 40 and that would have changed the jury's verdict. Indeed, they did not even choose to discuss anywhere close to the 40 asserted references at trial. Without a specific identification of prejudice that resulted from the Court's

ruling, the Fish Defendants have identified no basis for granting a new trial. Accordingly, the Fish Defendants' objection to being limited to 40 prior art references provides no basis for a new trial.

### F. The Court's Remarks To The Jury Were Proper

Defendants complain that the Court made "highly prejudicial" remarks about the merits of their case. However the Court's instructions and remarks to the jury were fully warranted by the Defendants' continued violations of the Court's orders. These violations continued even after the Court warned Defendants of exactly what sanctions would be imposed if the Defendants failed to correct their course of action. *Verdin v. Sea-Land Service, Inc.*, 8 F.3d 21, 1993 WL 455645, *5 (5th Cir. 1993) ("[T]he court has the right and duty to comment on the evidence in an effort to ensure that both parties receive a fair trial.").

There is no doubt that the Defendants were adequately warned of the importance of complying with the Court's orders. At the pre-trial conference, Magistrate Judge Everingham cautioned, "I can assure you that if you try to directly or indirectly go into something that's covered by an order in limine, the reaction that you get from the Court will not be one that favorable to your case or to your client's case." (11/22 Tr. at 12:25-13:4.) At a later pretrial hearing, Judge Everingham also warned counsel that when examining an expert on direct, "you're making a representation to the Court when you offer that opinion that it's been fairly disclosed in his expert report." (12/10 Tr. at 95:4-18.) At trial, the Court repeated these admonitions. In response to Defendants' concerns that a SynQor demonstrative slide might violate the Court's orders, the Court agreed with SynQor that the slide was proper but cautioned "[y]ou're forewarned not to violate the motion in limine" and "I would be careful bumping that line, if I were you." (12/15 AM Tr. at 5:6-12.) Nevertheless, the Defendants continually crossed

the line over the course of trial.

In response to one of these violations, the Court warned Defendants that in sanctioning one Defendant's misconduct, there would unavoidably be prejudice to the other Defendants. The Court therefore warned: "I hope that y'all can sort of get your heads together and decide that we're going to try to comply with Judge Ward's rulings." (12/15 PM Tr. at 99:11-16.) The Court later repeated this view. In response to counsel's assertion that it was inappropriate to allow one Defendant's misconduct to prejudice the other Defendants, the Court noted that the alternative would be "to prejudice the Plaintiff" without any remedy, and that "that's not going to be the rule of the Court." (*Id.* at 170:6-7, 170:25-171:4.)

### 1. The Fish Defendants

Even after hearing the Court's warnings, the Fish Defendants continued to violate the Court's orders. The Court granted SynQor's motion *in limine* to preclude reference to any prior art references not on the Defendants' narrowed list of 40 references. (*See* Dkt. No. 703 at 2; Dkt. No. 599 at 2.) Yet, Counsel for the Fish Defendants cross-examined Dr. Leeb on a prior art reference that was not on the list of 40 asserted references. (12/15 PM Tr. at 49:11-23.) SynQor objected, but counsel for the Fish Defendants mistakenly maintained that the reference was on the list. (*Id.* at 50:3-22.) The Court accepted the Fish Defendants' misrepresentation and allowed the continued cross-examination of Dr. Leeb using the excluded reference. (*Id.* at 50:23-51:22.) The next day, counsel for the Fish Defendants brought his own misrepresentation to the Court's attention. (12/16 AM Tr. at 173:1-174:1.) The Court then took the opportunity to make it abundantly clear what would happen if there was another violation of one of its motions *in limine*:

> you can expect an instruction like this: You know, I do not
> understand, Ladies and Gentlemen, why certain of these lawyers

> are violating the motion in limine. I don't know if it's because they believe their case is so weak and they have become desperate. I don't know that. I am instructing you, though, in light of the history I've given you, you may take that into account in assessing the credibility of their positions in this lawsuit.

*Id.* at 174:16-175:7.  Even assuming that the misrepresentation was not intentional, the Court's warning should have made the Fish Defendants extraordinarily careful in ensuring that they complied with the Court's orders for the balance of the trial.  But as discussed below, they did not take such care.

The instructions to the jury that the Fish Defendants object to occurred the day after the Court had given this final warning.  The Fish Defendants were conducting the direct examination of Mr. McAlexander.  As part of the direct examination, counsel walked Mr. McAlexander through a prior art Steigerwald patent to show where the reference disclosed elements of the claims of the patents-in-suit. (12/17 AM Tr. at 43:23-46:5.)  However, Mr. McAlexander's report contained only a general description of Steigerwald. (Dkt. No. 1026-17 at 3-4.)  In fact, it came to the Court's attention that nowhere in Mr. McAlexander's report did he match up the language of the claims of the patents in suit to the disclosures in Steigerwald. (12/17 AM Tr. at 49:7-13.)  SynQor objected, and the Court agreed there had been a violation. (*Id.* at 46:6-49:13.)  The Court then gave the first objected-to instruction. (*Id.* at 48:13-51:2.)

Later that morning, still during the direct examination of Mr. McAlexander, the Fish Defendants used a slide that equated the claim term "plural controlled rectifiers, each having a parallel uncontrolled rectifier and each connected to a secondary winding, each controlled rectifier being turned on and off in synchronization with the voltage waveform across a primary winding to provide an output" with "synchronous rectifiers." (Dkt. No. 1026-17.)  The Fish Defendants advocated this position during claim construction, but the Court expressly rejected it.

(Dkt. No. 474 at 24.) The Court had also ordered the parties not to refer to their claim construction positions at trial. (*Id.* at 58.) SynQor objected to use of the slide, and the Court again agreed that there had been a deliberate violation of its orders. (12/17 AM Tr. at 87:20-92:9.) The Court then gave the second objected-to instruction. (*Id.* at 92:12-96:10.)

The Fish Defendants dispute whether these actions constituted violations. However, they asked Mr. McAlexander to state where in Steigerwald various features of the patent claims are disclosed. (*See, e.g.,* 12/17 AM Tr. at 44:6-7 ("Can you just describe to us where [the isolation stage] is so we can highlight it?"); at 45:18-19 ("And where is the regulation stages without isolation?"). This detailed matching of the claims of the patents in suit to Steigerwald does not appear in Mr. McAlexander's expert report.

With regard to the "Synchronous Rectifier" demonstrative, the Fish Defendants attempt to justify their violation by arguing that even Dr. Schlecht admitted that the claim text "relates to" synchronous rectifiers. (Dkt No. 842 at 8.) In fact, Dr. Schlecht testified, consistent with the Court's construction, that "controlled rectifiers and uncontrolled rectifiers, and those are our names to address parts of what we call synchronous rectifiers today. Not all synchronous rectifiers have both of those parts, and so this is calling for a very specific type of synchronous rectifier." (12/13 PM Tr. at 41:12-18.) But Mr. McAlexander and his demonstrative misleadingly omitted this nuance. For example, Mr. McAlexander answered affirmatively when asked about the claim language, "is that just describing a synchronous rectifier?" (12/17 AM Tr. at 84:13-15.) Without question, this is the position that the Court explicitly rejected during claim construction.

The Fish Defendants also complain that the Court instructed the jury that "according to my count, this is either the fifth or sixth time they have done what I told them not to." (12/17 AM

Tr. at 95:22-24.) However, the Court did not single out the Fish Defendants when making this statement. In context, it is clear that the Court is referring to the Defendants as a group. In any case, given the way the Defendants coordinated and jointly managed their presentation of the issues at trial, the Fish Defendants bear responsibility for even the violations committed by counsel for the other defendants. Defendants had a joint responsibility to ensure that their joint presentation of their defenses stayed within the bounds of the Court's ruling. They certainly all stood to reap the benefits of an unfairly procured invalidity finding. The Court's decision to take corrective action only after repeated and clear warnings was justified in order to avoid undue prejudice to SynQor and does not merit a new trial.

### 2. Artesyn and Astec

Artesyn/Astec do not dispute that the Court correctly found that the Defendants had repeatedly violated several of the Court's orders, including during the direct examination of Mr. McAlexander. Nor do they dispute that the instructions were proper at least with regards to the Fish Defendants. (*See* Dkt No. 970 at 4.) Instead they argue that Mr. McAlexander's direct examination was not handled by counsel for Artesyn/Astec because of the severe time limitations imposed by the Court on the Defendants, and the instructions that followed the violations were excessive, and unnecessarily prejudicial to Artesyn/Astec.

Because they cannot dispute that the Court's instruction was warranted, Artesyn/Astec instead argue that they should not be held responsible for "a violation over which they had no control." (Dkt No. 970 at 4.) But Artesyn/Astec's position is at odds with the facts. Mr. McAlexander was a witness for Artesyn/Astec, so they had input in coordinating his direct examination during which the violations occurred. Moreover, the Court's jury instructions were given in response not just to the immediate violations during Mr. McAlexander's testimony, but

rather in response to Defendants' ongoing and repeated disregard for the Court's orders, including violations directly committed by counsel for Artesyn/Astec.

As discussed above, the Court's previous warnings were not sufficient to deter Artesyn/Astec. For example, during the cross-examination of SynQor's damages expert Dr. Brett Reed, counsel for Artesyn/Astec asked a question regarding what SynQor's customers would buy in the future, in direct violation of the Court's order. (12/16 AM Tr. at 151:20-152:5, 170:3-171:16.) The Court admonished Artesyn/Astec for this violation outside the jury's presence. (*Id.* at 170:6-16.) But that was not the only violation Artesyn/Astec committed. Specifically, the Court granted SynQor's motion *in limine* to preclude reference to any prior art references not on the Defendants' narrowed list of 40 references. (*See* Dkt. No. 703 at 1; Dkt. No. 599 at 5.) Counsel for the Fish Defendants cross-examined Dr. Leeb on a prior art reference that was not on the list of 40 asserted references. (12/15 PM Tr. at 49:11-23.) SynQor objected, but counsel for the Fish Defendants (mistakenly) maintained that the reference was on the list. (*Id.* at 50:3-22.) Counsel for Artesyn/Astec were present, but did not correct the Fish Defendants' misrepresentation to the Court. The Court accepted the Fish Defendants' misrepresentation, acquiesced in by Artesyn/Astec's silence, and allowed the continued cross-examination of Dr. Leeb using the excluded reference. (*Id.* at 50:23-51:22.)

Moreover, the instructions to the jury that Artesyn/Astec object to occurred the day after the Court had given its final warning. As discussed above, the instructions were given when counsel for the Fish Defendants was conducting the direct examination of Mr. McAlexander, a witness "upon whom Artesyn and Astec were relying." (Dkt No. 970 at 4.) Thus, the Court was correct in not allowing Artesyn/Astec to escape responsibility for the violations that occurred during Mr. McAlexander's testimony. As the Court made clear in both of its instructions to the

jury, the Court's instructions were not just motivated by the violations at hand, but rather the continuing disregard of its orders by all of the Defendants. (*See* 12/17 AM Tr. at 50:12-14 ("given the number of times that some of the defense counsel have violated my order, I'm going to tell you this"); at 50:20-24 ("having occurred the number of times that it has, I'm telling you you can take counsel's disregard of my instructions into account"); at 95:22-96:2 ("according to my count, this is either the fifth or sixth time they have done what I told them not to. And as I told you earlier, you may take that into account"). As detailed above, Artesyn/Astec were directly responsible for at least two of the earlier violations. They acquiesced to the Fish Defendants' misrepresentation regarding the list of 40 references by remaining silent in the face of the Fish Defendants' false statement to the Court, and they asked a question regarding Cisco's future conduct in direct violation of the Court's order.

Moreover, Artesyn/Astec had control over the direct examination of Mr. McAlexander, admittedly "a witness upon whom Artesyn and Astec were relying." (Dkt No 970 at 4.) As noted above, Artesyn/Astec had been specifically warned to coordinate with their co-defendants to ensure that no more violations of the Court's orders occurred. It is only logical that Artesyn/Astec were involved in planning the examination of Mr. McAlexander with the Fish Defendants. They doubtlessly reviewed the slides that Mr. McAlexander used during his presentation. Given the Court's repeated and clear warnings, Artesyn/Astec should have reviewed the planned testimony and slides of their own witness to ensure that the direct examination would not run afoul of the Court's orders, as the Court had instructed them to do. Their failure to ensure that the examination of their own witness would comply with the Court's orders is not excusable. Moreover, if SynQor had failed to object to the Defendants' misconduct, Artesyn/Astec would have benefited from the improper testimony. It is only fair that they

similarly share in the consequences. In any case, the Court gave the jury an instruction that limited any prejudice to Artesyn/Astec (even though Artesyn/Astec shared responsibility for the violations). The Court instructed the jury "only as to the Power-One Defendants should you consider the intentional violation of the Court's order." (12/17 AM Tr. at 158:7-17.) In its earlier instruction, the Court had also informed the jury that it was "Power-One in particular" who was "trying to end run my order." (*Id.* at 95:9-11.) Accordingly, a new trial is not warranted on account of the Court's curative instructions.

### 3. Lineage and Cherokee

Lineage/Cherokee do not dispute that the Court correctly found that Defendants had repeatedly violated several of the Court's orders, including during the direct examination of Joseph McAlexander. Instead they try to shift the responsibility for the undisputed violations of the Court's orders to its co-defendants. However, the violations that led to the Court's curative instructions were not isolated, spontaneous events. Rather, they were part of an ongoing series of violations throughout the course of trial. In addition, the specific violations that occurred during Mr. McAlexander's testimony were a part of the Defendants' case that Lineage/Cherokee took part in coordinating.

As discussed above, there is no doubt that Lineage/Cherokee (along with the other Defendants) was adequately warned of the importance of complying with the Court's orders. Nevertheless, Lineage/Cherokee (along with the other defendants) failed to heed the Court's warnings. For example, Lineage/Cherokee's own counsel asked SynQor's witness on cross-examination a question relating to a hypothetical injunction that might issue. (12/15 PM Tr. at 82:14-21.) However, the Court granted SynQor's motion in limine precluding any mention of a permanent injunction. (*See* Dkt. No. 703 at 2; Dkt. No. 599 at 3.) SynQor objected to

Lineage/Cherokee's violation of this order at a side bar. (12/15 PM Tr. 84:10-17.) The Court agreed that a violation had been committed, and offered to give the jury a curative instruction. (*Id.* at 87:4-18.) SynQor decline the instruction, but the Court cautioned Lineage/Cherokee against any further violations in the strongest terms: "you're just blowing by my orders like they don't exist, and I'm not going to put up with it." (*Id.* at 87:1-3.)

Lineage/Cherokee was undeterred. Counsel for Lineage/Cherokee put an exhibit before the jury, PTX1897, that displayed attorney objections. (12/15 PM Tr. at 96:2-97:12.) This exhibit had not been pre-admitted; instead, Judge Everingham had specifically instructed counsel that the objections should be taken out of the exhibit. (12/15 PM Tr. at 97:15-21, 101:9-23.) The Court promptly noticed Lineage/Cherokee's violation of its order and demanded that the exhibit be taken down. (12/15 PM Tr. at 97:13-14.) The Court then offered a clear warning to all counsel as to the consequences of continued violations of its orders:

> the next time that you wade off in it ... I'm going to start talking to the jury about all the things that we did to try to conduct this trial appropriately and how you are intentionally violating this Court's order, and you're wasting their time, you're wasting my time, and it may result in a total waste of their time. Those are just the kinds of things that I'll start telling them, and they're going to be very disadvantageous to your client, and I intend for them to be, because your conduct is intentionally disregarding what I have ordered in this case.

*Id.* at 100:8-21. The Court also noted that any curative instruction given to the jury as to one Defendant would inevitably spill over onto the other Defendants, but warned that this was unavoidable. The Court advised "I hope that y'all can sort of get your heads together and decide that we're going to try to comply with Judge Ward's rulings." (*Id.* at 99:11-16.) Later in the day, the Court repeated this view. In response to counsel's assertion that it was inappropriate to allow one Defendant's misconduct to prejudice the other Defendants, the Court noted that the

alternative would be "to prejudice the Plaintiff" without any remedy, and that "that's not going to be the rule of the Court." *Id.* at 170:6-7, 170:25-171:4.

Nevertheless, Lineage/Cherokee participated in yet another violation that same day. It acquiesced to the Fish Defendants' misrepresentation regarding the list of 40 references by remaining silent in the face of the Fish Defendants' false statement to the Court. As noted above, Lineage/Cherokee does not dispute that these violations occurred or that the Court's instructions were warranted. As the Court made clear in both of its instructions to the jury, the Court's instructions were not just motivated by the violations at hand, but rather the continuing disregard of its orders by all of the Defendants. (12/17 AM Tr. at 50:12-14 ("given the number of times that some of the defense counsel have violated my order, I'm going to tell you this"); at 50:20-24 ("having occurred the number of times that it has, I'm telling you, you can take counsel's disregard of my instructions into account"); at 95:22-96:2 ("according to my count, this is either the fifth or sixth time they have done what I told them not to. And as I told you earlier, you may take that into account").

As detailed above, Lineage/Cherokee was directly responsible for several of those violations. Lineage/Cherokee referenced the possibility of an injunction and showed the jury attorney objections made during discovery. It acquiesced to the Fish Defendants' misrepresentation regarding the list of 40 references by remaining silent in the face of the Fish Defendants' false statement to the Court.

Moreover, Lineage/Cherokee had control over the direct examination of Mr. McAlexander. As noted above, Lineage/Cherokee had been specifically warned to coordinate with their co-defendants to ensure that no more violations of the Court's orders occurred. It is only logical that Lineage/Cherokee were involved in planning the examination of Mr.

McAlexander with the Fish Defendants. They doubtlessly reviewed the slides that Mr. McAlexander used during his presentation. Given the Court's repeated and clear warnings, Lineage/Cherokee should have reviewed the planned testimony and slides of their own witness to ensure that the direct examination would not run afoul of the Court's orders, as the Court had instructed them to do. Their failure to ensure that the examination of their own witness would comply with the Court's orders is not excusable. Moreover, if SynQor had failed to object to the Defendants' misconduct, Lineage/Cherokee would have benefited from the improper testimony. It is only fair that they similarly share in the consequences. In any case, the Court gave the jury an instruction that limited any prejudice to Lineage/Cherokee (even though Lineage/Cherokee shared responsibility for the violations). The Court instructed the jury "only as to the Power-One Defendants should you consider the intentional violation of the Court's order." (12/17 AM Tr. at 158:7-17.) In its earlier instruction, the Court had also informed the jury that it was "Power-One in particular" who was "trying to end run my order." (*Id.* at 95:9-11.) Accordingly, a new trial is not warranted on account of the Court's curative instructions.

### 4. Bel Fuse

Bel Fuse admits that the Court was "justified" in its frustration at the repeated violations of its orders by the Defendants. (Dkt. No. 977 at 3.) Bel Fuse also cannot dispute that the Court correctly found that its orders had been violated, Bel Fuse instead proclaims its "complete innocence" with regards to the violations. (Dkt. No. 977 at 7.) This position is at odds with the facts. First, Bel Fuse admits that it "worked to coordinate trial strategies and presentations with the other defendants." (Dkt. No. 977 at 2.) The violations that prompted the Court's jury instructions occurred during the direct examination of Mr. McAlexander, a witness for Bel Fuse. Bel Fuse had a responsibility to ensure that the examination of its own witnesses was conducted

in compliance with the Court's orders. As discussed above, Bel Fuse was warned of the importance of complying with the Court's orders. Whether it played a part behind the scenes or abdicated its responsibility, Bel Fuse properly suffered any alleged consequences of the Court's instructions to the jury.

As the Court made clear in both of its instructions to the jury, the Court's instructions were not just motivated by the violations at hand, but rather the continuing disregard of its orders by all of the Defendants. (12/17 AM Tr. at 50:12-14 ("given the number of times some of the defense counsel have violated my order, I'm going to tell you this"); at 50:20-24 ("having occurred the number of times that it has, I'm telling you you can take counsel's disregard of my instructions into account"); at 95:22-96:2 ("according to my count, this is either the fifth or sixth time they have done what I told them not to. And as I told you earlier, you may take that into account")). This includes Bel Fuse's acquiescence to the Fish Defendants' misrepresentation regarding the list of 40 references. Moreover, Bel Fuse had control over the direct examination of Mr. McAlexander. As noted above, Bel Fuse had been specifically warned to coordinate with its co-defendants to ensure that no more violations of the Court's orders occurred. Bel Fuse admits that Mr. McAlexander was presented jointly to testify on behalf of all the Defendants and Bel Fuse worked with the other Defendants to coordinate presentations. (Dkt. No. 977 at 2.) Bel Fuse doubtlessly reviewed the slides in advance that Mr. McAlexander used during his presentation. Given the Court's repeated and clear warnings, Bel Fuse should have reviewed the planned testimony and slides of its own witness to ensure that the direct examination would not run afoul of the Court's orders, as the Court had instructed it to do. Bel Fuse's failure to ensure that the examination of its own witness would comply with the Court's orders is not excusable.

Moreover, if SynQor had failed to object to the Defendants' misconduct, Bel Fuse would

have benefited from the improper testimony. It is only fair that it similarly share in the consequences. And in any case, the Court gave the jury an instruction that limited any prejudice to Bel Fuse (even though Bel Fuse shared responsibility for the violations). Bel Fuse argues that the Court's corrective instruction was insufficient because it allegedly did not make clear that the Court's earlier instruction that the jury may "decide whether they're disregarding my orders intentionally, because they may feel like their case is so weak" was only to be applied to the Fish Defendants. (Dkt. No. 977 at 8.) However, the Court instructed the jury "only as to the Power-One Defendants should you consider the intentional violation of the Court's order." (12/17 AM Tr. at 158:7-17.) This instruction informed the jury that they were only to consider whether the Power-One (Fish) Defendants were intentionally violating the Court's orders due to the weakness of their case. In its earlier instruction, the Court had also informed the jury that it was "Power-One in particular" who was "trying to end run my order." (*Id.* at 95:9-11.) Accordingly, a new trial is not warranted on account of the Court's curative instructions.

### G. Summary Judgment on Infringement

Prior to trial, the Court denied the Fish Defendants' motion for summary judgment of no infringement based on the "isolation" limitation of the asserted claims (Dkt. No. 673) and granted partial summary judgment of infringement (Dkt. No. 760). The Fish Defendants assert that the Court's orders constitute error for essentially three reasons. First, the Fish Defendants dispute the Court's interpretation of the "isolation" limitation in the asserted claims. As explained in the summary judgment motion, the Fish Defendants' argument regarding the "isolation" limitation is premised on an erroneous reading of the Court's Claim Construction Opinion and the language of the claims themselves. As the Court ruled on this issue once before, "plaintiff's view of the court's claim construction is correct" and "the Fish defendants' contrary

argument is rejected." (Dkt. No. 673.)  The Fish Defendants fail to present any ground on which they are entitled to a new trial.

Second, the Fish Defendants take issue with the Court's order of partial summary judgment of infringement for many of the limitations of the asserted claims. (Dkt. No. 760.)  The Fish Defendants assert that summary judgment as to "individual elements" was improper. However, "[s]ummary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed. Cir. 1994) (citations omitted) (affirming summary judgment).  It is also appropriate to grant partial summary judgment with respect to accused products meeting the limitations of certain claims or parts of claims.  The Court's partial summary judgment order narrowed the issues at trial to only those that were in dispute and was proper.  The Fish Defendants are not entitled to a new trial on this ground.

Third, the Fish Defendants assert, without explanation, that the Court granted summary judgment as to unspecified "certain limitations" in the asserted system claims without having evidence of what those systems were or that the Fish Defendants bus converters were ever incorporated therein.  That is not the case, and the Court's summary judgment order was proper. Furthermore, SynQor submitted substantial amounts of summary judgment evidence in conjunction with its briefing regarding numerous end products incorporating the Fish Defendants' accused bus converters along with a detailed infringement analysis from its expert, Dr. Leeb. (*See* Dkt. Nos. 542 & 543.)  The Fish Defendants' conclusory arguments leave the impression that the Court found limitations met in the abstract without evidence as to the specific end products, but that is not the case.  Moreover, the Court withheld summary judgment as to

"whether the accused converters have substantial non-infringing uses," and left that for the jury to decide. (*See* Dkt No. 760 at 3.)  Accordingly, the Court's order on partial summary judgment did not constitute error, and the Fish Defendants are not entitled to a new trial on this ground.

**H.  The Fish Defendants Opened the Door and Caused the Playing of a Privilege Objection to the Jury to be Proper**

The Fish Defendants argue that the playing of a privilege objection was improper and tainted the jury verdict. While the Fish Defendants complain that a privilege objection was played to the jury, they fail to reveal that the Court only allowed it to be played because the Fish Defendants themselves had designated a highly misleading excerpt from Mr. Takahashi's deposition that opened the door to the playing of the privilege objection.  SynQor designated the following excerpt from Mr. Takahashi's deposition to be played at trial:

> QUESTION: Mr. Kikuchi Hitoshi informed Mr. Nakama that Murata Manufacturing was conducting a broad and careful patent search relating to patents pertaining to unregulated bus converters plus point of loads; is that correct?
>
> ANSWER: Yes, it is. He did.

The Fish Defendants counter-designated the following exchange to be played at trial:

> QUESTION: When developing the MPDNB001S bus converters, did Murata Manufacturing investigate whether there were issued patents that may be relevant to the product?
>
> ANSWER: Yes, we did the investigation.
>
> QUESTION: Did Murata Manufacturing find any of SynQor's patents during that investigation?
>
> ANSWER: No, they did not.

However, this counter-designation is highly misleading. At Mr. Takahashi's deposition, the witness was instructed not to answer on privilege grounds whether the "broad and careful" patent search referenced in SynQor's designation was the same as the investigation during the

development of the MPDNB001S.  The witness also was instructed not to answer whether that investigation was limited to only Japanese patents, or whether it was broader.  SynQor objected to the Fish Defendants' misleading counter-designation arguing that if the Fish Defendants' counter-designation were played, the jury would be left with the mistaken impression that Murata performed a broad and careful patent search that included U.S. patents and failed to uncover SynQor's patents. (*See* Dkt No. 777.)  SynQor requested that the Court strike the Fish Defendants' counter-designation.  In the alternative, SynQor requested that it be allowed to play the questions and privilege objections that would allow the jury to get a complete, accurate picture of the evidence.  The Court chose the latter option, sustaining SynQor's objections in part and allowing both the Fish Defendants' counter-designations and SynQor's counter-counter designations to be played.

By sustaining SynQor's objections, the Court did not permit the Fish Defendants to affirmatively assert that they had searched for and failed to uncover SynQor's patents while denying all discovery into the scope of that search.  To allow the Fish Defendants to do so would be akin to allowing them to unfairly use privilege as both a sword and a shield, which courts have consistently held is improper. *See, e.g.*, *In re Echostar Communications Corp.*, 448 F.3d 1294, 1301 (Fed. Cir. 2006).

Notably, the Fish Defendants could have avoided having the privilege objection played to the jury simply by withdrawing their misleading counter-designations.  They were even warned that the Court did not approve of the Fish Defendants allowing a witness to be questioned on the results, but not the scope, of a search. (12/14 AM Tr. at 9:21-22, 12:13-16.)  Nevertheless, they maintained that their counter-designations were proper.  In so doing, they opened the door and allowed the privilege objection to be played so that the jury would not be left with an incomplete

and misleading picture.

Regarding SynQor's statement during closing argument. SynQor told the jury:

> you heard deposition testimony from Murata's Mr. Takahashi. He explained that Murata conducted a broad and careful patent search relating to the use of an unregulated bus converter with point-ofloads… when we asked Mr. Takahashi whether the patent search uncovered the '190 patent before the suit was filed, Murata's counsel, Mr. Katz, told Mr. Takahashi not to answer the question.

(12/21 AM Tr. at 41:15-25.)  This is an accurate statement that resulted from the Fish Defendant opening the door with its counter-designation.  Mr. Takahashi testified that one patent search did not uncover SynQor's patents.  But the Fish Defendants blocked SynQor from discovering whether that search was the same as the "broad and careful" patent search that Murata conducted.  Therefore, SynQor was correct that the Fish Defendants told Mr. Takahashi not to answer whether the "broad and careful" search was the one that did not uncover SynQor's patents.  Moreover, the Fish Defendants did not object to SynQor's closing argument when it was made.  Their failure to timely object means they are now "barred from urging the [allegedly] improper arguments as grounds for a new trial after the jury had returned its verdict." *Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, Inc.,* 848 F.2d 613, 619 (5th Cir. 1988) (citation omitted).

## I.  SynQor did not Improperly Rely on the Entire Market Value Rule

The Fish Defendants argue they should get a new trial because SynQor improperly relied on the Entire Market Value Rule ("EMVR") to justify the reasonableness of the proposed damages award. (Dkt. No. 972 at 9-10.)  It appears that the Fish Defendants are looking for some way to construct an argument that would draw support from the Federal Circuit's recent decision in *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011).  In arguing that *Uniloc* compels a similar result here, the Fish Defendants gloss over the fact that SynQor did not use the

EMVR in its damages presentation.  Unlike the patentee in *Uniloc*, SynQor did not present evidence that sought to justify the proposed damages award by comparison to the total revenues generated by the accused products.  In fact, at trial it was the Defendants who presented evidence as to the total revenues and profits they earned on the sale of infringing products, as a basis to argue that the damages SynQor was seeking were excessive. (*See e.g.,*12/21 AM Tr. at 80:15-25.)

Nonetheless, the Fish Defendants point to the evidence SynQor presented as to the price of the customer end products—particularly Cisco end products—that incorporate the accused bus converters. (Dkt No. 972 at 9-10.)  But this evidence was relevant because the cost of Cisco's end products provides relevant context in which to gauge the value of board space savings.  For example, to illustrate the value of technology that enabled customers to save precious space on their end product load boards, Dr. Schlecht made reference to the prices the customers (like Cisco) command for their products. (*See, e.g.*, 12/13 PM Tr. at 98:2-99:15.)  This is entirely appropriate contextual evidence where, as here, there is a direct relationship between board space and the value and price of the end product.  This is not akin to using the EMVR as a means to inject a huge number into the record for the sole purpose of making a proposed damages figure look comparatively small—as was done in *Uniloc*.

In summary, the Fish Defendants' argument concerning SynQor's alleged use of the EMVR as a "check" on its damages is misguided.  SynQor's reference to the pricing of end products that incorporate the accused bus converters was entirely appropriate, and SynQor made no effort to characterize its damages request as a small percentage of the total revenues generated by the infringing products, which is the essence of the misapplication of the EMVR that led to the result in *Uniloc*.

### J. The Court's Refusal to Allow Bel Fuse to Put on a Noninfringement Expert

On December 10, 2010—three days before the trial was scheduled to begin—the Court granted, in part, SynQor's motion for partial summary judgment relating to infringement by Bel Fuse. The Court stated its basis for finding direct and indirect infringement by Bel Fuse was because "Bel Fuse submitted no expert opinion of its own," on the issue. (Dkt. No. 752 at 1.) In its Motion for Reconsideration, Bel Fuse argued that Dr. Callahan misspoke at his deposition. (Dkt. No. 766.) In essence, Bel Fuse is asking the Court for a third bite at the apple to convince the Court that Mr. Callahan's expert report covered Bel Fuse and that the Court's summary judgment Order regarding infringement was improper. As before, the Court finds that Mr. Callahan did not express an opinion as to Bel Fuse and the Court's Order on summary judgment was proper. (Dkt. Nos. 752 & 780.) Bel Fuse has not presented any new arguments or evidence in its second request to reconsider its ruling on partial summary judgment of infringement. Accordingly, the Court affirms its previous two orders and DENIES Bel Fuse's request for a new trial.

Bel Fuse also argues that failure to allow it to rely on Mr. Callahan's opinions, which did not relate to Bel Fuse or its products, "made the trial unfair and facilitated a miscarriage of justice." This argument is without merit. It was neither unfair nor a miscarriage of justice, particularly in view of the fact that the full record at trial makes clear that Bel Fuse and its end customers (mainly Cisco) directly infringe the asserted claims. Bel Fuse made no offer of proof regarding what non-infringement positions its expert would have presented, and has therefore waived any argument here. Accordingly, the inability of Bel Fuse to rely on an expert that did not provide an opinion addressed to Bel Fuse or its products and who was not even called to testify at trial, cannot be considered to be unfair or a miscarriage of justice.

### K. Bel Fuse was not Entitled to a Continuance to Retain an Infringement Expert

Bel Fuse failed to seek a continuance of the trial to retain an expert on infringement and has waived the right to seek a new trial on that basis. Notwithstanding that waiver, Bel Fuse's argument that it is entitled to a new trial is unpersuasive. Indeed, none of the four factors Bel Fuse points to for allowing it to designate a new expert the day before trial or granting it a continuance weigh in its favor.

First, Bel Fuse's explanation for failing to designate an expert witness is unavailing. As noted above, Bel Fuse did not designate an expert prior to the Court's deadline for doing so, as the Court has already ruled twice. (Dkt. Nos. 752 & 780.) It cites no support for believing that it had retained an expert other than its *ex post facto* dissection of the wording in Mr. Callahan's report. In short, Bel Fuse fails to indicate anything in Mr. Callahan's report that addresses Bel Fuse's products, and it cites no evidence that it retained Mr. Callahan to provide an opinion.

Bel Fuse next states that expert witnesses may be more important and more often used in patent cases than in other civil cases. If this is Bel Fuse's view, then it should have retained and disclosed one in accordance with this Court's Docket Control Order. This case was filed on November 13, 2007. On May 16, 2008, the Court entered a docket control order that provided for the parties to designate rebuttal expert witnesses at the earliest on September 1, 2010, which was subsequently extended to October 7, 2010. (Dkt. Nos. 128 & 459.) Bel Fuse provides no excuse for failing to obtain and disclose an expert opinion on infringement during this nearly 3 year period. Accordingly, the factor regarding Bel Fuse's explanation for failure to previously designate a witness cannot weigh in favor of it having been granted a continuance that it never sought.

Second, the alleged importance of the testimony does not weigh in Bel Fuse's favor. Defendants used nearly 20 hours of trial time to present around 20 witnesses live and via video

deposition, including a demonstration of fundamental physics by Mr. Boschert. Yet, none of the Defendants that did properly designate Mr. Callahan as an expert on infringement issues opted to call him to testify. Moreover, the particular aspect of Mr. Callahan's opinion that Bel Fuse cites in its motion is without merit. Dr. Leeb specifically explained to the jury, for Defendants who did disclose Mr. Callahan's opinion but chose not to call him, that their unregulated bus converters are not regulating and produce a "non-regulated output" regardless of the input voltage they are provided.

Third, Bel Fuse mistakenly asserts that there would have been no undue prejudice if Bel Fuse were allowed to "technically" designate Mr. Callahan. Bel Fuse ignores the fact that, because Mr. Callahan disclosed no opinion as to Bel Fuse or its products, SynQor would have been unduly prejudiced by being forced to cross-examine him on issues for which he disclosed no opinion. The disclosure requirements of Fed. R. Civ. P. 26 are specifically designed to avoid precisely this kind of prejudice. Rule 26 and the practice of this Court do not countenance such trial by ambush.

Finally, Bel Fuse argues that the failure to delay the trial was an abuse of discretion. Bel Fuse cites no legal authority that it can be an abuse of discretion to not grant a continuance that was not requested. Nevertheless, even if Bel Fuse had requested a continuance, SynQor should not have been forced to suffer further damages to its business and reputation caused by the Defendants' infringing acts. Bel Fuse was not entitled to a continuance extending the harm to SynQor caused by Defendants' infringement, and the failure to grant a continuance, which was not even requested, was not error. Accordingly, Bel Fuse's request for a new trial is DENIED

## V.     CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motions for a new trial.

It is so ORDERED.

SIGNED this 17th day of August, 2011.

_T. John Ward_

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE